PHILIP J. KAPLAN  (State Bar No. 135735)
philipkaplan@ca.rr.com
LAW OFFICES OF PHILIP J. KAPLAN
3278 Wilshire Blvd., Suite 106
Los Angeles, California 90010
Telephone:  (213) 480-8981

Attorney for Plaintiff
LENHOFF ENTERPRISES, INC. dba
LENHOFF & LENHOFF

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENHOFF ENTERPRISES, INC., a California corporation dba LENHOFF & LENHOFF, | CASE NO.  2:15-cv-1086 –BRO (FFMx) |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE SHERMAN ACT, UNFAIR COMPETITION LAW, INTENTIONAL INTERFERENCE WITH CONTRACT, AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| vs. | |
| UNITED TALENT AGENCY, INC., a California corporation; INTERNATIONAL CREATIVE MANAGEMENT PARTNERS LLC, a Delaware limited liability company; and DOES 1 through 5, inclusive, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff LENHOFF ENTERPRISES, INC.  (hereinafter sometimes referred to as "Plaintiff") hereby alleges as follows:

## PARTIES

1.    Defendant United Talent Agency, Inc. (hereinafter sometimes "UTA") is, and at all material times was, a corporation existing under the laws of the State of California and licensed to do and doing business in the State of

California.

2.     Defendant International Creative Management Partners LLC (hereinafter sometimes "ICM") is, and at all material times was, a limited liability company existing under the laws of the State of Delaware and licensed to do and doing business in the State of California.

3.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 5, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this complaint, and that Plaintiff's damages as alleged were proximately and legally caused by the Defendants' conduct.

4.     At all times material herein, each Defendant was the agent, servant and employee of each of the remaining Defendants, and acting within the purpose, scope and course of said Agency, service and employment, with the express and/or implied knowledge, permission and consent of the remaining Defendants, and each of them, and each of said Defendants ratified and approved the acts of Defendants.

## JURISDICTION/VENUE

5.     This court has subject matter jurisdiction, pursuant to 15 U.S.C. § 2, and Sections 4, 4C, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 22, and 26.  This court has pendent jurisdiction over the California State law claims.  Venue is proper pursuant to 28 U.S.C. § 1400(a), because the defendants or their agents reside or may be found within this district and because defendants transact business, including the alleged tortious acts, within this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Background – Lenhoff & Lenhoff

6.     Lenhoff & Lenhoff ("Plaintiff") is a Talent Agency that was

established in 1997.  Plaintiff is franchised with the Screen Actors Guild, Writers Guild of America, and the Directors Guild of America.  Plaintiff's principals have been representing talent since 1988.

7.     Plaintiff represents Writers, Directors, Producers and Cinematographers.  In addition to this representation, Charles Lenhoff has been active within the Association of Talent Agents ("ATA") and vocal about the merits of adopting a Code of Ethics by ATA franchise members and the adverse effect of "poaching" on talent agents and, particularly, the talent they represent.

8.     Plaintiff is a boutique Agency consisting of two agents, with a roster of clients that it has cultivated and nurtured over the years.  All of Plaintiff's clients, including Client #1 and Client #2 herein, are represented by Plaintiff on an <u>exclusive</u> basis.  Plaintiff alleges that it has spent years building up its clients' "brands", including Clients #1 and #2, in the marketplace and in positioning them in the best possible light.  Presently, Plaintiff has approximately thirty (30) clients of which eighteen (18) are consistently revenue-producing with Producers being, by far, the highest earners.  Plaintiff has nine (9) Producer clients.  A loss of, e.g., two (2) Producer clients would mean a devastating loss of between twenty to twenty-five percent of Plaintiff's revenue.

## B.     Background – UTA and ICM

9.     Defendant UTA is a large talent Agency, ranked behind CAA (Creative Artists Agency) and WME (William Morris/Endeavor).  On information and belief, UTA employs two hundred (200) agents and services 3,000 plus clients.  Plaintiff is informed that UTA is controlled by over thirty partners.

10.    Plaintiff is informed and believes that Defendant ICM was renamed "ICM Partners" sometime in 2012.  On information and belief, ICM employs two hundred plus (200) agents and is controlled by forty partners.  On information and belief, Plaintiff alleges that ICM services 4,500 plus clients.

**C.     "Poaching" Activities By UTA Against Plaintiff**

11.     Beginning on or about May 2012, an agent employed by UTA within its "Production Department" ("UTA Agent #1" or "Agent #1") contacted a client of Plaintiff, suggesting that the client sever its relationship with Plaintiff and let UTA represent them exclusively.

12.     Soon thereafter, Plaintiff responded by contacting Andrew Thau, Senior Counsel at UTA.  Plaintiff advised that UTA's employee (Agent #1) was tortiously interfering with Plaintiff by attempting to induce that exclusive client to breach its agreement with Plaintiff.  Plaintiff requested that the solicitations/poaching activity cease.  Plaintiff was informed that it would.

13.     However, on or about March 2014, Plaintiff learned that UTA Agent #1 contacted another client of Plaintiff's, offering that client employment on a TV series that UTA claimed to have "packaged."

14.     Again, Plaintiff contacted Andrew Thau of UTA and, again, requested that the phone calls to Plaintiff's clients cease.

15.     On or about April 2014, Plaintiff received notice from yet another client that Agent #1 had been calling on the client.  Plaintiff was informed by the client that Agent #1 had been calling every three (3) months for the past two (2) years.

16.     Significantly, Plaintiff was informed that Agent #1 had been told, repeatedly, by Plaintiff's client to stop calling.

17.     Plaintiff contacted its trade representative at the ATA and requested that the ATA intervene.  Plaintiff is informed, believes, and alleges that the ATA notified UTA and asked UTA to discuss the matter with Plaintiff.  When UTA contacted Plaintiff, Plaintiff asked that UTA make itself available for a meeting to discuss the contact that now appeared to be a "robo-dialing" program that, Plaintiff is informed and believes and thereon alleges, was engineered or, at least, authorized by Defendant UTA.

18.     Defendant UTA refused to meet with Plaintiff, contending that its

activities in contacting Plaintiff's exclusive clients were legitimate because "poaching" was an "acceptable avenue for talent pursuit" and not actionable. Plaintiff responded that UTA was engaged in tortious interference.

19.   On or about April 2014, and continuing thereafter, Plaintiff provided to UTA its list of exclusively represented clients, so that UTA would have clear notice of Plaintiff's clients.  This was done on a monthly basis until November 2014, and Plaintiff's client list was sent by email and by registered letter, with copies to the Association of Talent Agents.  Plaintiff continued its request that UTA cease its predatory practices.

20.   As a result of the numerous calls made by UTA to Plaintiff's clients, together with UTA's refusal to stop the calls when asked by Plaintiff's clients and by Plaintiff, Plaintiff alleges that its relationship with various clients has, and continues to be, disrupted, as more fully set forth below.

### D.   Interference By UTA/The "Packaging" Inducement

21.   On or about November 4, 2014, a client of Plaintiff's informed Plaintiff that she no longer wished to be represented by Plaintiff.  No reasons were given.  This particular client ("Client #1"), a diversity director, producer, and DGA unit production manager, had been signed with Plaintiff for approximately four (4) years.  Plaintiff alleges that Client #1 had been served very effectively by Plaintiff, and her career was on an upward trajectory during the entire relationship.  In particular, Plaintiff alleges that Client #1 tripled her income in just four (4) years that she was represented by Plaintiff.  In return, Client #1 had shown her gratitude with gifts and praise, only to abruptly terminate the relationship without an explanation.  Client #1 even referred several clients to Plaintiff.

22.   Within hours of Client #1's termination of her contract with Plaintiff, Plaintiff learned that she had removed Plaintiff from her IMDb ("Internet Movie Database") online listing.

23.   Less than one (1) month later, on or about December 1, 2014, Plaintiff learned that the DGA ("Director's Guild") website listed Agent #1 as

the former client's agent.  Plaintiff was instrumental in getting Client #1 into the DGA (the trade union representing diversity directors), which was major goal for Client #1.

