1  PHILIP J. KAPLAN (State Bar No. 135735)
   LAW OFFICES OF PHILIP J. KAPLAN
2  Email: philipkaplan@ca.rr.com
   3278 Wilshire Boulevard
3  Suite 106
   Los Angeles, California 90010
4  Telephone: (213) 480-8981
   Facsimile: (213) 480-8941
5
   Attorneys for Plaintiff
6  LENHOFF ENTERPRISES, INC.

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11 LENHOFF ENTERPRISES, INC., a        Case No. 2:15-cv-1086-BRO (FFMx)
   California corporation dba LENHOFF
   & LENHOFF,
12
                   Plaintiff,
13                                      **PLAINTIFF'S MEMORANDUM OF**
                                        **POINTS AND AUTHORITIES IN**
14        v.                            **OPPOSITION TO DEFENDANT**
                                        **UNITED TALENT AGENCY'S**
15                                      **MOTION TO DISMISS, PURSUANT**
                                        **TO FRCP RULE 12(b)(6)**
16

17

18

19 UNITED TALENT AGENCY, INC.,         **Date:   September 21, 2015**
   a California corporation;            **Time:   1:30 p.m.**
20 INTERNATIONAL CREATIVE              **Courtroom: "14"/Spring St.**
   MANAGEMENT PARTNERS LLC,            **Judge: Hon. Beverly Reid O'Connell**
21 a Delaware limited liability company;
   and DOES 1 through 5, inclusive,
22
                   Defendants.
23

24

25

26

27

28

LAW OFFICES OF
PHILIP J. KAPLAN

# <u>TABLE OF CONTENTS</u>

Page

I. FACTUAL ALLEGATIONS.................................................... 1

    A.   Conspiracy...................................................... 1

    B.   Intent........................................................... 2

    C.   Market Share/Dominance –
        2001/2 vs. Today (TV Representation)....................... 2

    D.   Injury to Competition:  Horizontal Agreements/
        Allocation of Market.................................... 3

    E.   Concerted Action:  Conduct/Course of Dealing......... 3

        1.   *Refusal to deal*..................................... 3

        2.   *Lack of Independent Action*............................... 4

    F.   Causal Antitrust Injury:  Allocative Inefficiency/
        Higher Prices............................................... 5

    G.   Antitrust Injury............................................. 7

II.   LEGAL DISCUSSION

    A.   FRCP Rule 12(b)(6) Standard.................................... 7

    B.   Conspiracy To Monopolize (Section 2)...................... 8

        1.   *Under the circumstances of this case, a*
            *"shared" or "joint" monopoly is cognizable*
            *in the Ninth Circuit, because the Uber Agencies*
            *are a "small group"*........................................... 8

2. *Support in other Circuits for a "shared" or "joint" monopoly*............................................... 10

3. *Shares are properly aggregated*........................ 12

4. *Conspiracy allegations are sufficient*................ 12

C. If Not A Conspiracy To Monopolize Claim, Plaintiff Should Be Permitted To Amend And Allege An Oligopoly Under Section 1............................................ 14

D. Injury To Competition Has Been Sufficiently Alleged......................................................... 14

E. Antitrust Injury Has Been Properly Alleged.................. 15

F. Tortious Interference............................................... 16

G. Unfair Business Practices................................................ 16

H. Declaratory Relief............................................................ 17

III. CONCLUSION............................................................................ 18

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Ashcraft v. Iqbal*
556 U.S. 662 (2009)............................................................ 7, 16

*Arista Records LLC v. Lime Grp. LLC*
532 F.Supp.2d 556 (S.D.N.Y. 2007)

*Bell Atlantic Corp. v. Twombly*
550 U.S. 554 (2007)............................................................ 7, 13

*Brantley v. NBC Universal, Inc.*
675 F.3d 1192 (9th Cir. 2012)............................................. 14

*Church & Dwight Co., Inc.*
*v. Mayer Laboratories*
2011 WL 1225912 (N.D. Cal. 2011)..................................... 16

*Compare The Jeanery v.*
*James Jeans, Inc.*
849 F.2d 1148 (9th Cir. 1988)............................................. 14

*Crimpers Promotions, Inc. v.*
*Home Box Office, Inc.*
724 F.2d 290 (2d Cir. 1983)................................................ 14

*Durrell v. Sharp Healthcare*
(2010) 183 Cal.App.4th 1350.............................................. 17

*Harkins Amusement Enterprises, Inc. v.*
*General Cinema Corporation*
850 F.2d 477 (9th Cir. 1988)............................................... 9

*H.L. Hayden Co. of N.Y., Inc. v.*
*Siemens med. Sys., Inc.*
879 F.2d 1005 (2d Cir. 1989)................................................. 11

*In re Credit Default Swaps Antitrust Litigation*
2014 WL 4379112 (S.D.N.Y.2014)........................................ 11

*In re Text Messaging Antitrust Litig.*
630 F.3d 622 (7th Cir. 2010)................................................. 13

*Johnson v. Mammoth Recreations*
975 F.2d 604 (9th Cir. 1992)................................................. 7