24.     Further, on information and belief, Plaintiff alleges that Client #1 was induced to sever her contract with Plaintiff by the representation that she would be part of UTA's Packaging activities.   As more fully set forth below, by promising Plaintiff's client that she would be included in a "package", the client was being informed that she would *not* have to pay the customary ten percent (10%) commission to her new Agency, UTA.  Instead, UTA would be looking to earning a "packaging fee," which, typically, amounts to Three Percent (3%) of the Network Base License Fee after each episode is produced, an equal amount of Three Percent (3%) deferred out of profits (if any) and a percentage of Ten Percent (10%) of the Modified Gross Receipts profits, as well as, in some instances, an additional Fifteen Percent (15%) share of publication rights, a Twenty Percent (20%) share of stage rights, and a Twenty-Five Percent (25%) share of merchandising.  In most cases, the total payments to the Agency are more than what the Agency's client earns on the show. Significantly, these rights – and income stream – are for the "life of the work," as more fully discussed below.  In what amounts to "extortion", Plaintiff agrees with the analysis that, "the only reason these fees are being paid to the Agencies by the studios/production companies is out of fear that the Agency will kill the deal if the Agency doesn't get paid the packaging fee."[1] On information and belief, more than 99% of the top tiered writers, directors, producers and performers are not paying hundreds of millions in commissions, Plaintiff alleges, because a handful of the 611 California State Licensed Talent Agencies are "extorting" billions in dollars of packaging fees from the scripted series market.

**E.     Interference By ICM/The "Packaging" Inducement**

25.     Similarly, in June 2014, Plaintiff alleges that ICM poached a client

---

[1] Gavin Polone *"Your Agent Gets Money For Nothing"* – The Hollywood Reporter 4/10/15

of Plaintiff's ("Client #2"), a director, producer, and production manager. Again, Client #2 was exclusive to Plaintiff.

26.     As with Client #1, Client #2's announcement of a "change" was abrupt.  Client #2, also, had received vigorous representation by Plaintiff and had enjoyed a very successful career with Plaintiff.  For example, Plaintiff had successfully moved Client #2 into a position as a Producing Director – a key goal for Client #2.  Nevertheless, Plaintiff alleges, within an approximate twenty-four (24) hour period after advising Plaintiff that Client #2 was terminating his exclusive contract with Plaintiff, Client #2 had entered into a multi-year contract on a television series.  Plaintiff alleges that, with respect to the above television series, Plaintiff had submitted Client #2 to the Employer and Executive Producer and had pre-negotiated a deal for the series prior to termination.  Plaintiff is informed, believes, and thereon alleges that Defendant ICM was speaking to Client #2 <u>prior to</u> his termination of Plaintiff.  Further, on information and belief, Plaintiff alleges that ICM advised Client #2 that, if he terminated Plaintiff, he would be hired by the Employer – not knowing that Plaintiff had already submitted Client #2 for the job.

27.     Plaintiff further alleges that, as with Client #1, a major inducement by the large Agency (here, ICM) to Client #2 was the promise of packaging on other projects and, therefore, the nonpayment of commissions by the client.

28.     The "packaging fee", Plaintiff alleges, dwarfs what the smaller agent (such as Plaintiff) could ever earn, while allowing the largest Agencies (viz., UTA, ICM, WME and CAA) to compete unfairly with smaller Agencies for talent (by offering to "waive" the 10% commission).  Moreover, as more fully set forth below, Plaintiff alleges that, as the result of this unfair competition, the power of the above Agencies has increased, as they have grown and consolidated their control.  Today, and especially since 2002, these large Agencies are, Plaintiff alleges, more than titular agents.  Because these Agencies stockpile talent, as well as exercise control over the development, production, financing, distribution, advertising, and even the technology for

content delivery to the consumer, they have morphed into, Plaintiff alleges, producers, de-facto employers, apex predators and "UBER AGENCIES."

29.     While a handful of talent and their representatives, undoubtedly, flourish, Plaintiff alleges that, with the elimination of smaller Agencies due to unfair competition, an increasing number of writers, actors, directors, etc., especially in the diversity category, are finding it more difficult to obtain representation.  Specifically, Plaintiff is informed, approximately thirty-nine (39) Agencies have either disappeared through consolidation (buy/sell/or merge), moved into talent management, or they have simply disappeared, since 2002, as more fully set forth herein.  As a result, Plaintiff alleges, far too many talented individuals within the State of California, and elsewhere, are either not working or they find their work is being stifled where they are not the "marquee" element driving the Package.  Plaintiff alleges that the Uber Agencies control the talent; accordingly, if Artists want their idea to get financed, produced, and distributed, they must agree to the Agency receiving a packaging fee or else there will be no "traction" from the Agency packaging team.  More importantly, if the Agency package is not put out to market, the studios and networks have nothing to buy.

30.     Ultimately, Plaintiff further alleges, the consumer suffers, because of the lack of diversity and creativity caused by the monopoly described below.

**F.     Trade and Commerce/Unlawful Agreement/Monopoly**

**a.     Talent Agencies Act/Relevant Regulations**

31.     The Talent Agencies Act was enacted in 1913, modified in 1937, 1943, 1959, 1967 and renamed in 1978.

32.     In 1982, Recording Contracts were excluded under the Act, and a "Talent Agency" was defined under California Labor Code Section 1700.4, in pertinent part, as a "person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists . . . ."

33.     Pursuant to Section 1700.39 of the Act, "[n]o talent Agency shall

divide fees with an employer, an agent or other employee of an employer."
Despite the above prohibition and the "general materials" agreement (discussed below), Plaintiff alleges that packaging fees are, in fact, a division of fees and sharing of profits between a Studio employer and an Agency.

**b.    The Packaging Or "General Materials" Agreement Exemption**

34.    Plaintiff alleges that, beginning in 1959 up to the current time, the California Labor Commissioner has taken the position that the Package Agreement (also known as the "General Materials" Agreement) falls outside the jurisdiction of the Labor Commission; accordingly, such contracts need not be approved.  In particular, in a letter from the California Labor Commission, dtd. June 22, 1959, to counsel for the William Morris Agency, the State Labor Commissioner stated:  "The decision that this form is not such as requires the approval of the Labor Commissioner is based upon the fact that this type of contract is concerned exclusively with 'creative property or package show' and contains nothing with respect to the employment of an artist for the rendering of his personal services or for the advising and counseling of artists in their professional careers."  (Emphasis)

35.    As recently as 1998, the State Labor Commissioner was asked to respond to a draft petition and its request for a change in the Labor Commissioner's policy towards packaging agreements and their exemption from the Talent Agencies Act (Labor Code §§ 1700 – 1700.47).  In its letter in response to the draft petition, dtd. October 30, 1998, the Labor Commission cited, among other things, the prior 1959 Labor Commission opinion (above). Further, the Labor Commission, observed, "it appears that artists benefit from package agreements."

36.    Even assuming that the Labor Commissioner's above analysis about "artist benefit" under packaging was not flawed at *that* time (1998), which Plaintiff denies, Plaintiff alleges that, in 2015, the longstanding opinion of the California Labor Commission concerning the "packaging exemption" is no longer correct, fair, or sustainable.  As more fully set forth herein, Plaintiff

alleges that, in light of the enormous flood of outside investment into talent Agencies since 2002, consolidation of talent Agencies, and monopolization of the television market by the Uber Agencies, the loyalties of the Uber Agencies have become *more* than divided.  Rather, Plaintiff alleges, the Uber Agencies are loyal to the package, itself, and not to their individual clients.

### c.   Prior Restrictions Upon Agency Production

37.   During the 1930's, there was substantial vertical integration within the entertainment business.  In particular, Music Corporation of America ("MCA") was a major player, as it was both acting as an Agency for talent and producing.  In or about 1938/1939, Plaintiff alleges that the Screen Actor's Guild ("SAG") required that MCA and others cease their production.  In or about 1952, this same restriction imposed by SAG was applied to television production.

38.   However, MCA managed to escape the SAG television restriction until on or about the 1960's, at which time the U.S. Justice Department, under Attorney General Robert F. Kennedy, commenced an antitrust investigation into MCA and its Manager, Lew Wasserman.  Eventually, MCA relented and agreed to cease its television production activities.

### d.   Conspiracy:  2002 Expiration of the SAG Franchise Agreement with the Association Of Talent Agents
### ["Rule 16(g)"]

39.   SAG's Agency Regulations [a/k/a "Rule 16(g)] were originally created in 1939.

40.   Rule 16(g) was the franchise agreement between SAG and the Association of Talent Agents ("ATA") until 2002, as more fully set forth below.