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*
190 F.3d 775 (7th Cir. 1999)................................................. 10

*Moss v. Secret Serv.*
572 F.3d 962 (9th Cir. 2009)................................................. 7

*Movie 1 & 2 v. United Artists*
909 F.2d 1245 (9th Cir. 1990)............................................... 14

*Newcal Industries, Inc. v. IKON Office Solution*
513 F.3d 1038 (9th Cir. 2008)............................................... 17

*Oxbow Carbon Minerals, LLC v.*
*Union Pacific Railroad Company*
926 F.Supp.2d 36 (D.D.C. 2013)........................................... 13

*Phillips v. County of Allegheny*
515 F.3d 224 (3d Cir. 2008)................................................. 16

*Phoenix Elec. Co. v. Nat'l Elec.*
*Contractors Ass'n. Inc.*
867 F.Supp. 925 (D.Or. 1994)............................................... 8

*Rebel Oil Co. v. Atl. Richfield Co.*
51 F.3d 1421 (9th Cir. 1995)................................................. 7, 8, 10,
                                                                        12, 14

## TABLE OF AUTHORITIES
### (continued)

*Standfacts Credit Services, Inc. v.*
*Experian Information Solutions, Inc.*
405 F.Supp.2d 1141 (C.D. Cal. 2005)...................................... 14

*United States v. E.I. du Pont de Nemours & Co.*
351 U.S. 377 (1956).................................................. 10

*United States v. American Airlines*
743 F.2d 1114 (5th Cir. 1984)..................................... 10

### Statutes and Other Authority

Cal. Labor Code § 2855................................................ 4

Cal. Business & Prof. Code § 17200........................................ 16

Fed. R. Civ. P. 12................................................... 7

Fed. R. Civ. P. 15................................................... 7

## I. **FACTUAL ALLEGATIONS**

### A.  **Conspiracy**

Plaintiff Lenhoff & Lenhoff (hereinafter "Plaintiff") alleges that, beginning in the late 1990's and continuing to 2002, representatives from the largest packaging agencies (and members of the Association of Talent Agents' Strategic Planning Committee) "conspired and agreed, amongst themselves, that it was in *their* best interests to proceed *without* Rule 16(g)."  First Amended Complaint ("FAC") ¶ 50.

These representatives were Jim Berkus of United Talent Agency ("UTA"), Jeff Berg (ICM), Bryan Lourd (CAA), Walt Zifkin (William Morris Agency), Rick Rosen (Endeavor), and Bob Broder (Broder/Kurland/Webb/Uffner Agency).  Rule 16(g) constituted the franchise agreement between the Screen Actor's Guild ("SAG") and the Association of Talent Agents ("ATA").  At that time, up until 2002, Plaintiff alleges that Rule 16(g) "forbade an Agency to possess any financial interest in a production or distribution company or vice versa."  FAC ¶ 43.

Prior to 2002, on or about April 20, 2000, Plaintiff alleges that the ATA had insisted on opening up negotiations with SAG, "demanding 'financial interest'" (the right to invest in or be invested in by outside investors).  However, SAG's membership rejected the deal negotiated between the ATA and SAG.  As the expiration of Rule 16(g) was approaching, Plaintiff alleges that the objective of the above individuals, on behalf of their talent agencies, was, ultimately, "to force the termination of Rule 16(g)."  Their intent, in bringing about Rule 16(g)'s demise, was to achieve greater control, for themselves, over the relevant market, *viz.,* representation of talent for scripted TV.  FAC ¶¶ 50, 60 – 64 (describing the consolidation of ICM and Broder Webb, made possible by the lifting of Rule 16(g) restrictions, and containing details about their TV clients and packaging).

Plaintiff alleges that unfettered investment, with Rule 16(g) restrictions gone, permitted agencies, such as ICM and UTA, to "factor" (or pre-sell) their TV packages to the outside investment community.  With respect to ICM, Plaintiff

alleges that "ICM's plan to raise capital and consolidate with Broder was 'in the works' during the negotiations over Rule 16(g) and before its expiration." FAC ¶¶ 63, 64.

**B.     Intent**

Plaintiff alleges that, "in bringing about the demise of Rule 16(g), the intent of Defendants UTA, ICM, as with the other agencies, was to destroy competition and to build a monopoly of Uber Agencies." FAC ¶ 51.  Contrary to what the non-core agents were led to believe, during the negotiation period, the plan was not to build alliances with the smaller agencies.  Rather, Defendants understood that Rule 16(g)'s expiration "would generate a financial windfall to these six (6) Agencies [now four] allowing them to enjoy unfettered, vertical integration of their businesses, more concentration of power, and more control over production and distribution."   FAC ¶¶ 50, 51.

**C.     Market Share/Dominance – 2001/2 vs. Today (TV Representation)**

As expected, and as planned, an enormous amount of cash flooded into the four major talent agencies, which, today, are UTA, ICM, CAA, and WME (formed by the merger between William Morris and Endeavor).  The amount, from 2002 until today, is estimated at over $6.5 billion[1].  FAC ¶ 60.