41.   The ATA is a non-profit trade association comprised of approximately 101 of the 611 California state licensed talent Agencies, including UTA, ICM, WME and CAA.  On information and belief, Plaintiff alleges that the above Agencies (the 4 "Uber Agencies") exercise effective

control over the ATA Board of Directors ("ATA Board"), and these Agencies substantially cover the overhead costs of the ATA.

42.     On or about April 20, 2000, the ATA opened up negotiations with SAG, demanding "financial interest", i.e., the right to invest in, or be invested in, by outside/offshore investors, private equity hedge funds, ad Agencies, advertisers and independent producers, etc.  SAG opposed the ATA's demand, viewing the financial interest to be self-dealing, self-serving, and a conflict of interest (contrary to agent's duty to obtain the highest quote for the agent's client).

43.     Prior to April 2000, Rule 16(g), clearly, forbade an Agency to possess *any* financial interest in a production or distribution company or vice versa.  The 1991 SAG/ATA Basic Contract, Section XVI ("Agents To Be Independent"), provided, in pertinent part:  "A.  Other than as herein permitted, no person, firm or corporation engaged or employed in the production or distribution of motion pictures or owning any interest in any company so producing or distributing, shall own any interest in an agent, directly or indirectly, nor shall any such person, firm or corporation own or control any indebtedness of the agent or of any of its owners, nor shall any such person, firm or corporation share in the profits of the agent."

44.     On or about October 20, 2000, the SAG/ATA agreement ["Rule 16(g)] expired.

45.     Accordingly, commencing on October 20, 2000, a contractual 15-month period ensued, with the parties attempting to negotiate the issue of "financial interest."

46.     In February 2002, a tentative agreement was reached with the ATA for a "limited" financial interest.  Among other things, this tentative agreement allowed agents to take up to twenty percent (20%) stakes in production and distribution companies, and it allowed advertising firms and independent (non-studio) producers to take up to ten percent (10%) and twenty percent (20%) stakes, respectively, in Talent Agencies.

47.     On April 20, 2002, this tentative agreement was submitted for approval to SAG's members and rejected.  This was the first time in its sixty-nine year history that the SAG membership had rejected the negotiated agreement with agents.

48.     On April 21, 2002, the SAG National Board unanimously voted to temporarily suspend enforcement of Rule 16(a) of the SAG Constitution, so that its members are not subjected to disciplinary proceedings, in light of the expiration of Rule 16(g).

49.     Meanwhile, the ATA Board of Directors, which, Plaintiff alleges, was controlled by the largest Agencies at that time, viz., UTA, ICM, Broder/Kurland/Webb/Uffner (which ICM purchased in 2005/2006), CAA, The William Morris Agency, and Endeavor (which merged, in 2009, into WME) was attempting to sell its membership on the notion that an expired franchise agreement would <u>benefit</u> *every* talent Agency, large or small.  The promise was that the expiration would allow for "new strategic alliances" that would create "more opportunities" – not less.  However, Plaintiff is informed, believes, and thereon alleges, the members of ATA's Strategic Planning Committee (which consisted of representatives from the largest packaging Agencies: UTA's Jim Berkus, ICM's Jeff Berg, CAA's Bryan Lourd, William Morris' Walt Zifkin, Endeavor's Rick Rosen, and Broder/Kurland/Webb/Uffner's Bob Broder) were interested in changing the business model of *their* Agencies from a "service based" business to an "asset based" receivables business which could be factored and leveraged.  Plaintiff is informed, believes, and thereon alleges that the above six principals shared a prophetic vision that involved vast sums of capital that would be available, once the SAG Franchise Agreement imploded.

50.     Accordingly, Plaintiff is informed, believes, and thereon alleges that, beginning in in the late 1990's and continuing to 2002, the objective of ATA's Strategic Planning Committee was, in fact, to force the *termination* of Rule 16(g).  Plaintiff alleges, on information and belief, that, unbeknownst to

the other members of the ATA during the negotiations with SAG, the largest Agencies existing at that time, including Defendants UTA and ICM, had conspired and agreed, amongst themselves, that it was in *their* best interests to proceed *without* Rule 16(g).  The expiration, they realized, would generate a financial windfall to these six (6) Agencies allowing them to enjoy unfettered, vertical integration of their businesses, more concentration of economic power, and more control over production and distribution.

51.   Contrary to the prophetic representations made by the ATA Board to its smaller members, the plan was not at all to create new "alliances" with small, independent Agencies.  Rather, Plaintiff alleges that, in bringing about the demise of Rule 16(g), the intent of Defendants UTA, ICM, as with the other Agencies, was to destroy competition and to build a monopoly of Uber Agencies.

52.   Plaintiff alleges that this destruction of competition was made possible by enormous outside funding (primarily, private equity) that flooded into the large Agencies after 2002 -- all of which funding was made possible by the expiration of Rule 16(g).  Plaintiff is informed, believes, and thereon alleges that, since 2002, the amount of money that the largest talent Agencies have received from private equity sources, in return for a stake in those Agencies, is over $6.5 billion.

53.   Plaintiff alleges that this funding has allowed the Uber Agencies to, among other things, consolidate their power over the television market, as more fully set forth herein.

**e.   UTA – Aggregation of Power since 2002**

54.   UTA was founded in 1991, as the result of a merger between two Talent Agencies.  In the beginning, UTA had, approximately, twenty-six agents.

55.   Beginning in 2002 and continuing to the present time, UTA has expanded into production.  In or about 2007, Plaintiff is informed, UTA and the Internet advertising Agency, Spot Runner, created an independent studio

-13-

for digital media called 60Frames Entertainment ("60 Frames").  Although, Plaintiff is further informed, 60Frames ceased operations in 2009, this independent studio was, clearly, in the production business – as opposed to, solely, representing talent.  Further, with respect to financial investment, Plaintiff is informed and believes and thereon alleges that funding for the 60Frames joint venture came from such sources as Tudor Investment Corporation, a $13 billion hedge fund, and the Pilot Group, a private investment company.

56.     With respect to feature films, Plaintiff is informed, believes, and alleges that UTA has expanded its film finance and international sales business within its Independent Film Group.  Not only is Independent Film Group involved with strategies for financing, packaging, and distribution, Plaintiff is informed, believes, and alleges that Independent Film Group and its employees are listed as "producer" and "production company" on several upcoming projects.

57.     In addition, on or about 2012, UTA launched UTA Brand Studio. According to UTA's own literature, UTA Brand Studio – "A Brand New Story", Brand Studio was created to "help companies develop and sustain strong brand attachment."  (Emphasis)  Plaintiff alleges that, in the television market, studios are, customarily, *employers* of talent and not Talent Agencies (who have the role of procuring employment).

58.     While UTA, as with the other large Agencies, expands into these new markets, Plaintiff alleges that they have ventured far outside the parameters set by the California Business and Professions Code, including without limitation its definitions of "Talent Agency" and "Artist."  While, Plaintiff alleges, UTA's clients may eventually be employed by a UTA Brand Studio client, the companies serviced by UTA Brand Studio, by other wings of UTA, and/or by joint ventures formed by UTA cannot be deemed "Artists" within the meaning of California Labor Code Section 1700.4 (b).  Further, Plaintiff alleges that the lifting of the "financial interest" restriction under Rule

16(g), in 2002, has led to direct violations by the Uber Agencies of California Labor Code Section 1700.40 (b).  Section 1700.40 (b) provides as follows: "No talent Agency may refer an artist to any person, firm, or corporation in which the talent Agency has a <u>direct or indirect financial interest for other services to be rendered to the artist</u>, including, but not limited to, photography, audition tapes, demonstration reels or similar materials, business management, personal management, coaching, dramatic school, casting or talent brochures, Agency-client directories, or other printing."  (Emphasis)

59.   Plaintiff alleges that the above relationship (between large Agency and corporate client) is fraught with conflict.  Further, if a percentage of the large Agency is owned by an advertising firm and the Agency is involved with an advertisement for a large corporation, who is the Agency, truly, representing?