In 2001/2002, Fifty-one percent (51%) of the scripted series market (for series staffing) was serviced by fifty-five (55) agencies.  Today, UTA, ICM, CAA, and WME control and share seventy-nine percent (79%) of the series staffing market. FAC ¶¶ 71 and 98.

In 2001/2002, twenty-six (26) agencies controlled forty-four (44%) of the scripted series term deal market (contracts between a writer, producer, director, or performer and a network or studio employer).  Today, UTA, ICM, CAA, and WME

---

[1] It is estimated that approximately $50 billion per year is spent producing scripted series TV.

LAW OFFICES OF
PHILIP J. KAPLAN

Plaintiff's Memorandum In Opposition To UTA's FRCP Rule 12(6)(6) Motion
Case No. 2:15-cv-1086 BRO (FFMx)

control and share ninety-one percent (91%) of the term deal market. FAC ¶¶ 72 and 98.

In 2001/2002, fifteen (15) agencies controlled ninety-six percent (96%) of the scripted series packing market (or submarket). Today, UTA, ICM, CAA, and WME control and share ninety-three percent (93%) of the scripted series packaging market. FAC ¶ 73.

Meanwhile, Plaintiff alleges that approximately thirty-nine (39) of the fifty-five (55) agencies that competed in this TV market no longer exist either through consolidation, by becoming talent managers, "or they have simply disappeared, since 2002 . . . ." FAC ¶ 29.

**D.     Injury to Competition:  Horizontal Agreements/Allocation of Market**

Plaintiff alleges that Defendants UTA and ICM have engaged and continue to engage in "exclusive co-packaging contracts with the other two Uber Agencies (WME and CAA), which defeats and lessens competition, encourages monopoly, and restrains trade in the scripted series market." More specifically, Plaintiff alleges that, by virtue of their packaging or co-packaging agreements with one another (thereby splitting packaging fees),  the 4 Uber Agencies, in essence, "own stock in each other's packaging assets." FAC ¶ 73:1-9.  As a result, Plaintiff alleges, "there is an extremely high – perhaps, impossible – barrier for all the other Agencies to compete for this market, let alone a new entrant to the market.  FAC ¶ 73:1-12.

Plaintiff further alleges that the Big 4 (including WME and CAA) have a policy of *not* splitting packaging fees with non-Uber Agencies (or "Big 4") and have formed, in essence, a "cartel" that controls the market.  FAC ¶¶ 73 and 84.

**E.     Concerted Action:  Conduct/Course of Dealing**

**1.     *Refusal to deal***

Plaintiff alleges that UTA and ICM have coerced studios (buyers) to buy their packages and employ their talent, under the threat of not having access at all, and

that non-core agencies, including plaintiff, are excluded. FAC ¶¶ 84, 99, and 104. Although not alleged in detail, Plaintiff can and will allege where the Big 4, exclusively amongst themselves, discussed the foundation of their packaging business, the future of their combined business, and the economic and business challenges they would, collectively, face to maintain a monopoly.

Additionally, Plaintiff can and will allege the number of instances where the Big 4 would not co-package with Plaintiff (and other non-core agencies), as well as refusals to deal from buyers (studios, networks, or producers), should it be determined that such allegations are necessary to fully state a claim.

### 2. *Lack of Independent Action*

Plaintiff has alleged that the packaging fee (explained more fully below) is tantamount to "extortion" and has no market legitimacy. In most cases, Plaintiff alleges, the Uber Agencies earn more on a TV show than their client. One reason for this is that, unlike non-core agencies, whose relationships are limited by the 7-year employment rule (Cal. Labor Code § 2855), the Uber Agencies are not. Rather, the packaging fee extends "for the life of the work." FAC ¶ 24, 85.

Despite the allegation of "extortion," Plaintiff concedes that more can be alleged about how, precisely, the numbers work with packaging and how it affects both buyers (studios/networks), who pay more as a result of packaging, and how talent (consumers of agents' services), in fact, can earn less. This will be addressed more fully below.

With respect to whether studios and networks are operating out of sound business judgment, Plaintiff can and will more fully allege how the TV scripted marketplace reflects an anticompetitive market situation, considering the fact that studios and networks have no choice but to deal with the Uber Agencies and pay more for talent (in the form of packaging fees), rather than deal directly with non-Big 4 agencies (including Plaintiff), should the court require.

F.    **Causal Antitrust Injury:  Allocative Inefficiency/Higher Prices**

Plaintiff has alleged that a packaging fee amounts, typically, to three percent (3%) of the Network Base License Fee (sometimes referred to as the "upfront" fee) for each episode produced, and equal amount of three percent (3%) deferred out of profits (received before the talent), and a percentage of ten percent (10%) of the Gross (profit received before the talent's Net profits), and other percentages.  FAC ¶ 24.

Should this court permit leave to amend, Plaintiff would be able to allege the following about packaging fees and their anticompetitive effects on both studios/producers (buyers) and talent (customers):  Packaging fees are considered a marketing cost.  In other words, talent bears the expense of the agency's packaging fees as a cost, instead of that expense being absorbed by the employer, who agrees to pay the package fee.  In effect, the agency is charging talent an imputed commission, even though the agent advised talent that would not be charging any commissions.  Apart from their anticompetitive effect, packaging fees inherently present a conflict of interest (and disguise the true price to the consumer):  the more the agency negotiates for itself, the more the client is disadvantaged.