**f.    Private Equity:  ICM Acquisition Of Broder Webb Chervin Silbermann Agency fka Broder/Kurland/Webb/Uffner/CAA Sells Majority Stake to TPG /WME and Silver Lake**

60.   Again, Plaintiff is informed, over $6.5 billion in private equity has been received by Defendants UTA, ICM, WME and CAA.  Plaintiff is informed, believes, and alleges, that WME and CAA are both planning a public offering and/or may issue debt on future artist earnings.

61.   With respect to ICM, Plaintiff is informed, it received approximately $100 million from a private equity firm, Rizvi Traverse Management ("Rizvi"), in return for a large stake in ICM.  This occurred in 2005 – just three (3) years after the expiration of Rule 16(g).

62.   The following year, Plaintiff is further informed, ICM purchased Broder Webb Chervin Silbermann Chervin Silbermann fka Broder/Kurland/Webb/Uffner for $70 million (ICM's Jeff Berg and Broder Webb Chervin Silbermann Chervin Silbermann's Bob Broder had served on the ATA Strategic Planning Committee in 2002).  Accordingly, the implosion of the 2002 SAG Franchise Agreement allowed for the above investment by

Rizvi and ICM's purchase of Broder Webb Chervin Silbermann.  Broder Webb Chervin Silbermann, at that time, represented several large-earning TV producers, including Chuck Lorre, who created "Two and a Half Men" and "Big Bang Theory" as well as Christopher Lloyd, co-creator of "Modern Family," and Vince Gilligan, the creator of "Breaking Bad."  Not only did Broder Webb Chervin Silbermann represent the above TV producers, Broder Webb Chervin Silbermann controlled the packages.

63.     Plaintiff is informed, believes, and alleges that ICM was able to raise funding for its acquisition of Broder Webb Chervin Silbermann because i) Rule 16(g) had expired; and ii) the package fees earned by Broder Webb Chervin Silbermann's clients were viewed as "assets" rather than as mere agent commissions and, therefore, could attract such funding.  Plaintiff is informed, believes, and alleges that the Broder Webb Chervin Silbermann packages were "factored" (because, as "assets", the package fees could be viewed as long-term accounts receivable) and valued at $70 million.

64.     In view of the timing of ICM's purchase of Broder [shortly after the expiration of Rule 16(g)], Plaintiff is informed, believes, and thereon alleges that ICM's plan to raise capital and consolidate with Broder was "in the works" during the negotiations over Rule 16(g) and before its expiration.

65.     During this same time period, in or about 2009, Plaintiff is informed, CAA received $350 million against a $1 billion valuation from TPG Capital ("TPG") (a private equity fund with $59 billion in reported total assets), in exchange for a 35% stake in CAA.  In October 2014, Plaintiff is informed, it was announced that TPG would be taking a majority stake in CAA.  Plaintiff is further informed, believes, and thereon alleges that TPG agreed to pay an additional $225 million for a 53% majority stake in CAA.

66.     In 2006, prior to the above purchase by TPG, Plaintiff is informed, TPG, together with other partners, acquired the Spanish-language broadcaster, Univision, in a $13.7 billion leveraged buyout.  Plaintiff alleges that Univision is an employer of talent and that TPG's ownership interest in Univision (and

CAA) creates an inherent conflict.

67.   In 2009, William Morris merged with Endeavor Agency, becoming William Morris Endeavor or WME.  Thereafter, in 2012, it was announced that a private equity firm, Silver Lake Partners, would be acquiring a minority interest in WME (presently believed to be 51%).  This cash infusion transformed WME into a "technologically entertainment and media company." Plaintiff is informed, believes, and thereon alleges that the primary impetus behind the cash from Silver Lake was to expand into the direct-to-consumer release of content by WME talent and to create a worldwide marketing business and global media fund.  On information and belief, Plaintiff alleges that the above fund owns copyrights and distribution rights in perpetuity, and that these copyrights and distribution involve products and productions that feature the work of WME's clients.

68.   In 2013, Plaintiff is informed, WME and Silver Lake purchased IMG (with earnings of $160 million annually derived from producing fees) for a reported $2.5 billion.  Plaintiff is informed that Mubadala Development Company, an investment vehicle for the United Arab Emirates, is a minority investor in the purchase by WME of IMG.  Plaintiff is informed, believes, and thereon alleges that WME/IMG is clearly in the <u>production</u> business.  It has been observed: "Over the next decade Forstmann transformed IMG into an international production-and-packaging powerhouse.  The expanding business cut profitable deals with more than 200 American college and university sports teams, as well as with Indian Premier League cricket, Wimbledon, the Australian and U.S. Open tennis tournaments, tennis tournaments in Spain and Malaysia, and Barclays Premier League soccer.  It ran Fashion Week in New York, Milan, and London, and in China it formed an exclusive joint venture with the national television network to create sports programming."[2]  Plaintiff further alleges that WME/IMG are in the <u>distribution</u> business as well: "IMG

---

[2] William D Cohan *"The Inside Storey of Ari Emanuel's Big, Risky WME-IMG Merger"* – Vanity Fair March 2015

distributes over 32,000 hours of content – originating from more than 200 clients and events – to major global broadcasters annually, across all forms of media including TV, audio, fixed media, inflight and closed circuit, broadband and mobile. The company's multimedia product offering includes inCycle and Golfing World, while IMG also produces and distributes Sport 24, the first ever live global premium 24-hour sports channel for the airline and cruise industries, and EDGEsport, the 24-hour premium action sports channel. It maintains the world's largest sports archive with more than 250,000 hours of footage and operates joint ventures with the PGA European Tour (European Tour Productions), Associated Press (SNTV) and Asian Tour (Asian Tour Media)."[3]

69.     In recent years, Plaintiff is informed, WME has made over fifteen (15) strategic investments in companies across the digital media landscape, including the interactive advertising, social media, social gaming, and online retail sectors.  Plaintiff is further informed that, on January 28, 2015, WME purchased, via its IMG arm, Dixon Talent.  Dixon Talent is a <u>management</u> company that represents such talent as Jimmy Kimmel, Stephen Colbert, and Jon Stewart.  Plaintiff alleges that this purchase by WME further blurs the lines between Agents and Talent Managers and creates more conflict.

70.     Not only has there been tremendous consolidation, ushered in by the unfettered right to be invested *in* and investment *by* Defendants UTA and ICM, as well as the other two largest Agencies, Plaintiff alleges that the very <u>nature</u> of Defendants UTA and ICM, as *agents*, has been transformed into something else, i.e., into businesses never contemplated by the Talent Agencies Act.  Moreover, this consolidation has resulted in an injury to the relevant marketplace (scripted series television) and an injury to competition, as more fully set forth below.

**g.     Monopolization of the Relevant Market (Scripted Series Television)**

71.     <u>Scripted Series Staffing (*See* Exhibits A, B, C & D)</u> – Plaintiff

---

[3] "IMG" - Wikipedia

alleges that the number of licensed Agencies in 2001/2002 to 2014/2015 has increased from 571 to 611; however, a large portion of those are non-core Agencies working outside the scripted series television market in the print, modeling, live performance and other areas non related to scripted series television.  Plaintiff is further informed, believes, and alleges that many are talent managers holding a license but working out of their homes.  Fifty-one percent (51%) of the 2001/2002 scripted series market was serviced by fifty five (55) Agencies.  This has dramatically consolidated to 4 Uber Agencies controlling 79% of the 2014/2015 scripted series staffing market.

72.   Scripted Series Term Deals[4] (See Exhibits E & F) – Plaintiff alleges that the 2001/2002 scripted series term deal market had 373 term deals and was serviced by 26 out of 571 licensed Agencies.  Plaintiff is informed that 26 Agencies controlled 44% of the 2001/2002 scripted series term deal market.  However, today only 9 out of 611 licensed Agencies service 393 scripted series term deals.  By massive contrast, 4 Uber Agencies (UTA, ICM, WME and CAA) control 91% of the 2014/2015 scripted series term deal market.