A typical agency packaging fee for a scripted TV show can work out to be, approximately, $30,000 per episode in upfront and deferred fees that go to the agency.  However, the talent represented and packaged by that same agency, who is earning an industry average of $40,000 an episode, and who believe they are "saving" a 10% commission ($4,000) are, in fact, making far less in light of the way packaging fees are applied (unbeknownst to the talent/consumer).  The agency takes its 10% gross profit participation <u>before</u> the talent's net profit participation.  This is because, as a result of the package, the agency's profit is an "off-the-top" marketing <u>expense</u>.  Consequently, assuming the same TV series earns $100 million gross, the agency's 10% gross back-end fee is $10 million, which reduces the profit pot to $90 million, thereby <u>reducing</u> the talent's profit participation.  The net profit distribution

is $1,350,000 to the talent, after all the deductions.  The final total on the above would pay the agency $17 million in packaging fees, in contrast to its talent earning $6,350,000.  That talent earns "more," because it is not being commissioned 10%, is illusory.  The truth is that talent makes less, because the Uber Agencies are, in fact, competing with their own clients for compensation.

With respect to the "price" that talent pays for representation, Plaintiff can and will allege that the packaging arrangement disguises <u>increased</u> fees (therefore, higher "prices"), resulting in a marketplace where the most powerful representatives of talent, *viz.,* the Uber Agencies, disadvantage the very people they claim to represent.

With respect to "choice" and "quality," Plaintiff can and will allege, should the court permit, that packaging affects both.  Because the above $30,000 paid to, in most cases, one or more of the Uber Agencies per TV episode, that amount comes out of the budget.  As a result, it can be alleged, the added (and valueless) cost of $30,000 means that something of production value is <u>lost</u>, e.g., a set, music, a scene, storyline, or, perhaps, an actor.  Both quality and choice, Plaintiff alleges, is constrained by the current dysfunctional TV scripted market.

Finally, Plaintiff alleges, the issue raised by "diversity" is, ultimately, one of choice.  Here, Plaintiff alleges, "the Uber Agencies have failed to produce scripted series packages that promote significant advances in television diversity."  FAC ¶ 74.  Choice, Plaintiff alleges, is limited by what the Uber Agencies decide to package.  Specifically, it is alleged that the "Uber Agencies have failed to produce scripted series packages that promote significant advances in television diversity.  Indeed, between the 2001-2002 and 2014-2015 television seasons, minorities have fallen further behind today as elements that drive a package (a 2.3% increase) relative to their growing population (8% increase), and women increased a mere 1.6% of all scripted series television packages."  FAC ¶ 74:15-22.

Although 'diversity' is a social issue, Plaintiff's allegations pose legitimate antitrust concerns, *viz.,* of limited choice in the marketplace on the part of consumers

(talent): "As a result [of the stranglehold placed on the TV market by the Big 4], the presence of diversity artists, their ideas, and their shows have been stifled and are not proportionately reflected in the triple digit increase in the number of shows between 2001/2002 and the 2014/2015 scripted series market." FAC ¶ 74:22-25.

### G.   Antitrust Injury

Plaintiff alleges that several packagable clients it represented were poached and was, therefore, harmed. FAC ¶¶ 7-24. It is alleged that the Uber Agencies "use their market power to sign and stockpile talent, despite the fact that such talent representation agreements are not in the independent economic best interest of the talent coerced or induced to such rights." FAC ¶ 87. Further, Plaintiff alleges, packaging by the Uber Agencies serves as "devices for stifling competition and for diverting the talent cream of the business to the 4 Uber Agencies." FAC ¶ 88.

## II.   LEGAL DISCUSSION

### A.   FRCP Rule 12(b)(6) Standard

In evaluating the sufficiency of a pleading, courts generally must accept all factual allegations as true. Legal conclusions, however, are not entitled to the assumption of the truth. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)(citing *Twombly,* 550 U.S. at 555).

FRCP Rule 15(a) provides that a party may amend a pleading with leave of court, and that "[t]he court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2); *see also Moss v. Secret Serv.,* 572 F.3d 962, 972 (9th Cir. 2009). Leave to amend should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay. *Johnson v. Mammoth Recreations,* 975 F.2d 604, 607 (9th Cir. 1992).

/ / /

/ / /

/ / /

/ / /

**B.     Conspiracy To Monopolize (Section 2)**

1.     *Under the circumstances of this case, a "shared" or "joint" monopoly is cognizable in the Ninth Circuit, because the Uber Agencies are a "small group"*

Defendant UTA argues that Plaintiff's conspiracy monopolize claim is unsustainable, because "one firm *alone* must have the power to control market output and exclude competition." *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1443 (9th Cir. 1995). In addition to *Rebel Oil,* UTA cites the district court case of *International Longshore and Warehouse v. ICTSI Oregon, Inc.,* 15 F.Supp.3d 1075 (D.Or. 2014) and other authorities contained in the *International Longshore* decision.