73.   Scripted Series Packaging  (See Exhibits G & H) – Plaintiff alleges that, in 2001/2002, 157 scripted series were packaged by 15 Agencies that controlled 96% of the scripted series packaging market.  Thirty one (31) of those packages were split amongst a handful of Agencies.  However, in 2014/2015, again by massive contrast, 353 packaged scripted series were packaged by 11 Agencies, with 4 Agencies dominating 93% of the scripted series market.  Plaintiff is informed that 105 of the 353 scripted series packages were split between Agencies, but only a mere 16 of the 105 packages were split with a non-core Uber Agency.  On information and belief, Defendants UTA and ICM have engaged and continue to engage in exclusive co-packaging contracts with the other two Uber Agencies (WME and CAA), which defeats and lessens competition, encourages monopoly, and restrains trade in the

---

[4] A Term Deal is a contract between a writer, producer, director or performer and a network, studio or production company employer.

scripted series marketplace. On information and belief, Plaintiff is informed, believes, and alleges that the 4 Uber Agencies have a policy to *not* split packaging fees with non-Uber Agencies and that they are engaged in horizontal price-fixing, horizontal market division, and a concerted refusal to deal. Plaintiff alleges that scripted series' packaging is dominated by the four Uber Agencies (including Defendants), who, in essence, own "stock" in each other's packaging assets. Plaintiff is informed, believes, and thereon alleges that, by virtue of the above agreement and practice, the Uber Agencies have formed a "cartel" that controls the market. As a result, Plaintiff is informed, believes, and alleges, there is an extremely high – perhaps, impossible – barrier for all the other Agencies to compete for this market, let alone a new entrant to the market.

74. Diversity (*See* Exhibit I) – Plaintiff alleges that the general effect of this monopoly by the Uber Agencies is that it has crushed competition between all 611 Licensed Talent Agencies for the representation of diversified talent and their shows. As gatekeepers in the television development process, Plaintiff alleges, the Uber Agencies have failed to produce scripted series packages that promote significant advances in television diversity. Indeed, between the 2001-2002 and 2014-2015 television seasons, minorities have fallen further behind today as elements that drive a package (a 2.3% increase) relative to their growing population (8% increase), and women increased a mere 1.6% of all packaging drivers, this despite the Uber Agencies controlling 92.4% of all scripted series television packages. As a result, the presence of diversity artists, their ideas, and their shows have been stifled and are not proportionately reflected in the triple digit increase in the number of shows between 2001/2002 and the 2014/2015 scripted series market. This dismal record with respect to diversity, Plaintiff is informed and believes, can be attributed to the Uber Agencies shifting their proper focus from representing the Artist-person to "the package." Consequently, today's scripted series staffing, production, and end-user programming fundamentally deprives the

consumer freedom of choice of a truly balanced and diversified scripted series market, that is representative of society and reflects today's demographic realities.  Even though there was close to a 300% increase in the amount of scripted series produced between 2001/2002 and 2014/2015, the average consumer would not know the difference between types of shows between then and now, primarily because of this lack of diversity in today's market.  Plaintiff alleges that today's shows are just as homogeneous as before, and there are even more of them which fundamentally reduce the consumer's option to watch diversity driven shows.  Diversity in the market cannot self-equalize without a healthy and competitive Agency market.

75.     Plaintiff alleges that this domination of the market would not be possible without the ability to "package" a group of the major talent or star components of a television program or series.  Further, Plaintiff alleges, the monopolization of the television market has been made possible by the choreographed "planned implosion" of Rule 16(g) and, thereafter, the financial investment opportunities that Defendants UTA and ICM knew would be coming their way as a result.

### h.   Packaging

76.     According to the WGA (Writers Guild of America – a recognized labor union)/Artists' Manager Basic Agreement of 1976 [the franchise agreement between agents and writers negotiated by the William Morris Agency and ICM and untouched in over thirty-nine (39) years], the fee, commission, or compensation that may be earned by an Artists' Manager [Agent] of a television program or series is termed a "package commission."

77.     While, under the above WGA Basic Agreement, an Artists' Manager cannot require that a Writer sign a package representation agreement as a condition of representing the Writer, an Artists' Manager may request a Writer to sign a package representation agreement.

78.     Further, when package representation agreements are entered into, the WGA Basic Agreement calls for annual franchise fees (referred to as

"Negotiator's Fees") that are to be deposited into a "Negotiator's Fund" established by the WGA and the AMG (Artist's Managers Guild), which is currently known as the ATA.

79.    Plaintiff reserves the right to supplement and amend this complaint with more details concerning whether UTA and ICM have adhered to the WGA Rider W Contract between Agent and Artist, which, Plaintiff alleges, discloses Exhibit "N" in transparent fashion to its clients.

### i.    Predatory Practices:  Poaching and "Pricing"

80.    Plaintiff alleges that, in addition to expanding into its production, advertising, among other ventures, it was the further plan of UTA and ICM, commencing in 2002 and continuing to the present, to poach clients from smaller Agencies, particularly in the television market.

81.    Plaintiff is informed, believes, and thereon alleges that, Defendants UTA and ICM, acting as apex predators, have been engaged in a willful and wanton policy and practice of poaching top echelon clients of smaller Agencies earmarked as "low hanging fruit" under the guise of the "right to compete" in order to stockpile talent for packaging.

82.    As set forth herein, Plaintiff alleges that, as with its recent clients that UTA and ICM lured away, UTA and ICM make representations to prospective clients (who are already under contract with smaller Agencies) that they are in the "process of packaging a TV series" or that UTA is representing an "executive producer/show runner" – which is "code" for, "we can offer you work, and you will be part of a package and will not have to pay the 10% commission you are paying XYZ Agency."

83.    Plaintiff alleges that the packaging opportunity, which is, effectively, unavailable to smaller Agencies (because the Uber Agencies have poached the vast percentage of top-tiered talent), allows the largest Agencies to engage in "predatory pricing."  In other words, Plaintiff alleges, the smaller Agencies, who charge ten percent (10%), are undercut by the largest Agencies, including UTA and ICM, who can offer to charge the prospective television

client *zero*.

84.    Plaintiff is informed, believes, and alleges that the 4 Uber Agencies have a policy to not split packaging fees with non-Uber Agencies and are engaged in horizontal price-fixing, horizontal market division, and a concerted refusal to deal.  Plaintiff is further informed, believes, and alleges that scripted series packaging is dominated by a "cartel" of apex predator Uber Agencies that control 96% of the market.  Plaintiff alleges that the Uber Agencies' packaging inducement of not having to pay commissions is a *pricing* strategy intended to drive competitors out of the market or to create barriers to entry for potential new competitors.

85.    Plaintiff further alleges that the largest talent Agencies earn packaging fees *in perpetuity*, whether or not they continue to represent the client driving the package.  Meanwhile, the smaller Agencies are capped at a ten percent (10%) commission of fees received from procuring employment for the client and/or they are restricted by California's "7 Year Rule", pursuant to California Labor Code Section 2855.

### G.    Anticompetitive Conduct and Effects

86.    The most important driver of the economic success of an Agency is fair competitive access to talent.

87.    Packaging agreements or understandings (expressed or implied) allow the dominant Uber Agencies to use their market power to sign and stockpile talent, despite the fact that such talent representation agreements are not in the independent economic best interest of the talent coerced or induced to grant such rights.

88.    Plaintiff alleges that Packaging Agreements, therefore, function as devices for stifling competition and for diverting the talent cream of the business to the 4 Uber Agencies.

89.    By virtue of, *inter alia*, their high market share and packaging power, the 4 Uber Agencies have market – indeed, monopoly – buying power in the scripted series market.

-23-

90.    Plaintiff alleges that the monopoly power is further evidenced by their ability to force talent to exclude other Agencies from the market, and the high barriers to entry into the market.

91.    In order to survive economically, all Agencies need fair competitive access to talent.  UTA and ICM's poaching activities essentially have the effect of denying, at least in part, the revenue Plaintiff needs to stay in business.

92.    Plaintiff alleges that Defendants UTA and ICM's poaching activities essentially have the effect of lowering the overall quality of Agency representation by forcing talent to be represented by a packaging Agency or else not at all.

93.    Devised with the predatory intent to deprive Plaintiff of a fair competitive opportunity to obtain the supply of talent needed for effective competition, Plaintiff alleges that the conduct of Defendants UTA and ICM, as more fully set forth herein, violates antitrust principles long established by the United States Supreme Court.

94.    The 4 Uber Agencies represent the world's largest pool of talent. Plaintiff is informed, believes, and thereon alleges that these Agencies use their worldwide and national market and monopoly power in a substantial number of non-competitive talent representation areas to coerce Hollywood networks, studios, and other production companies to deny their competitors (like Plaintiff) fair competitive access to talent, with the intent to drive them out of business, prevent them from earning the revenues needed for expansion, and to foreclose competition.