First, it should be noted that the district court decision of *International Longshore* is not controlling Ninth Circuit authority.

Second, although a Section 2 case, *International Longshore* is distinguishable. There, the district court observed that the number of defendants allegedly conspiring to monopolize were far too numerous to allege "shared" monopoly and, certainly, could not be construed as constituting a "small group:" "ICTSI, however, does not allege that ILWU and PMA are conspiring to create a monopoly for any single PMA member of firm or even for a small group of PMA members. Instead, ICTSI argues that ILWU and PMA are conspiring to create a monopoly on the West Coast ports for the 70-member PMA." *Id.* at 1096 (Emphasis). This similar concern, i.e., of too many defendants allegedly conspiring, was raised in *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.,* 867 F.Supp. 925, 941-2 (D.Or. 1994) ("There is likewise no suggestion that any one or small group of the contractors who belong to [the multiemployer bargaining group] have or could obtain monopoly power.")

With respect to controlling Ninth Circuit authority, *Rebel Oil Co. v. Atl. Richfield Co., infra,* that case is distinguishable in, at least, several respects. Again, as with the above cases, there were numerous defendants (15 directly operated ARCO-branded stations and another 38 independent ARCO-branded stations), rather

-8-

than a small group.  More importantly, *Rebel Oil* is an <u>attempted monopolization</u> case.  *Rebel Oil* does not involve, as it does in the instant case, allegations that competitors have conspired to monopolize the market ("Rebel does not allege that ARCO conspired with its competitors in Las Vegas to monopolize the market.") *Rebel,* at p. 1444.

That leaves the Ninth Circuit case of *Harkins Amusement Enterprises, Inc. v. General Cinema Corporation,* 850 F.2d 477 (9th Cir. 1988).  *Harkins* involved a suit by an independent film exhibitor against regional picture exhibitors and national film distributors and, among other claims, an allegation of conspiracy to monopolize.  Unlike *Rebel Oil, Harkins is* a Section 2 conspiracy to monopolize case.  Faced with numerous defendants, the Ninth Circuit, in *Harkins,* found that a claim could not be stated under Section 2 for a "shared" monopoly. *Id.* at 490. Interestingly, the Ninth Circuit pronounced:  "We need not decide whether the shared monopoly theory may be viable <u>under some circumstances</u>.  Suffice it to say that in this case, <u>involving a small market with *numerous* sellers</u>, no claim is stated under section 2."  At 490 (Emphasis).

Based on the above and, particularly, the Ninth Circuit authority of *Harkins* (a conspiracy to monopolize case, as opposed to *Rebel Oil),* Plaintiff submits that the Ninth Circuit has left the door <u>open</u> for a "shared" or "joint" monopoly theory of conspiracy under Section 2 for a "small group" of conspirators.  Were this court to "walk" through that "door" and find that Plaintiff herein can state a claim for conspiracy to monopolize, based on its allegations of a small group (4) or alleged "cartel" conspiring to monopolize the scripted TV market (the relevant market), Plaintiff contends that this court would not be making either bad law or new law. Rather, this case presents those circumstances which the Ninth Circuit has *already* indicated may be cognizable under a Section 2 conspiracy to monopolize claim.

/ / /

/ / /

**2.     Support in other Circuits for a "shared" or "joint" monopoly**

The Seventh Circuit Court of Appeals, with the Hon. Richard Posner writing the opinion, found that there was joint monopoly in a case against <u>three</u> (3) defendants. *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 779-80 (7th Cir. 1999).

The Fifth Circuit Court of Appeals recognized a shared or "joint" monopoly in *U.S. v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984). *American Airlines* was a FRCP Rule 12(b)(6) case, in which the U.S. Government's case had been dismissed. On appeal, the Fifth Circuit focused upon the issue of power: "Monopoly power is 'the power to control price or exclude competition.'" *Id.* at 1117 *quoting United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264, 1278 (1956).

In looking at the facts, the Fifth Circuit aggregated the market shares of American Airlines and Braniff (competitors of one another) and determined that, "together," they enjoyed an overall market share of seventy-six percent (76%)[2] of monthly enplanements at Dallas-Fort Worth International Airport, with high barriers to entry. In a telephone call from American Airlines president to Braniff's president, it was proposed that the two competing airlines raise their fares twenty percent (20%). The Fifth Circuit concluded that, upon acceptance, there would have been monopoly "power;" accordingly, the U.S. had sufficiently stated a claim under a "shared" monopoly theory: "The government unequivocally alleged that [American's president] proposed to enlist his chief competitor in a cartel so that American and Braniff, acting together, could control prices and exclude competition at DFW; as Crandall explained to Putnam, 'we can both live here and there ain't no

---

[2] This aggregation by the Fifth Circuit is cited with approval in *Rebel Oil Co., Inc. v. Atlantic Richfield Co., infra* at 1437, 1438 ("The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize.")

room for Delta.'  As a result of the monopolization, Braniff would 'make more money and I will too.'"  *Id.* at 1118.