95.    Plaintiff offers the same, or higher, quality individual Agency representation experience per commission dollar paid as UTA or ICM do. Therefore, for every artist of which Plaintiff is deprived – not on the merits but as a result of UTA and ICM's leveraging its producing and monopoly power to strong arm Studios, production companies, and their own clients into not hiring Plaintiff's clients – consumers are left with only 4 choices (UTA, ICM, WME

and CAA), which, Plaintiff alleges, is no choice at all.

96. UTA and ICM's poaching, packaging and monopolizing campaign has injured, and will continue to injure, Plaintiff and the consuming public unless enjoined.

97. Plaintiff alleges that UTA's and ICM's anticompetitive conduct described herein, over the past few years and continuing today, has been pursued with the predatory intent to deprive Plaintiff an opportunity to obtain clients needed for effective competition, thereby constituting violations of the Sherman Act.

98. The 4 Uber Agencies possess monopoly power in the scripted series marketplace, as demonstrated by their 76% market share of scripted series staffing, a 91% market share of term deals at the studios and networks, and a 93% market share of scripted series packaging, its actual exclusion of competition and control over production, and the high barriers to entry into the marketplace.

99. Plaintiff is informed, believes, and alleges that UTA and ICM have used their monopoly power to coerce Studio employers to buy their packages and to employ their talent, or else not have access to top tiered talent, thus denying Plaintiff the opportunity to compete fairly with them for talent. This coercion has had a direct adverse effect on competition by preventing Plaintiff from competing with UTA and ICM on the merits.

100. By such acts, practices, and conduct, UTA and ICM have directly insulated themselves from competition with Plaintiff for talent, and they have thereby restrained trade in and have willfully maintained or expanded their monopoly power in the scripted series marketplace.

101. UTA and ICM's conduct has no pro-competitive benefit or justification. The anticompetitive effects of their behavior outweigh any purported pro-competitive justifications. Talent has been deprived of the freedom to choose where to be represented. The public has been deprived of the freedom to choose what will be seen and has been forced to consume only

what is packaged.

102.   Plaintiff alleges that UTA's and ICM's disregard for other Agencies' client contracts is an abuse of power and anticompetitive scheme that has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success.

103.   Over the past 77 years and continuing today, Plaintiff is informed, believes, and alleges that the combined 4 Uber Agencies have engaged in a course of conduct that amounts to exclusive dealing in violation of the Sherman Act.

104.   Plaintiff is informed, believes, and thereon alleges that Defendants UTA and ICM have engaged and continue to engage in exclusive contracts with the other 2 Uber Agencies (WME and CAA), that defeat and lessen competition, encourage monopoly, and restrain trade in the TV marketplace.

105.   Diversity in the market will self-equalize with a healthy and competitive Agency market. The most important driver of the economic success of an Agency is fair competitive access to talent.

## H. Lack of Diversity in Scripted Series Television and the Effect on the Consumer

106.   Plaintiff alleges that there is a problem in Hollywood with Diversity, or the lack thereof.  Since 2002, Plaintiff alleges that there has been a consolidation of media power and Agency representation whereby 4 Uber Agencies are packaging/selling scripted series only to a handful of buyers.

107.   Historically, there has been a dearth of gender, racial and ethnic diversity in film and television – both in front of and behind the camera. This reality has meant limited access to employment for women and minorities and to a truncating of the domain of media images contributing greatly to how we think about ourselves in relation to others. When marginalized groups in society are absent from the stories a nation tells about itself, or when media images are rooted primarily in stereotypes, inequality is normalized and is

more likely to be reinforced over time through prejudices and practices.[5] The facts show the following:

- Minorities are underrepresented by a factor of 7 to 1 among lead roles in scripted series
- Minority writing staffs on scripted series are 10 percent or less
- Diversity and minority directors on scripted series are 10 percent or less
- The Academy of Motion Picture Arts and Sciences are 93% white, and even though the Academy of Television Arts & Sciences' 18,000 plus members demographic breakdown has not been made public, the organizations Emmy scripted series nominees and winners have historically lacked diversity
- Scripted television series Network and Studio Executives, for which greenlighting decisions are made, were 96% white and 71% male
- Minority show creators in scripted television are underrepresented by factor of 9 to 1

108.    Talent Agencies wield tremendous influence and are brokers of scripted series packaging.  Without scripted series packaging, the buyers have nothing to produce, specifically in the scripted series television market. Nothing produced means nothing new and relevant to consume, which harms the consumer.

109.    Today's Uber Agency has supplanted the Agencies built around the personality and connections of one or two individuals.  The 4 Uber Agencies form a triumvirate of power that shapes the scripted series labor market in which representation by an Uber Agency provides scripted series diversity talent (writers, directors, producers, performers, etc.).  These Agencies offer

---

[5] Dr. Darnell Hunt, Dr. Ana-Christina Ramon, and Dr. Zachary Price *"2014 Hollywood Diversity Report"*; Dr. Darnell Hunt and Dr. Ana-Christina Ramon *2015 Hollywood Diversity Report"*

the perceived reputation, legitimacy, and resources that flow from a central location in a network of recurrently contracting parties (the cartel of Uber Agencies).  By packaging a scripted series, the Uber Agency, in effect, becomes the gatekeeper of scripted series television product-labor markets.

110.   Plaintiff alleges that the 4 Uber Agencies contribute little to scripted series diversity, considering the scripted series market has almost tripled in growth since 2002.

111.   Since 2002, the Uber Agency packaging monopoly has risen by twenty (20) points to a dominating 93% of the market, while diversity packaging has only risen by 2.3 points.

112.   Diversity groups account for more than a quarter of total U.S. buying power, about $3.2 trillion, but are woefully underrepresented amongst the scripted series the 4 Uber Agencies are packaging.

113.   The combination of all the facts above creates a vicious cycle that virtually guarantees the marginalization of diversity driven scripted series available to the consumer.

114.   Diversity (*See* Exhibit I) – Plaintiff incorporates by reference the allegations contained in Paragraph 74 hereinabove.

### H.   Interstate Commerce

115.   Plaintiff alleges that Defendants' conduct substantially affects interstate commerce throughout the United States and has caused and continues to cause antitrust injury throughout the United States.

### I.   Statute Of Limitations/Conspiracy:  Continuing Violation

116.   Plaintiff alleges that Defendants' conspiracy, as more fully alleged hereinabove, has been a continuing violation to the present time.

## FIRST CAUSE OF ACTION

### (For Violations Under The Sherman Act – Section 2)

117.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

118.   Plaintiff alleges that Defendants UTA and ICM have attempted to combine or conspire with other entities to monopolize trade or commerce in violation of 15 U.S.C. § 2, as more fully set forth hereinabove.

119.   Plaintiff further alleges that Defendants have i) engaged and continue to engage in exclusionary or predatory conduct; ii) with the specific intent to destroy competition and build a monopoly; and iii) with a dangerous monopoly power in the relevant market (viz., scripted series television).

120.   Plaintiff alleges that Defendants' conduct has caused an antitrust injury, i.e., harm to the competitive process, itself, and has caused damage to Plaintiff and has deprived Plaintiff of fair competition in the market for Plaintiff's services as a television agent.

121.   As a direct and proximate cause, Plaintiff has sustained damages in an amount according to proof.

## SECOND CAUSE OF ACTION

### (For Unlawful/Unfair Business Practices)

122.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

123.   Plaintiff alleges that Defendants' conduct, alleged above, constitutes unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.*

124.   Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own right and because they violated the Sherman Act.

125.   Defendants' conduct injured Plaintiff; accordingly, Plaintiff is a "person" that has suffered an injury in fact and that has lost money or property as a result of unfair and/or unlawful competition, pursuant to California Business and Professions Code § 17204.

126.   Plaintiff alleges that it is entitled to disgorgement of Defendants' unlawful gains and restitution, pursuant to California Business and Professions Code § 17203.