It is clear that the Second Circuit Court of Appeals does not recognize a shared monopoly theory under an <u>attempt to monopolize</u> claim under Section 2. *H.L. Hayden Co. of N.Y., Inc. v. Siemens med. Sys., Inc.,* 879 F.2d 1005, 1018 (2d Cir. 1989)  With respect to a conspiracy to monopolize theory, however, it is submitted that the door is "open" for a shared monopoly, in a situation where there is a small group of competitors who seek to allocate the market for themselves and exclude others.  In *In re Credit Default Swaps Antitrust Litigation,* 2014 WL 4379112 (S.D.N.Y. 2014), in considering a 12(b)(6) motion to dismiss, the district court discussed the viability of a "shared monopoly" conspiracy claim under Section 2.  There, the court noted the observations of a fellow jurist in New York: "Some district courts . . . although expressing skepticism generally about the shared monopoly theory, have suggested that <u>the theory may be viable in the context of a claim for conspiracy to monopolize if the aim of the conspiracy is to form a single entity to possess the illegal market power, or where two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity</u>."  *In re Credit Default Swaps Antitrust Litigation, quoting Arista Records LLC v. Lime Grp. LLC,* 532 F.Supp.2d 556, 580 (S.D.N.Y. 2007) (Emphasis).

The court, however, in *In re Credit Default Swaps,* determined that, even though a "conspiracy-to-monopolize-jointly" claim was "theoretically possible," the plaintiffs had not alleged market allocation and exclusion:  "The charge is not, for example, that the twelve named Dealer-Defendants split the market among themselves and conspired to exclude other big banks."  2014 WL 4379112.

To summarize the above, Plaintiff contends that the proper focus, with the instant motion, ought to be one of monopoly "power," rather than a mechanical application of a "single entity" test.  Recognizing this, both the Second and Ninth

1    Circuits have signaled that a small group of competitors, who allocate the market
2    amongst themselves and who exclude others, may have sufficient monopolistic
3    power and, therefore, can be proper defendants in a conspiracy to monopolize
4    Section 2 claim.

5          **3.      Shares are properly aggregated**

6          Defendants argue that there is an insufficient market share by each (UTA or
7    ICM) to support Plaintiff's antitrust claim. This is false. As stated above, shares of
8    the individual cartel members are properly aggregated in a conspiracy to monopolize
9    claim. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1437, 1438 (9th
10   Cir. 1995).

11         In the instant case, Plaintiff contends that the relevant market shares
12   controlled by the Big 4 are 79% (for scripted series staffing deals), 91% (for scripted
13   series term deals), and 96% (for scripted series packaging). FAC ¶¶ 71-73.

14         **4.      Conspiracy allegations are sufficient**

15         Plaintiff alleges that the principals of UTA and ICM, together with principals
16   of WME and CAA, conspired to monopolize the scripted TV market. These
17   principals, then-members of the ATA Strategic Planning Committee who exercised
18   "effective control" over the Committee, are alleged to have formed a combination
19   that would work, in unison, to terminate Rule 16(g) and its restrictions on outside
20   investment. FAC 50, 60 – 64. By lobbying against Rule 16 (g), the intent and plan
21   of the above principals was that their agencies would receive outside investment,
22   once the restrictions of 16(g) were lifted. With added capital, the barriers to entry
23   for the non-Big 4 Agencies, which lack the talent packages to warrant investing in,
24   would be raised. Today, based on 2014/2015 statistics, Plaintiff alleges that UTA,
25   ICM, WME, and CAA, with the assistance of over $6.5 billion in outside capital,
26   have achieved "cartel" status in the relevant market, *viz.,* the scripted TV market. ¶¶
27   41 – 103.

28

LAW OFFICES OF
PHILIP J. KAPLAN

Plaintiff's Memorandum In Opposition To UTA's FRCP Rule 12(6)(6) Motion
Case No. 2:15-cv-1086 BRO (FFMx)

Within this market, Plaintiff alleges that "Defendants UTA and ICM have engaged and <u>continue to engage</u> in exclusive contracts with the other 2 Uber Agencies (WME and CAA), that defeat and lessen competition, encourage monopoly, and restrain trade in the TV marketplace." FAC ¶ 104 (Emphasis).

Although not set forth in the FAC, Plaintiff can and will allege (if permitted) current practices by the Uber Agencies, including how their agents "blocked booked" broadcasters' calendars at a Realscreen event in Washington, D.C. (in early 2015), so that small, boutique producers would not have access to the buyers. Such producers, whose small budgets make an agency fee prohibitive, find themselves coerced either to do business with the Uber Agencies or be out of the running for series orders from cable channels and broadcast networks.

Plaintiff submits that its allegations of a conspiracy are sufficient. In *Oxbow Carbon Minerals LLC v. Union Pacific Railroad Company,* 926 F.Supp.2d 36 (D.D.C. 2013), the district court discussed allegations of conspiracy to monopolize. There, the court noted that parallel conduct placed in a "context" (commonly referred to as "plus factors") could evidence a "preceding agreement." *Id.* at 46, 47 *citing Bell Atlantic Corp. v. Twombly,* 550 U.S. at 556-57, 127 S.Ct. 1955. Such "plus factors" may include "details of industry structure, and industry practices that facilitate collusion." *Oxbow, infra,* at 47 *quoting In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 627-28 (7th Cir. 2010) (upholding a denial of a Rule 12(b)(6) motion).