### THIRD CAUSE OF ACTION

### (For Intentional Interference With Contract)

127.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

128.   Plaintiff and the clients identified herein (Clients #1 and #2) had valid, exclusive contracts.

129.   Plaintiff alleges that Defendants' had knowledge of such contracts. Further, Plaintiff alleges, Defendant UTA had been given notice of Plaintiff's complete exclusive client list. Defendant ICM had unabated access to Plaintiff's complete exclusive client list.

130.   Plaintiff alleges that Defendants committed intentional acts designed to induce a breach of such contract, as well as committing acts in order to disrupt other contractual relationships between Plaintiff and its clients.

131.   Plaintiff further alleges that Defendants actually induced the breach of its clients, as more fully alleged above, and has continued to disrupt other contractual relationships between Plaintiff and its other clients.

132.   As a direct and proximate cause, Plaintiff alleges that it has sustained damage in an amount according to proof.

133.   Plaintiff is further informed and believes and thereon alleges that the above-described conduct by Defendants was done with malice and/or oppression and/or fraud in that its purpose was/is to eliminate Plaintiff as a competitor.  Thus, Plaintiff seeks an award of punitive damages in an amount according to proof.

### FOURTH CAUSE OF ACTION

### (For Intentional Interference With Prospective Economic Advantage)

134.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

135.   Plaintiff and the clients identified herein had an economic relationship that would have resulted in a future economic benefit beyond the scope of the contract above.

136.   Plaintiff alleges that Defendants had knowledge of such relationship.

137.   Plaintiff alleges that Defendants committed intentional acts designed to disrupt the relationship.

138.   Plaintiff alleges that Defendants engaged in wrongful acts through its unlawful, unfair, and predatory practices in violation of the Sherman Act, as more fully set forth above.

139.   Plaintiff alleges that Defendants actually disrupted Plaintiff's relationship with the client identified herein.

140.   As a direct and proximate result, Plaintiff alleges that it was harmed.

141.   Plaintiff is further informed and believes and thereon alleges that the above-described conduct by Defendants was done with malice and/or oppression and/or fraud in that its purpose was/is to eliminate Plaintiff as a competitor.  Thus, Plaintiff seeks an award of punitive damages in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (For Declaratory Relief)

142.   Plaintiff adopts, reiterates, and incorporates all of the preceding allegations of this complaint.

143.   An actual controversy has arisen and now exists between Plaintiff and Defendants in that Plaintiff contends:

(a)   Defendants have committed violations of the Sherman Act, 15 U.S.C. § 2, as alleged above;

(b)   The alleged conduct of Defendants violates the California Labor Code Section 1700 *et seq.* and, specifically, Section 1700.39; and

(c)   The alleged conduct of Defendants is "unlawful" and/or "unfair" within the meaning of California Business and Professions Code Section 17200 *et seq.*

144.   Plaintiff is informed and believes and thereon alleges that

Defendants contend to the contrary.

145.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain its rights and duties relative to the above-matters.

### SIXTH CAUSE OF ACTION

### (For Injunctive Relief)

146.   Plaintiff adopts, reiterates, and incorporates all of the preceding allegations of this complaint.

147.   Unless the conduct of Defendants as alleged herein is prevented and restrained, defendants will continue to violate Plaintiff's rights causing great and irreparable harm.  Accordingly, Plaintiff seeks a preliminary and permanent injunction to enjoin Defendants' unlawful, unfair, and anticompetitive conduct.  Unless a preliminary injunction is issued, Plaintiff will suffer great and irreparable injury and the likelihood of success on the merits is great.

148.   Plaintiff seeks a preliminary and permanent injunction to enjoin Defendants from packaging, producing, financing and distribution of scripted series and all other content programming while maintaining a Talent Agency License.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### AS TO THE FIRST CAUSE OF ACTION FOR VIOLATIONS UNDER THE SHERMAN ACT

1.   For appropriate injunctive and declarative relief pursuant to the Sherman Act and California Business and Professions Code §§ 17200 *et seq.* and any other extraordinary relief as this court may deem just and proper to remedy the violations and to prevent future violations of a like or similar nature, as more fully set forth below;

2.   For actual damages; and

1       3.     For treble damages for each and every violation of the Sherman

2 Act, pursuant to 15 U.S.C. §§ 15 and 26.

3      **AS TO THE SECOND CAUSE OF ACTION FOR**

4      **UNLAWFUL/UNFAIR BUSINESS PRACTICES**

5       1.     For disgorgement and/or restitution, pursuant to California

6 Business and Professions Code § 17203.

7     **AS TO THE THIRD CAUSE OF ACTION FOR INTENTIONAL**

8        **INTERFERENCE WITH CONTRACT**

9       1.     For general damages in an amount according to proof;

10      2.     For special damages in an amount according to proof; and

11      3.     For exemplary and punitive damages in an amount necessary to

12 punish and set an example of Defendants;

13    **AS TO THE FOURTH CAUSE OF ACTION FOR INTENTIONAL**

14 **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

15       1.     For general damages in an amount according to proof;

16      2.     For special damages in an amount according to proof; and

17      3.     For exemplary and punitive damages in an amount necessary to

18 punish and set an example of Defendants.

19     **AS TO THE FIFTH CAUSE OF ACTION FOR DECLARATORY**

20              **RELIEF**

21       1.     For a declaration that:

22       (a)    Defendants UTA and ICM have committed violations of the

23 Sherman Act, 15 U.S.C. § 2, as alleged above;

24       (b)    The alleged conduct of Defendants UTA and ICM violates

25 the California Labor Code Section 1700 *et seq.* and, specifically, Section

26 1700.39; and

27       (c)    The alleged conduct of Defendants UTA and ICM is

28 "unlawful" and/or "unfair" within the meaning of California Business and

Professions Code Section 17200 *et seq.*

## AS TO THE SIXTH CAUSE OF ACTION FOR INJUNCTIVE RELIEF

1.      For a permanent injunction prohibiting Defendants UTA and ICM from the predatory practice of client poaching from any and all talent Agencies that represent television clients.

## AS TO ALL CAUSES OF ACTION

1.      For attorney's fees pursuant to 15 U.S.C. §§ 15 and 26, California Code of Civil Procedure Section 1021.5, and as otherwise permitted under law;

2.      For costs of suit incurred herein, including without limitation prejudgment interest, pursuant to 15 U.S.C. §§ 15 and 26 and as otherwise permitted under law; and

3.      For such other and further relief as this court may deem just and proper.

DATED:  June 15, 2015          LAW OFFICES OF PHILIP J. KAPLAN

By_____

Philip J. Kaplan
Attorney for Plaintiff
LENHOFF ENTERPRISES, INC.

1

2

**<u>Demand For Jury Trial</u>**

3       Plaintiff hereby demands a jury trial in this action pursuant to Federal

4   Rules of Civil Procedure, Rules 38 and 81.

5

6   DATED:  June 15, 2015          LAW OFFICES OF PHILIP J. KAPLAN

7

8   _____

9                                  Philip J. Kaplan
                                   Attorney for Plaintiff
10                                 LENHOFF ENTERPRISES, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-35-

1
2
3 **UNITED STATES DISTRICT COURT**
4 **CENTRAL DISTRICT OF CALIFORNIA**
5
6 **<u>EXHIBITS TO COMPLAINT:</u>**
7
8   • Exhibit A – 2001/2002 Scripted Series Staffing Representation
    Breakdown Pie Chart
9
10   • Exhibit B – 2001/2002 Scripted Series Staffing Representation
    Breakdown Column Chart
11
12   • Exhibit C – 2014/2015 Scripted Series Staffing Representation
    Breakdown Pie Chart
13
14   • Exhibit D – 2014/2015 Scripted Series Staffing Representation
    Breakdown Column Chart
15
16   • Exhibit E – 2001/2002 Scripted Series Term Deals Pie Chart
17
18   • Exhibit F – 2014/2015 Scripted Series Term Deals Pie Chart
19   • Exhibit G – 2001/2002 Scripted Series Packaging Drivers Pie Chart
20
21   • Exhibit H – 2014/2015 Scripted Series Packaging Drivers Pie Chart
22   • Exhibit I - 2001/02 and 2014/15 TV Seasons Percentage Point Increases
    between Diversity, Agency Packaging and Scripted Series Staffing Pie
    Chart
23
24
25
26
27
28