Here, Plaintiff contends that it has alleged a preceding agreement, including how that agreement came about, as well as outlining the industry structure, in detail, and industry practices that have facilitated collusion.

Defendants' motions should be denied on these grounds.

///

///

///

**C.     If Not A Conspiracy To Monopolize Claim, Plaintiff Should Be Permitted To Amend And Allege An Oligopoly Under Section 1**

In the alternative, Plaintiff should be permitted to plead a Section 1 claim.

First, a Section 1 claim does not require a specific intent to monopolize. *Compare The Jeanery v. James Jeans, Inc.,* 849 F.2d 1148, 1152 (9th Cir. 1988); *Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.,* 405 F.Supp.2d 1141, 1153 (C.D. Cal. 2005).

Assuming Plaintiff has been unsuccessful in pleading a "shared" monopoly under Section 2, it is submitted that Plaintiff has sufficiently alleged collusion between "oligopolists" in violation of Section 1.  *See Rebel Oil Co., Inc. v. Atlantic Richfield Co., infra,* at p. 1443 *citing Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 291 n. 1 (2d Cir. 1983).  Further, under a Section 1 claim, Plaintiff need not allege and prove an explicit agreement.  Collusion may be inferred from circumstantial evidence of defendants' conduct and course of dealing.  *Movie 1 & 2 v. United Artists,* 909 F.2d 1245, 1251-52 (9th Cir. 1990)

**D.     Injury To Competition Has Been Sufficiently Alleged**

Agreements between competitors in the same market (horizontal agreements) may harm competition.  Three major types of agreements are:  1) an agreement allocating a market and restricting each company to compete against the other; 2) an agreement, explicitly or tacitly setting prices that may injure or eliminate competition; or 3) a group of competitors acting in concert to harm another competitor or exclude that competitor from the market.  *See Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1198 (9th Cir. 2012).

Plaintiff contends the co-packaging agreements controlled by UTA, ICM, WME, and CAA may involve all three of the above agreements.  Plaintiff alleges that co-packaging agreements, dominated by the Uber Agencies, allocate the market and restricts competition.  Further, with respect to price, Plaintiff contends that, because the Uber Agencies are compensated by the packages (and more

1   handsomely), the "price" <u>offered to potential customers</u> (talent) whom they intend to

2   poach is lower (because no commission is paid).  But this "lower" price is illusory.

3   The true <u>cost</u>, *i.e.,* net computation, to talent is <u>higher</u>.

4       Accordingly, when Defendant UTA argues that Plaintiff has alleged that talent

5   "benefits" from packaging, this is false.  To the contrary, Plaintiff alleges that the

6   agreements (packaging agreements) which TV talent enters into with the Uber

7   Agencies "are not in the independent economic best interest of the talent coerced or

8   induced to grant such rights."  *See* Memorandum of UTA, p. 13:1-15; FAC ¶ 87.

9   Furthermore, Plaintiff alleges that consumer (talent) <u>choice</u> is reduced, in the TV

10  market, to either UTA, ICM, WME, or CAA.  FAC ¶¶ 94, 95.

11      Finally, Plaintiff alleges that the Uber Agencies act in concert to exclude the

12  non-Big 4 Uber Agencies from the TV market.  FAC ¶¶ 80-105.

13      Plaintiff has sufficiently pled injury to competition.

14  **E.    Antitrust Injury Has Been Properly Alleged**

15      A plaintiff must plead and prove that a defendant's behavior is

16  anticompetitive and that the plaintiff has been injured by an "anti-competitive <u>aspect</u>

17  of the practice under scrutiny."  *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192,

18  1200 (9th Cir. 2012) *quoting Atl. Richfield,* 495 U.S. at 334-35, 344, 110 S.Ct. 1884

19  (Emphasis).

20      Plaintiff contends that two premium, packagable clients were poached by

21  UTA and ICM.  This alleged injury flows from an anticompetitive aspect of the

22  alleged TV cartel, *viz.,* the illusory <u>price</u> offered by members of the cartel (UTA and

23  ICM), and is an aspect of the <u>diminished choice</u> in meaningful representation

24  confronted by talent working in TV.  Plaintiff, specifically, alleges that "the

25  dominant Uber Agencies . . . use their market power to sign and stockpile talent . . .

26  ."  FAC ¶ 87.

27      Plaintiff has successfully pled antitrust injury.

28

### F.  Tortious Interference

Defendants argue that Plaintiff's tortious interference claim is deficient, because the specifics of the alleged contracts entered into by Plaintiff's clients with Plaintiff have not been alleged.  *See* Memorandum of UTA, pp. 15/16.

This is not the law.

Tortious interference is a different situation than a suit on a contract.  In contrast, where tortious interference is alleged, it is only required that the existence of a contract be pled:  "*Twombly* and *Iqbal* do not require the specifics of the contract be pled at this stage.  Here, the gist of the alleged contract is plausible." *Church & Dwight Co., Inc. v. Mayer Laboratories,* 2011 WL 1225912 (N.D. Calif. 2011) *citing Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008) (concluding that, taken as true, the allegations provide "enough factual matter . . . to suggest the required element" of a contract).