# EXHIBIT "A"

Lenhoff Lenhoff - Copyright, All Rights Reserved

## 2001 - 2002 SCRIPTED SERIES REPRESENTATION BREAKDOWN

Criteria: 147 shows sampled from 55 of 571 licensed agencies representing 1348 artists/persons

Data compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Casting Breakdown Services, Hollywood Creative Directory, Academy Players Directory, ICM, UTA, Paradigm, and several industry experts

Note:  Producers that are talent managers or studio executives are not factored



no exclusive agency representation listed, 657, 49%

CAA, 118, 9%

ICM, 82, 6%

Broder/Kurland/Webb/Uffner, 79, 6%

William Morris Agency, 79, 6%

UTA, 72, 5%

Endeavor, 58, 4%

Paradigm, 21, 2%

Kaplan-Stahler-Gumer Agency, 21, 2%

Rothman Agency, 23, 2%

Major Clients Agency, 16, 1%

Gersh, 15, 1%

APA, 9, 1%

Vision Art, 9, 1%

Jim Preminger Agency, 6, 0%

Preferred Artists, 6, 0%

Bruce Brown Agency, 5, 0%

Dytman & Associates, 5, 0%

Innovative Artists, 4, 0%

Metropolitan, 4, 0%

Richland/Wunsch/Hohman, 4, 0%

Shapiro/Lichtman/Stein, 4, 0%

all other agencies, 51, 4%

tbd, 2, 0%



Exhibit "A"

- 37 -

EXHIBIT A - Last Modified:  6/10/2015 11:10 AM

# EXHIBIT "B"



## 2001-2002 SCRIPTED SERIES STAFFING REPRESENTATION BREAKDOWN
### Criteria: 147 shows sampled / 55 agencies / 1348 artists-persons

Lenhoff Lenhoff - Copyright, All Rights Reserved

Last Modified: 6/10/2015 11:13 AM

EXHIBIT B



-38-

EXHIBIT "C"



**2014-2015 SERIES STAFFING REPRESENTATION BREAKDOWN**

Criteria: 381 shows sampled from 53 of 611 licensed agencies representing 3297 artists/persons

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note: Producers that are talent managers or studio executives are not factored

Conclusion: 4 Uber Agencies control 79% of the series staffing market

CAA, 746, 23%

UTA, 708, 22%

WME, 804, 24%

ICM, 318, 10%

all other agencies, 144, 4%

Rothman Brecher Agency, 47, 1%

Gersh, 58, 2%

APA, 91, 3%

Paradigm, 140, 4%

no exclusive agency representation listed, 241, 7%

EXHIBIT C



# EXHIBIT "D"



## 2014-2015 SCRIPTED SERIES STAFFING REPRESENTATION BREAKDOWN
### Criteria: 381 shows sampled / 53 agencies / 3297 artists-persons

EXHIBIT D



# EXHIBIT "E"

Lenhoff Lenhoff - Copyright, All Rights Reserved

**2001 - 2002 SCRIPTED SERIES TERM DEALS**

Criteria: 26 out of 571 licensed agencies sampled 373 term deals at the studios and networks

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Conclusion: 26 Agencies control 44% of the term deals market



no exclusive agency representation listed, 209, 56%

CAA, 32, 9%

All Other Agencies, 32, 9%

William Morris Agency, 27, 7%

Endeavor, 24, 6%

ICM, 23, 6%

UTA, 14, 4%

Broder/Kurland/Webb/Uffner, 12, 3%

EXHIBIT E

Last Modified: 6/10/2015 11:21 AM



Exhibit "E"
-41-

EXHIBIT "F"

Lenhof Lenhof - Copyright, All Rights Reserved

## 2014 - 2015 SCRIPTED SERIES TERM DEALS

Criteria: 9 out of 611 licensed agencies sampled 393 term deals at the studios and networks

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several other industry experts

Conclusion: 4 Uber Agencies control 91% of the term deals market



CAA, 100, 25%
UTA, 92, 23%
WME, 130, 33%
ICM, 39, 10%
no exclusive agency representation listed, 18, 5%
PARADIGM, 5, 1%
ROTHMAN BRECHER, 3, 1%
APA, 2, 0%
ESA, 2, 1%
VERVE, 2, 1%

**EXHIBIT F**

Exhibit "3"

-42-

EXHIBIT "G"



**2001-2002 SCRIPTED SERIES PACKAGING DRIVERS**
Criteria: 157 packaged shows sampled

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note: 31 of the 157 packages were split between 2 or 3 agencies

Conclusion: 15 agencies controlled 96% of the packaging market

CAA, 34, 22%

UTA, 30, 19%

Endeavor, 19, 12%

ICM, 19, 12%

Broder/Kurland/Webb/Uffner, 15, 10%

William Morris Agency, 11, 7%

no exclusive agency representation listed, 7, 4%

Paradigm, 4, 3%

Vision Art, 3, 2%

Metropolitan, 3, 2%

Major Clients Agency, 3, 2%

Rothman Agency, 2, 1%

APA, 2, 1%

Kaplan-Stahler-Gumer Agency, 2, 1%

IFA, 1, 1%

Jim Preminger Agency, 1, 1%

EXHIBIT G

Exhibit "g"
-43-

# EXHIBIT "H"

Lenhoff Lenhoff - Copyright, All Rights Reserved

## 2014 - 2015 SERIES PACKAGING DRIVERS

Criteria:  353  packaged shows sampled

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note:  105 of the 353 packages were split between 2 or 3 agencies

Analysis: 4 Uber agencies control 93% of the packaging market and reluctantly split the package with the non-Uber agency in only 16 instances, maintaining the Uber Agency cartel "lock" on packaging



CAA, 132, 35%

UTA, 82, 18%

WME, 155, 31%

Alpern Group, 1, 0%

Vision Art Management, 1, 0%

Verve, 1, 0%

Rosdolsre, 1, 0%

Rothman Brecher Agency, 4, 1%

APA, 7, 2%

no exclusive agency representation listed, 7, 1%

Paradigm, 15, 3%

ICM, 38, 8%

EXHIBIT H

Last Modified: 6/10/2015 11:25 AM



Exhibit "H"

-44-

EXHIBIT "I"

Lenhoff Lenhoff · Copyright, All Rights Reserved

## Percentage Point Increases between 2001-2002 and 2014-2015 TV Seasons: Diversity, Agency Packaging, and Scripted Series Staffing

**Data compiled by:** Darnell M. Hunt, Ph.D., Professor in the Department of Sociology and the Department of African American Studies, in the Division of the Social Sciences, and Director of the Ralph J. Bunche Center for African American Studies at the University of California, Los Angeles (UCLA). Author and/or Editor of four scholarly books, of which one is directly related to matters of diversity in Hollywood — *Channeling Blackness: Studies on Television and Race in America* (Oxford University Press, 2005). Most recently, Dr. Hunt published a scholarly article on diversity and television writing —"Hollywood Story: Diversity, Writing, and the End of Television as We Know It" — in *The Sage Handbook of Television Studies* (Sage Publications, 2015), and a series of reports examining the state of diversity in the Hollywood entertainment industry. These include *The 2015 Hollywood Diversity Report: Flipping the Script* (with Ana-Christina Ramon) and *The 2014 Hollywood Diversity Report: Making Sense of the Disconnect* (with Ana-Christina Ramon and Zachary Price), both released by UCLA's Bunche Center; *The Hollywood Writers Report*, issued by the Writers Guild of America with installments in 2005, 2007, 2009, 2011, and 2014; and *The African American Television Report*, released by the Screen Actors Guild in June of 2000.

**Conclusion:** Between the 2001-02 and 2014-2015 television seasons, the 4 Uber Agencies increased their share of talent driven scripted television packaging by 20 percentage points, to an industry dominating 92.4 percent. As gatekeepers in the television development process, the Agencies have failed to produce packages that promote significant advances in television diversity. Indeed, between the 2001-02 and 2014-15 seasons, minorities have fallen further behind relative to their growing population share with respect to agency packaging drivers.



Uber Agency share of Packaging
Drivers, 20 points

Minority Share of U.S. Population,
8 points

Minority Share of all Scripted Series
Staffing, 4.9 points

Minority Share of all Packaging
Drivers, 2.3 points

Female Share of all Packaging Drivers,
1.6 points

2001-2002

2014-2015

EXHIBIT I

Last Modified: 6/12/2015 12:36 PM