Here, Plaintiff has alleged that Clients #1 and #2 were under contract and "exclusive" to Plaintiff.  Further, Plaintiff has alleged details about the service performed by Plaintiff (as well as details about the work performed by Clients #1 and #2 in the TV marketplace).  In addition, Plaintiff alleges facts about the length of time it represented Clients #1 and #2, before termination.  FAC ¶¶ 11-27.

In addition to the above, UTA claims that Plaintiff has failed to allege that "Client #1's [UTA's client] termination constituted a breach of contract or interference with an enforceable contractual relationship . . . ."  Memorandum of UTA, p. 16:21-24.

This is a misrepresentation to the court.

Under the FAC's Third Cause of Action, Plaintiff alleges that Clients #1 and #2 (ICM's client) "had exclusive, valid contracts."  Further, Plaintiff alleges that "Defendants' [sic] had knowledge of such contracts . . . [and that] Defendant UTA had been given notice of Plaintiff's complete exclusive client list."  FAC ¶¶ 128, 129; p. 30:5-10.  The Third Cause of Action continues:  "Plaintiff alleges that

LAW OFFICES OF
PHILIP J. KAPLAN

Plaintiff's Memorandum In Opposition To UTA's FRCP Rule 12(6)(6) Motion
Case No. 2:15-cv-1086 BRO (FFMx)

Defendants committed intentional acts designed to induce a breach of such contract . . . and that Defendants actually induced the breach of its clients . . . ." FAC ¶¶ 130, 131.

Plaintiff submits that Plaintiff's allegations are sufficient to survive a motion to dismiss. However, with the court's permission, Plaintiff can and will allege further details about its oral agreements with Clients #1 and #2.

## G.    Unfair Business Practices

Defendants claim that Plaintiff's UCL claim, under either prong (unlawful/unfair) cannot stand.

It is submitted that this argument misstates the law, as it applies to the 'unfairness' prong. Contrary to UTA's argument, it is not the law that an unfairness claim must invoke a particular "statute." *See* Memorandum of UTA, p. 19:5-11. Rather, it may be sufficient that a claim threatens an "incipient" violation of an antitrust law "or violates the policy or spirit of an antitrust law." *Durrell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1366 (Emphasis).

## H.    Declaratory Relief

Finally, Plaintiff 's declaratory relief claim is valid. *See Newcal Industries, Inc. v. IKON Office Solution,* 513 F.3d 1038, 1056 (9th Cir. 2008) (Ninth Circuit reversed the lower court's dismissal of a declaratory relief claim, involving antitrust.)

In that case, Plaintiff sought a declaration that certain business relationships were not legally protectable, due to fraud. *Id.* at 1056. Similarly, Plaintiff seeks, among other things, a declaration that "Defendants UTA and ICM have committed violations of the Sherman Act . . . ." FAC Prayer, p. 33:18-28.

Plaintiff's Declaratory Relief claim should stand.

/ / /

/ / /

/ / /

**III.   CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied or, alternatively, Plaintiff should be granted leave to amend consistent with this court's ruling.

Dated:  August 24, 2015        Respectfully submitted,

**LAW OFFICES OF PHILIP J. KAPLAN**

By _____
       PHILIP J. KAPLAN
Attorneys for Plaintiff
LENHOFF ENTERPRISES, INC.

# **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within entitled action.  I am employed at 3278 Wilshire Blvd., Suite 106, Los Angeles, CA 90010.

      On August 24, 2015, I served the within **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT UNITED TALENT AGENCY'S MOTION TO DISMISS, PURSUANT TO FRCP RULE 12(b)(6)** upon interested parties in this proceeding or action by depositing a true and correct copy enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Postal Service at Los Angeles, California, addressed as follows:

### **See Attached Service List**

(X)    **CM/ECF:** via Filing in Court's electronic docket.

( )    **BY U.S. MAIL:**  I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, such envelope(s) would be deposited with the U.S. Postal Service on that same day, with postage thereon fully prepaid, at Los Angeles, California.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing contained in the affidavit.

( )    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

(X)    (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

      Executed on August 24, 2015, at Los Angeles, California.

                               _____
                                   Philip J. Kaplan

| | |
|---|---|
| **Case Name:** | **LENHOFF & LENHOFF v. UNITED TALENT AGENCY** |
| **Case No.:** | **2:15-cv-1086 BRO (FFMx)** |

## MAILING/SERVICE LIST

### Attorneys for Defendant United Talent Agency, Inc.

Steven A. Marenberg, Esq.
smarenberg@irell.com
IRELL & MANELLA
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Bryan J. Freedman, Esq.
bfreedman@ftllp.com
FREEDMAN + TAITELMAN, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067

### Attorneys for Defendant International Creative Management Partners LLC

Michael B. Garfinkel, Esq.
mgarfinkel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067

Jacqueline E. Young, Esq.
JYoung@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105