1  **PHILIP J. KAPLAN  (State Bar No. 135735)**
   **philipkaplan@ca.rr.com**
2  **LAW OFFICES OF PHILIP J. KAPLAN**
   3278 Wilshire Blvd., Suite 106
3  Los Angeles, California 90010
   Telephone:  (213) 480-8981
4

5  Attorney for Plaintiff
   LENHOFF ENTERPRISES, INC. dba
6  LENHOFF & LENHOFF

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  LENHOFF ENTERPRISES, INC.,        )   CASE NO.  2:15-cv-1086 –BRO
    a California corporation dba      )   (FFMx)
12  LENHOFF & LENHOFF,                )
                                      )
13              Plaintiff,            )   **SECOND AMENDED**
                                      )   **COMPLAINT FOR**
14          vs.                       )   **VIOLATIONS OF THE**
                                      )   **SHERMAN ACT, UNFAIR**
15  UNITED TALENT AGENCY,             )   **COMPETITION LAW,**
    INC., a California corporation;   )   **INTENTIONAL**
16  INTERNATIONAL CREATIVE            )   **INTERFERENCE WITH**
    MANAGEMENT PARTNERS               )   **CONTRACT, AND**
17  LLC, a Delaware limited liability )   **INTENTIONAL**
    company; and DOES 1 through 5,    )   **INTERFERENCE WITH**
18  inclusive,                        )   **PROSPECTIVE ECONOMIC**
                                      )   **ADVANTAGE**
19              Defendants.           )
                                      )   **DEMAND FOR JURY TRIAL**
20                                    )

21

22

23      Plaintiff LENHOFF ENTERPRISES, INC.  (hereinafter sometimes

24  referred to as "Plaintiff") hereby alleges as follows:

25                          **PARTIES**

26      1.     Defendant United Talent Agency, Inc. (hereinafter sometimes

27  "UTA") is, and at all material times was, a corporation existing under the laws

28  of the State of California and licensed to do and doing business in the State of

California.

2.     Defendant International Creative Management Partners LLC (hereinafter sometimes "ICM") is, and at all material times was, a limited liability company existing under the laws of the State of Delaware and licensed to do and doing business in the State of California.

3.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 5, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this complaint, and that Plaintiff's damages as alleged were proximately and legally caused by the Defendants' conduct.  At all times material herein, each Defendant was the agent, servant and employee of each of the remaining Defendants, and acting within the purpose, scope and course of said Agency, service and employment, with the express and/or implied knowledge, permission and consent of the remaining Defendants, and each of them, and each of said Defendants ratified and approved the acts of Defendants.

## JURISDICTION/VENUE

4.     This court has subject matter jurisdiction, pursuant to 15 U.S.C. § 2, and Sections 4, 4C, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 22, and 26.  This court has pendent jurisdiction over the California State law claims.  Venue is proper pursuant to 28 U.S.C. § 1400(a), because the defendants or their agents reside or may be found within this district and because defendants transact business, including the alleged tortious acts, within this district.

## SUMMARY OF THE CASE

5.     Plaintiff alleges that Defendants UTA and ICM, together with two other "Uber" talent agencies, William Morris/Endeavor ("WME") and Creative Artists Agency ("CAA"), have engaged in a conspiracy to restrain trade and to

create an oligopoly in order to control the scripted television ("TV") relevant market, including the scripted TV packaging submarket (explained more below). This restraint/control has been achieved by Defendants' agreement to implement a series of exclusive dealing contracts, the effect of which, particularly cumulatively, has been to foreclose competition and to protect Defendant/Uber agencies against competition.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    Background – Lenhoff & Lenhoff

6.    Lenhoff & Lenhoff ("Plaintiff") is a Talent Agency that was established in 1997. Plaintiff is franchised with the Screen Actors Guild, Writers Guild of America, and the Directors Guild of America. Plaintiff's principals have been representing talent since 1988.

7.    Plaintiff represents Writers, Directors, Producers and Cinematographers. In addition to this representation, Charles Lenhoff has been active within the Association of Talent Agents ("ATA") and vocal about the merits of adopting a Code of Ethics by ATA franchise members and the adverse effect of "poaching" on talent agents and, particularly, the talent they represent.

8.    Plaintiff is a boutique Agency consisting of two agents, with a roster of clients that it has cultivated and nurtured over the years. All of Plaintiff's clients, including Client #1 and Client #2 herein, are represented by Plaintiff on an exclusive basis. As more fully set forth below, both Clients #s 1 and #2 were being represented by Plaintiff, at all material times, pursuant to verbal contracts between Plaintiff and Clients #s 1 and #2. However, because both Clients #1 and #2 were, at all material times, acting under the aegis of the Director's Guild of America ("DGA"), and because Plaintiff was, at all material times, a member of the Association of Talent Agents ("ATA"), Plaintiff alleges that those practices, procedures, and terms set forth in Rider "D" to the Agreement between the ATA and the DGA were/are applicable to the subject agreements between Plaintiff and Clients #s 1 and #2. Such

practices, procedures, and terms include, but are not limited to, the "90 Day Clause" contained in Rider "D." Rider "D" states, among other things, that an agency agreement "may not terminate" if, during the 90-day period prior to notice of termination, the individual is either *actually* employed or there are "contracts or bona fide offers" for employment. For this and other reasons, Plaintiff contends that the subject contracts with Clients #1 and #2 were subject to limitations on the right to terminate and, therefore, were *not* terminable at will. Plaintiff further alleges that it has spent years building up its clients' "brands", including Clients #1 and #2, in the marketplace and in positioning them in the best possible light. Presently, Plaintiff has approximately thirty (30) clients of which eighteen (18) are consistently revenue-producing with Producers being, by far, the highest earners. Plaintiff has nine (9) Producer clients. A loss of, e.g., two (2) Producer clients would mean a devastating loss of between twenty to twenty-five percent of Plaintiff's revenue.

**B.    Background – UTA and ICM**

9.    Defendant UTA is a large talent Agency, ranked behind CAA (Creative Artists Agency) and WME (William Morris/Endeavor). On information and belief, UTA employs two hundred (200) agents and services 3,000 plus clients. Plaintiff is informed that UTA is controlled by over thirty partners.

10.    Plaintiff is informed and believes that Defendant ICM was renamed "ICM Partners" sometime in 2012. On information and belief, ICM employs two hundred plus (200) agents and is controlled by forty partners. On information and belief, Plaintiff alleges that ICM services 4,500 plus clients

**C.    "Poaching" Activities By UTA Against Plaintiff**

11.    On May 8, 2012, an agent employed by UTA, Ryan Tracey ("Agent #1") contacted a client (not Client #1 referenced hereinafter) of Plaintiff, suggesting that the client sever its relationship with Plaintiff and let UTA represent them exclusively. Plaintiff informed the Executive Director of the ATA, Karen Stuart ("Stuart"), to ask Agent #1 to stop calling Plaintiff's

-4-

client. Stuart called Andrew Thau, Head of Business Affairs at UTA (and ATA Board Member). After, Stuart called Plaintiff and instructed him to call Andrew Thau.

12. On May 18, 2012, Plaintiff spoke to Thau. Plaintiff advised that UTA's employee (Agent #1) was tortiously interfering with Plaintiff by attempting to induce that exclusive client to breach its agreement with Plaintiff. Plaintiff requested that the solicitations/poaching activity cease. Plaintiff was informed that it would.

13. However, on March 6, 2014, Plaintiff learned that UTA Agent #1 contacted another client of Plaintiff's (not surprisingly, "Client #2"). Client #2 told Plaintiff that Agent #1 called him and said he was "packaging" a TV series called "Daredevil" and was looking for a line producer. Was Client #2 interested? Client #2 replied, "Are you offering me a job?" To which Agent #1 said, "Perhaps, send me your credits."

14. Again, Plaintiff contacted Andrew Thau of UTA and informed him that Agent #1 was not only calling Plaintiff's clients again, but was suggesting he was in a position to offer clients employment. Plaintiff informed Thau he had valid contracts and requested that the phone calls to Plaintiff's clients cease. Thau said he would look into it and get back to Plaintiff. Thau never did.

15. On or about April 4, 2014, Plaintiff received notice from yet another client that Agent #1 had been calling on the client and Agent #1 knew of a potential job for client in Los Angeles. Plaintiff was informed by the client that Agent #1 had been calling every three (3) months for the past two (2) years.

16. Significantly, Plaintiff was informed that Agent #1 had been told, repeatedly, by Plaintiff's client to stop calling.

17. Plaintiff, again, contacted its trade representative at the ATA, Karen Stuart, and requested that the ATA intervene and arrange a meeting between Plaintiff and UTA. Plaintiff is informed, believes, and alleges that the

ATA notified UTA and asked UTA to discuss the matter with Plaintiff.  Later, on or about April 4, 2014, Michael Sinclair of UTA, who works under Andrew Thau, contacted Plaintiff.   Plaintiff asked that UTA make itself available for a meeting to discuss the contact that now appeared to be a "robo-dialing" program that, Plaintiff is informed and believes and thereon alleges, was engineered or, at least, authorized by Defendant UTA.  Sinclair responded and stated UTA would not meet with Plaintiff, contending that its activities in contacting Plaintiff's exclusive clients were legitimate because "poaching" was an "acceptable avenue for talent pursuit" and not actionable.  Plaintiff responded that UTA was engaged in tortious interference.

19.    On or about April 30, 2014, Plaintiff sent its first "Dispute Notice" as an olive branch stating, "Dear Michael, Regarding the dispute between our companies, I've had a chance to huddle with my people and we are willing to take the view that this was a simple misunderstanding/mistake on the part of UTA, Ryan Tracy and others within the firm.  Towards that end, we are willing to walk away at this time by your simply agreeing to cease contacting my clients. In that regard, a simple e-mail will do.   However, be assured our extension of this olive branch is not, nor shall not be construed as a sign of reluctance to litigate on the basis of UTA's systematic ongoing interference with both our contractual rights and business relations.  If necessary we will pursue all actual damages plus punitive damages against both the companies and all individuals we deem responsible. . . . [A]ttached is a list of all my clients.  Furthermore, I will be sending you my updated client list on a monthly basis so there will be absolutely no misunderstanding as to my existing relationships.  This should serve to prevent future disruptions of my business."

Continuing thereafter for seven months, Plaintiff sent via email and registered letter a "dispute notice" to UTA's Michael Sinclair (with copies to ATA) recounting Defendant's interference and requesting that UTA cease its predatory practices. The notice also provided to UTA Plaintiff's list of exclusively represented clients for the "duration of the next year", so that UTA

would have clear notice of Plaintiff's clients. This was done on a monthly basis until November 18, 2014.

20.   Plaintiff is informed, believes, and thereon alleges that its own trade representative the ATA, which historically has helped resolve disputes between agencies, was pressured to distance herself from Plaintiff's dispute with UTA. On September 16, 2014, Plaintiff's trade representative at the ATA sent an e-mail in response to notice to the Plaintiff with a copy to the Defendant stating, "ATA has not requested this information and ATA will not retain this information." As a result of the numerous calls made by UTA to Plaintiff's clients, together with UTA's refusal to stop the calls when asked by Plaintiff's clients and by Plaintiff, Plaintiff alleges that its relationship with various clients has, and continues to be, disrupted, as more fully set forth below.

### D.   Interference By UTA/The "Packaging" Inducement

21.   On November 4, 2014, a client of Plaintiff's informed Plaintiff that she no longer wished to be represented by Plaintiff. No reasons were given. This particular client ("Client #1"[1]), a diversity director, producer, and DGA unit production manager, had been signed with Plaintiff for approximately four (4) years. Plaintiff alleges that Client #1 had been served very effectively by Plaintiff, and her career was on an upward trajectory during the entire relationship. In particular, Plaintiff alleges that Client #1 tripled her income in just four (4) years that she was represented by Plaintiff. In return, Client #1 had shown her gratitude with gifts and praise, only to abruptly terminate the relationship without an explanation. Client #1 even referred several clients to Plaintiff.

22.   Within hours of Client #1's termination of her contract with Plaintiff, Plaintiff learned that she had removed Plaintiff from her IMDb

---

[1] Plaintiff has chosen not to identify Client #1 and Client #2 in the SAC, because they are in a position to hire Plaintiff's clients. Plaintiff is concerned about reprisals against its current clients, as a result of identifying Clients #1 and #2 herein.

("Internet Movie Database") online listing.

23.     Less than one (1) month later, on or about December 1, 2014, Plaintiff learned that the DGA ("Director's Guild") website listed Agent #1 as the former client's agent.  Plaintiff was instrumental in getting Client #1 into the DGA, which was major goal for Client #1.

24.     Further, on information and belief, Plaintiff alleges that Client #1 was induced to sever her contract with Plaintiff by the representation that she would be part of UTA's Packaging activities.   As more fully set forth below, by promising Plaintiff's client that she would be included in a "package", the client was being informed that she would *not* have to pay the customary ten percent (10%) commission to her new Agency, UTA.  Instead, UTA would be looking to earning a product "packaging fee," which, typically, amounts to a guaranteed Three Percent (3%) of the Network Base License Fee after each episode is produced, an equal amount of Three Percent (3%) deferred fee and a percentage of Ten Percent (10%) of the Gross Receipts profits, as well as, in some instances, an additional Fifteen Percent (15%) share of publication rights, a Twenty Percent (20%) share of stage rights, and a Twenty-Five Percent (25%) share of merchandising.  In most cases, the total payments to the Agency are substantially more than what the Agency's client earns on the show. Significantly, these rights – and income stream – are for the "life of the work," as more fully discussed below.  In what amounts to "extortion", Plaintiff agrees with the analysis that, "the only reason these fees are being paid to the Agencies by the studios/production companies is out of fear that the Agency will kill the deal if, and withhold their talent if the Agency doesn't get paid the packaging fee."[2] On information and belief, more than 99% of the top tiered writers, directors, producers and performers are not paying hundreds of millions in commissions, Plaintiff alleges, because 4 of the 611 California State Licensed Talent Agencies are "extorting" billions in dollars of packaging fees from the scripted series market.

___

[2] Gavin Polone *"Your Agent Gets Money For Nothing"* – The Hollywood Reporter 4/10/15

### E.   Interference By ICM/The "Packaging" Inducement

25.     Similarly, on June 26, 2014, Plaintiff alleges that ICM poached a client of Plaintiff's ("Client #2"), a director, producer, and production manager. Again, Client #2 was exclusive to Plaintiff.  Client #2, also, had received vigorous representation by Plaintiff and had enjoyed a very successful career with Plaintiff.  For example, Plaintiff had successfully moved Client #2 into a position as a Producing Director – a major goal for Client #2.   As recently as June 18, 2014 Client #2 had signed a deal to direct an episode of the series "The Lottery" and would commence work on July 7, 2014.

26.     Nevertheless, Plaintiff alleges, within an approximate forty-eight (48) hour period after advising Plaintiff that Client #2 was terminating his exclusive contract with Plaintiff, Client #2 had entered into a multi-year contract on "Turn", an AMC television series.  Plaintiff alleges that, with respect to the above television series, on or about June 23, 2014, Plaintiff was informed that the line-producer on "Turn" would not be returning and Plaintiff submitted Client #2 to the Employer, AMC, and the Executive Producer of the series.  On June 24, 2014, AMC Executive Vice President, Drew Brown, called Plaintiff to confirm Client #2's availability, and specifically to pre-negotiate Client #2's credit, DGA rate and other terms.  AMC agreed to a Co-Executive Producer credit, a rate of $25,000 per episode fee for ten (10) episodes with options for two more production cycles, plus DGA allocated contract, fringes, housing, per diem and transportation.  AMC would not agree to allowing Client #2 to direct main unit during his first season on the show (possibly 2nd Unit, and then main unit on subsequent seasons).  However, AMC asked that Plaintiff hold off speaking with Client #2 because it had an offer out to another line-producer.   Plaintiff is informed, believes, and thereon alleges that Defendant ICM, through Janet Carol Norton, an agent at ICM ("Agent #2") was speaking to Client #2 prior to his termination of Plaintiff.  Further, on information and belief, Plaintiff alleges that ICM advised Client #2 that, if he terminated Plaintiff, he would be hired by the Employer since she represented

the line-producer who AMC had the offer out to but which fell through – not knowing that Plaintiff had already submitted Client #2 for the job.

27.     Plaintiff further alleges that, as with Client #1, a major inducement by the large Agency (here, ICM) to Client #2 was the promise of packaging on other projects and, therefore, the nonpayment of commissions by the client.

28.     The "packaging fee", Plaintiff alleges, dwarfs what the smaller agent (such as Plaintiff) could ever earn, under the "seven-year rule" deeming no contract in California can be binding over that time limit, while allowing the largest Agencies (viz., UTA, ICM, WME and CAA) to compete unfairly with smaller Agencies for talent (by offering to "waive" the 10% commission). Representing talent and tying them to a package, and waiving of the talent's commissions in favor of splitting a production fee and profits in "perpetuity" with the employer of the talent, is grossly conflicting, unlawful, legally unsustainable and in violation of the "seven-year rule". In *UTA vs. World Of Wonder*, UTA argued that they were hired by World Of Wonder to perform "services" to the client in connection with packaging, and that the defendant has become "indebted" to UTA for their "work, labor, services and materials rendered". This conflicting position clearly violates the seven-year rule, and also undermines the 1959 Labor Commissioner's packaging agreement exemption. However, as more fully set forth herein, the true facts are that the packaging arrangement disguises *increased* fees (thus, higher "prices") paid by the consumer talent for representation in the relevant market, *viz.,* scripted TV talent. Moreover, as more fully set forth below, Plaintiff alleges that, as the result of this unfair competition, the power of the above Agencies has increased, as they have grown and consolidated their control. Today, and especially since 2002, these large Agencies are, Plaintiff alleges, more than titular agents. Because these Agencies stockpile talent, as well as exercise control over the development, production, financing, distribution, advertising, and even the technology for content delivery to the consumer, they have morphed into, Plaintiff alleges, producers, de-facto employers, apex predators

and "UBER AGENCIES."

29.     While a handful of talent and their representatives, undoubtedly flourish, Plaintiff alleges that, with the elimination of smaller Agencies due to unfair competition, an increasing number of writers, actors, directors, etc., especially in the diversity category, are finding it more difficult to obtain representation.  Specifically, although there are presently 611 licensed talent Agencies, Plaintiff is informed, approximately thirty-nine (39) of the actually fifty-five (55) Agencies serving the relevant market have either disappeared through consolidation (buy/sell/or merge), moved into talent management, or they have simply disappeared, since 2002, as more fully set forth herein.  This is a seventy-one percent reduction (71%) in Agencies serving the relevant market.  As a result, Plaintiff alleges, far too many talented individuals within the State of California, and elsewhere, are either not working or they find their work is being stifled where they are not the "marquee" element driving the Package.  Plaintiff alleges that the Uber Agencies control the talent; accordingly, if Artists want their idea to get financed, produced, and distributed, they must agree to the Agency receiving a packaging fee or else there will be no "traction" from the Agency packaging team.  More importantly, if the Agency package is not put out to market, the studios and networks have nothing to buy.  On or about May 5, 2014, Tom Rothman, Chairman of major entertainment studio Sony Pictures stated in an e-mail, "They [Agencies] are demanding and getting fees now on these from the financiers (they call it a "packaging fee") and are keeping as many emerging high end filmmaker projects off the market until they have full control".

30.     Ultimately, Plaintiff further alleges, the consumer suffers, because of the lack of diversity and creativity caused by the oligopoly described below.

   **F.     Trade and Commerce/Unlawful Agreement/Oligopoly**
        **a.     Talent Agencies Act/Relevant Regulations**

31.     The Talent Agencies Act was enacted in 1913, modified in 1937, 1943, 1959, 1967 and renamed in 1978.

32.     In 1982, Recording Contracts were excluded under the Act, and a "Talent Agency" was defined under California Labor Code Section 1700.4, in pertinent part, as a "person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists . . ."

33.     Pursuant to Section 1700.39 of the Act, "[n]o talent Agency shall divide fees with an employer, an agent or other employee of an employer." Despite the above <u>prohibition</u> and the "general materials" agreement (discussed below), Plaintiff alleges that packaging fees are, in fact, a division of fees and sharing of profits between a Studio employer and an Agency.  However, there is no "penalty provision" in the Labor Code as stated in *Kenneth Hecht v. William Morris Agency* whereby the Labor Commissioner determined, "The Court went on to state that the central function of the Board was regulatory and disciplinary, and that there was nothing in the statutory provisions establishing the Board's authority to indicate an intent to propel the Board into the realm of tort law traditionally occupied by the judiciary… Applying the foregoing principles to the present context, it is evident that the Labor Commissioner does not have jurisdiction over tort claims asserted by petitioner . . .The bulk of the Act's provisions are concerned with the licensing and supervision of talent agencies as defined in the Act… In other words, the powers granted are essentially regulatory in nature, with very narrow dispute-resolution appendage directly related to the regulatory role."

**b.    The Packaging Or "General Materials" Agreement Exemption**

34.     Plaintiff alleges that, beginning in 1959 up to the current time, the California Labor Commissioner has taken the position that the Package Agreement (also known as the "General Materials" Agreement) falls outside the jurisdiction of the Labor Commission; accordingly, such contracts need not be approved.  In particular, in a letter from the California Labor Commission, dtd. June 22, 1959, to counsel for the William Morris Agency, the State Labor Commissioner stated:  "The decision that this form is not such as requires the

approval of the Labor Commissioner is based upon the fact that this type of contract is concerned exclusively with 'creative property or package show' and contains <u>nothing with respect to the employment of an artist for the rendering of his personal services</u> or for the advising and counseling of artists in their professional careers." (Emphasis)

35.    In 1998, the State Labor Commissioner was asked to respond to a draft petition and its request for a change in the Labor Commissioner's policy towards packaging agreements and their exemption from the Talent Agencies Act (Labor Code §§ 1700 – 1700.47).  In its letter in response to the draft petition, dtd. October 30, 1998, the Labor Commission cited, among other things, the prior 1959 Labor Commission opinion (above).  Further, the Labor Commission, observed, "it appears that artists benefit from package agreements."

36.    Even assuming that the Labor Commissioner's above analysis about "artist benefit" under packaging was not flawed at *that* time (1998), which Plaintiff denies, Plaintiff alleges that, in 2015, the longstanding opinion of the California Labor Commission concerning the "packaging exemption" is no longer correct, fair, or sustainable.  In 2015, in the face of unprecedented challenges to the relevant market for talent from agency consolidation, the creative community of artists, diverse and otherwise, are entitled to know that they are represented by agents who are in league with their employer.  There is a misrepresentation that packaging agreements maintain a fiduciary duty and bond between artists and their representative. Packaging fees violate Section 1700.39 "No talent agency shall divide fees with an employer, an agent or other employer".  If agents are prohibited from sharing profits with an employer, how can they sell an ownership interest to an entity that hires talent? Those who represent talent cannot convert themselves into employers of talent. The compensation of agents should be in direct proportion to the enrichment obtained by their clients.  Packaging gives the agent unilateral right to temporarily suspend the fiduciary duties, while the artist remains bound to the

agent under the terms of the agency contract. Talent depend on the judgment of their fiduciary, but that judgment is compromised when the agent is allowed profit from a revenue stream that is inversely proportional to the compensation paid to the client. Agents enjoy unique access and significant influence over the clients they represent. It is contrary to public policy to convert access and influence to the financial benefit of the representative at the expense of the represented. As more fully set forth herein, Plaintiff alleges that, in light of the enormous flood of outside investment into talent Agencies since 2002, consolidation of talent Agencies, and monopolization of the television market by the Uber Agencies, the loyalties of the Uber Agencies have become *more* than divided. Rather, Plaintiff alleges, the Uber Agencies are loyal to the package, itself, and not to their individual clients.

> c.    **Prior Restrictions Upon Agency Production**

37.    During the 1930's, there was substantial vertical integration within the entertainment business. In particular, Music Corporation of America ("MCA") was a major player, as it was both acting as an Agency for talent and producing. In or about 1938/1939, Plaintiff alleges that the Screen Actor's Guild ("SAG") required that MCA and others cease their production. In 1941, MCA bought William Paley's Columbia Artists' Bureau (an agency that managed radio talent) for $500,000, since the Federal Communications Commission forced Paley, owner of CBS, to divest his talent division as a conflict of interest.

38.    However, MCA managed to escape the SAG television restriction until on or about the 1960's, at which time the U.S. Justice Department, under Attorney General Robert F. Kennedy, commenced an antitrust investigation into MCA and its Manager, Lew Wasserman. Eventually, MCA relented and agreed to cease its television production activities. In 1962, antitrust action brought by the Department of Justice against MCA, held that *"...the integration under common ownership of an agency, MCA Artists, and a production company, Revue Pictures, is declared to be a combination to*

*restrain and monopolize interstate trade and commerce in violation of the*
*Sherman and Clayton Acts."*

### d.    Conspiracy:  2002 Expiration of the SAG Franchise Agreement with the Association Of Talent Agents
### ["Rule 16(g)"]

39.    SAG's Agency Financial Interests Regulations [a/k/a "Rule 16(g)] were originally created in 1939.

40.    Rule 16(g) was part of the franchise agreement between SAG and the Association of Talent Agents ("ATA") until 2002, as more fully set forth below.

41.    The ATA is a non-profit trade association comprised of approximately 101 of the 611 California state licensed talent Agencies, including UTA, ICM, WME and CAA.  On information and belief, Plaintiff alleges that the above Agencies (the 4 "Uber Agencies") exercise effective control over the ATA Board of Directors ("ATA Board"), and these 4 Agencies substantially cover the overhead costs of the ATA.

42.    Between February 18, 1999, and April 20, 2000, the ATA opened up negotiations with SAG, demanding loosening of the  "financial interest restrictions", i.e., the right to invest in, or be invested in, by outside/offshore investors, private equity hedge funds, ad Agencies, advertisers and independent producers, etc.  SAG opposed the ATA's demand, viewing the financial interest to be self-dealing, self-serving, and a conflict of interest (contrary to agent's uncompromised fiduciary duties).

43.    Prior to April 2000, Rule 16(g), clearly, forbade an Agency to possess *any* financial interest in a production or distribution company or vice versa.  The 1991 SAG/ATA Basic Contract, Section XVI ("Agents To Be Independent"), provided, in pertinent part: "A.  Other than as herein permitted, no person, firm or corporation engaged or employed in the production or distribution of motion pictures or owning any interest in any company so producing or distributing, shall own any interest in an agent, directly or

indirectly, nor shall any such person, firm or corporation own or control any indebtedness of the agent or of any of its owners, nor shall any such person, firm or corporation share in the profits of the agent."

44.     On or about April 20, 2000, ATA membership voted to serve the required six-month notice on SAG requesting to renegotiate the franchise agreement, specifically stressing the critical issue of financial interest restrictions of "Rule 16(g)".

45.     On or about May 3, 2001 – ATA claimed that "about 20% of SAG's 98,000 members are represented by franchised agents.  Unless meaningful amendments are made in the financial interest and commission prohibitions, the actor/agent ratio will further decline as agents abandon the agency business to better compete for their clients outside the guilds' jurisdiction."  Plaintiff alleges that this was an inflammatory threat by the larger Agencies.

46.     In February 2002, SAG, under new President Melissa Gilbert's leadership, and the ATA made a deal to loosen the restrictions under Rule 16(g) that allowed agents to take up to a 20% stake in production and distribution companies, and it allowed advertising firms and independent (non-studio) producers to take up to 10% and 20% stakes, respectively, in talent Agencies.

47.     On April 20, 2002, the provisional agreement was submitted to SAG's members for approval.  However, the internal fighting, under former SAG President William Daniels and anti-agent SAG Treasurer Kent McCord, divided the membership and the deal to change "Rule 16(g)" was voted down. Plaintiff is informed, believes, and thereon alleges that the ATA, led by the Strategic Planning Committee (made up of the 4 Uber Agencies) in these negotiations, knew it was unlikely that SAG members would vote to let Agencies have ownership in production companies, but, if it did, it benefitted the ATA.  And, if not, Plaintiff is informed, believes and thereon alleges that the ATA Strategic Planning Committee knew that the dysfunctional leadership

of SAG would not be able to force the ATA back to the negotiating table and the ATA actually did refuse.  Either way, the ATA would win, especially if nothing happened.  The inability to reach an agreement meant that there would no longer be *any* restrictions for agencies to own production companies or be barred from any other venture that previously had been a conflict of interest.

48.   On April 21, 2002, the SAG National Board unanimously voted to temporarily suspend enforcement of Rule 16(a) of the SAG Constitution, so that its members are not subjected to disciplinary proceedings, in light of the expiration of Rule 16(g).

49.   Meanwhile, the ATA Board of Directors, which, Plaintiff alleges, was controlled by the largest Agencies at that time, viz., UTA, ICM, Broder/Kurland/Webb/Uffner (which ICM purchased in 2005/2006), CAA, The William Morris Agency, and Endeavor (which merged, in 2009, into WME) was attempting to sell its membership on the notion that an expired franchise agreement would <u>benefit</u> *every* talent Agency, large or small.  The promise was that the expiration would allow for "new strategic alliances" that would create "more opportunities" – not less.  However, Plaintiff is informed, believes, and thereon alleges, the members of ATA's Strategic Planning Committee (which consisted of representatives from the largest packaging Agencies: UTA's Jim Berkus, ICM's Jeff Berg, CAA's Bryan Lourd, William Morris' Walt Zifkin, Endeavor's Rick Rosen, and Broder/Kurland/Webb/Uffner's Bob Broder) were interested in changing the business model of *their* Agencies from a "service based" business to an "asset based" receivables business. The packages, of which the 4 Uber Agencies presently control 93% of the market, could be factored and leveraged.  Plaintiff is informed, believes, and thereon alleges that the above six principals shared a prophetic vision that involved vast sums of capital that would be available to them, through their packages, once the SAG Franchise Agreement imploded.

50.   Accordingly, Plaintiff is informed, believes, and thereon alleges that, beginning in in the late 1990's and continuing to 2002, the objective of

ATA's Strategic Planning Committee was, in fact, to force the *termination* of Rule 16(g). Plaintiff alleges, on information and belief, that, unbeknownst to the other members of the ATA during the negotiations with SAG, the largest Agencies existing at that time, including Defendants UTA and ICM, had conspired and agreed, amongst themselves, that it was in *their* best interests to proceed *without* Rule 16(g). The expiration, they realized, would generate a financial windfall to these six (6) Agencies allowing them to enjoy unfettered, vertical integration of their businesses, more concentration of economic power, and more control over production and distribution. This strategy, to let 16(g) expire and not return to the bargaining table, was expressed by the ATA Board to its general membership at a meeting on December 10, 2002.

51.    Contrary to the representations made by the ATA Board to its smaller members, the plan was not at all to create new "alliances" with small, independent Agencies. Rather, Plaintiff alleges that, in bringing about the demise of Rule 16(g), the intent of Defendants UTA, ICM, as with the other largest Agencies (CAA, William Morris, Endeavor and Broder), was to destroy competition and to build a cartel of Uber Agencies.

52.    Plaintiff alleges that this destruction of competition was made possible by enormous outside funding (primarily, private equity) that flooded into the large Agencies after 2002 – all of which funding was made possible by the expiration of Rule 16(g). Plaintiff is informed, believes, and thereon alleges that, since 2002, the amount of money that the largest talent Agencies have received from private equity sources, in return for a stake in those Agencies, is over $6.5 billion.

53.    Plaintiff alleges that this funding has allowed the 4 Uber Agencies to, among other things, consolidate their power over the television market, as more fully set forth herein.

### e.    UTA – Aggregation of Power since 2002

54.    UTA was founded in 1991, as the result of a merger between two Talent Agencies. In the beginning, UTA had, approximately, twenty-six

agents.

55.    Beginning in 2002 and continuing to the present time, UTA has expanded into production.  In or about 2007, Plaintiff is informed, UTA and the Internet advertising Agency, Spot Runner, created an independent studio for digital media called 60Frames Entertainment ("60 Frames").  Although, Plaintiff is further informed, 60Frames ceased operations in 2009, this independent studio was, clearly, in the production business – as opposed to, solely, representing talent.  Further, with respect to financial investment, Plaintiff is informed and believes and thereon alleges that funding for the 60Frames joint venture came from such sources as Tudor Investment Corporation, a $13 billion hedge fund, and  the Pilot Group, a private investment company.

56.    With respect to feature films, Plaintiff is informed, believes, and alleges that UTA has expanded its film finance and international sales business within its Independent Film Group.  Not only is Independent Film Group involved with strategies for financing, packaging, and distribution, Plaintiff is informed, believes, and alleges that Independent Film Group and its employees are listed as "producer" and "production company" on several upcoming projects.

57.    In addition, on or about 2012, UTA launched UTA Brand Studio. According to UTA's own literature, UTA Brand Studio – "A Brand New Story", Brand Studio was created to "help companies develop and sustain strong brand attachment." (Emphasis)  Plaintiff alleges that, in the television market, studios are, customarily, *employers* of talent and not Talent Agencies (who have the role of procuring employment).  Recently, UTA sold a part of their company to Jeffrey Ubben's private equity firm ValueAct Capital who manages $18 billion in assets including significant investments in Microsoft, 21st Century Fox, Adobe, CB Richard Ellis and other companies.  UTA's New Media Ventures arm financed digital media firm Woven and discovery app Tapiture.  UTA along with Jarrod Moses and DJE Holdings co-owns ad agency

-19-

United Entertainment Group.  UTA Venture Fund is in the production business with UTA Brand Studios, a digital production space.  UTA owns broadcast news agency N.S. Bienstock.  UTA and book publisher Atria co-own Keywords, a digital production, distribution and marketing entity focusing on intellectual properties.

58.   While UTA, as with the other large Agencies, expands into these new markets, Plaintiff alleges that they have ventured far outside the parameters set by the California Business and Professions Code, including without limitation its definitions of "Talent Agency" and "Artist."  While, Plaintiff alleges, UTA's clients may eventually be employed by a UTA Brand Studio client, the companies serviced by UTA Brand Studio, by other wings of UTA, and/or by joint ventures formed by UTA cannot be deemed "Artists" within the meaning of California Labor Code Section 1700.4 (b).  Further, Plaintiff alleges that the lifting of the "financial interest" restriction under Rule 16(g), in 2002, has led to direct violations by the Uber Agencies of California Labor Code Section 1700.40 (b).  Section 1700.40 (b) provides as follows: "No talent Agency may refer an artist to any person, firm, or corporation in which the talent Agency has a direct or indirect financial interest for other services to be rendered to the artist, including, but not limited to, photography, audition tapes, demonstration reels or similar materials, business management, personal management, coaching, dramatic school, casting or talent brochures, Agency-client directories, or other printing."  (Emphasis)

59.   Plaintiff alleges that the above relationship (between large Agency and corporate client) is fraught with conflict.  Further, if a percentage of the large Agency is owned by an advertising firm and the Agency is involved with an advertisement for a large corporation, who is the Agency, truly, representing?

/ / /

/ / /

### f.   Private Equity:  ICM Acquisition Of Broder Webb Chervin Silbermann Agency fka Broder/Kurland/Webb/Uffner/CAA Sells Majority Stake to TPG /WME and Silver Lake

60.    Again, Plaintiff is informed, over $6.5 billion in private equity has been received by Defendants UTA, ICM, WME and CAA.  Plaintiff is informed, believes, and alleges, that WME and CAA are both planning a public offering and/or may issue debt on future artist earnings.

61.    With respect to ICM, Plaintiff is informed, it received approximately $100 million from a private equity firm, Rizvi Traverse Management ("Rizvi"), in return for a large stake in ICM.  This occurred in 2005 – just three (3) years after the expiration of Rule 16(g).

62.    The following year, Plaintiff is further informed, ICM purchased Broder Webb Chervin Silbermann Chervin Silbermann fka Broder/Kurland/Webb/Uffner for $70 million (ICM's Jeff Berg and Broder Webb Chervin Silbermann Chervin Silbermann's Bob Broder had served on the ATA Strategic Planning Committee in 2002).  Accordingly, the implosion of the 2002 SAG Franchise Agreement allowed for the above investment by Rizvi and ICM's purchase of Broder Webb Chervin Silbermann.  Broder Webb Chervin Silbermann, at that time, represented several large-earning TV producers, including Chuck Lorre, who created "Two and a Half Men" and "Big Bang Theory" as well as Christopher Lloyd, co-creator of "Modern Family," and Vince Gilligan, the creator of "Breaking Bad."  Not only did Broder Webb Chervin Silbermann represent the above TV producers, Broder Webb Chervin Silbermann controlled the packages.

63.    Plaintiff is informed, believes, and alleges that ICM was able to raise funding for its acquisition of Broder Webb Chervin Silbermann because i) Rule 16(g) had expired; and ii) the package fees earned by Broder Webb Chervin Silbermann's clients were viewed as "assets" rather than as mere agent commissions and, therefore, could attract such funding.  Plaintiff is informed, believes, and alleges that the Broder Webb Chervin Silbermann packages were

"factored" (because, as "assets", the package fees could be viewed as long-term accounts receivable) and valued at $70 million.

64.    In view of the timing of ICM's purchase of Broder [shortly after the expiration of Rule 16(g)], Plaintiff is informed, believes, and thereon alleges that ICM's plan to raise capital and consolidate with Broder was "in the works" during the negotiations over Rule 16(g) and before its expiration.

65.    During this same time period, in or about 2009, Plaintiff is informed, CAA received $350 million against a $1 billion valuation from TPG Capital ("TPG") (a private equity fund with $59 billion in reported total assets), in exchange for a 35% stake in CAA. In October 2014, Plaintiff is informed, it was announced that TPG would be taking a majority stake in CAA. Plaintiff is further informed, believes, and thereon alleges that TPG agreed to pay an additional $225 million for a 53% majority stake in CAA.

66.    In 2006, prior to the above purchase by TPG, Plaintiff is informed, TPG, together with other partners, acquired the Spanish-language broadcaster, Univision, in a $13.7 billion leveraged buyout. Plaintiff alleges that Univision is an employer of talent and that TPG's ownership interest in Univision (and CAA) creates an inherent conflict.

Additionally, CAA's owner TPG also owns a new mini-studio STX Entertainment. CAA's subsidiary Evolution Media Capital (EMC), a boutique investment bank, has orchestrated more than $15 billion dollars of deals such as the Fox Sports and ESPN $3 billion TV rights deal with the Pac-12 Conference, and the Texas Ranger sale for $550 million, the Philadelphia 76ers sale for $280 million and entertainment company CKX for $509 million. EMC also negotiated pricy new TV deals for the Boston Celtics, San Diego Padres, and other large transactions interfacing with Wall Street banks. CAA represents professional sports teams like the L.A. Dodgers, Texas Rangers, Philadelphia 76ers, Boston Celtics, San Diego Padres that employ many CAA clients. CAA also represents AMC Theaters, and through the CAA film Finance & Sales Group, packaged, financed and were the sales agents for films

"Sicario", "The Imitation Game", "American Hustle", "Still Alice" to name a few.

67.    In 2009, William Morris merged with Endeavor Agency, becoming William Morris Endeavor or WME.  Thereafter, in 2012, it was announced that a private equity firm, Silver Lake Partners, would be acquiring a minority interest in WME (presently believed to be 51%).  This cash infusion transformed WME into a "technologically entertainment and media company."  Plaintiff is informed, believes, and thereon alleges that the primary impetus behind the cash from Silver Lake was to expand into the direct-to-consumer release of content by WME talent and to create a worldwide marketing business and global media fund.  On information and belief, Plaintiff alleges that the above fund owns copyrights and distribution rights in perpetuity, and that these copyrights and distribution involve products and productions that feature the work of WME's clients.

68.    In 2013, Plaintiff is informed, WME and Silver Lake purchased IMG for a reported $2.5 billion.  In 2014, WME/IMG received $193,053,459 in producing fees, which was up from the $168,713,090 in producing fees they received in 2013.  Plaintiff is informed that Mubadala Development Company, an investment vehicle for the United Arab Emirates, is a minority investor in the purchase by WME of IMG.  Plaintiff is informed, believes, and thereon alleges that WME/IMG is clearly in the <u>production</u> business.  It has been observed: "Over the next decade Forstmann transformed IMG into an international production-and-packaging powerhouse.  The expanding business cut profitable deals with more than 200 American college and university sports teams, as well as with Indian Premier League cricket, Wimbledon, the Australian and U.S. Open tennis tournaments, tennis tournaments in Spain and Malaysia, and Barclays Premier League soccer.  It ran Fashion Week in New York, Milan, and London, and in China it formed an exclusive joint venture with the national television network to create sports programming."[3]  Plaintiff

---

[3] William D Cohan *"The Inside Storey of Ari Emanuel's Big, Risky WME-IMG Merger"* –

further alleges that WME/IMG are in the <u>distribution</u> business as well: "IMG distributes over 32,000 hours of content – originating from more than 200 clients and events – to major global broadcasters annually, across all forms of media including TV, audio, fixed media, inflight and closed circuit, broadband and mobile. The company's multimedia product offering includes inCycle and Golfing World, while IMG also produces and distributes Sport 24, the first ever live global premium 24-hour sports channel for the airline and cruise industries, and EDGEsport, the 24-hour premium action sports channel. It maintains the world's largest sports archive with more than 250,000 hours of footage and operates joint ventures with the PGA European Tour (European Tour Productions), Associated Press (SNTV) and Asian Tour (Asian Tour Media)."[4]

WME/IMG owner Silver Lake purchased Hollywood payroll company Cast & Crew Entertainment Services for $700 million. Cast & Crew is one of the largest employer of talent in Hollywood. Aside from providing payroll services and production accounting to studios, networks and production companies for features, TV and commercials, Cast & Crew is, the majority of the time, the "Employer of Record". Cast & Crew also offers residual processing, health and benefits management, consultation on production incentives, cash advances against transferable tax credits, bridge loans and other financial instruments.

69. In recent years, Plaintiff is informed, WME has made over fifteen (15) strategic investments in companies across the digital media landscape, including the interactive advertising, social media, social gaming, and online retail sectors. Plaintiff is further informed that, on January 28, 2015, WME purchased, via its IMG arm, Dixon Talent. Dixon Talent is a <u>management</u> company that represents such talent as Jimmy Kimmel, Stephen Colbert, and Jon Stewart. Plaintiff alleges that this purchase by WME further blurs the lines

---

Vanity Fair March 2015
[4] "IMG" - Wikipedia

between Agents and Talent Managers and creates more conflict.

70.    Not only has there been tremendous consolidation, ushered in by the unfettered right to be invested *in* and investment *by* Defendants UTA and ICM, as well as the other two largest Agencies, Plaintiff alleges that the very nature of Defendants UTA and ICM, as *agents*, has been transformed into something else, i.e., into businesses never contemplated by the Talent Agencies Act.  Moreover, this consolidation has resulted in an injury to the relevant marketplace (scripted series television) and an injury to competition, as more fully set forth below.

      **g.    The Relevant Market (Scripted Series Television)/Oligopoly**

71.    Scripted Series Staffing (*See* Exhibits A, B, C & D) – Plaintiff alleges that the number of licensed Agencies in 2001/2002 to 2014/2015 has increased from 571 to 611; however, a large portion of those are non-core Agencies working outside the scripted series television market in the print, modeling, live performance and other areas non related to scripted series television.  Plaintiff is further informed, believes, and alleges that many are talent managers holding a license but working out of their homes.  Fifty-one percent (51%) of the 2001/2002 scripted series market was serviced by fifty five (55) Agencies.  This has dramatically consolidated to 4 Uber Agencies controlling 79% of the 2014/2015 scripted series staffing market.

72.    Scripted Series Term Deals[5]  (*See* Exhibits E & F) – Plaintiff alleges that the 2001/2002 scripted series term deal market had 373 term deals and was serviced by 26 out of 571 licensed Agencies.  Plaintiff is informed that 26 Agencies controlled 44% of the 2001/2002 scripted series term deal market.  However, today only 9 out of 611 licensed Agencies service 393 scripted series term deals.  By massive contrast, 4 Uber Agencies (UTA, ICM, WME and CAA) control 91% of the 2014/2015 scripted series term deal market.

73.    Scripted Series Packaging  (*See* Exhibits G & H) – Tying two or

---

[5] A Term Deal is a contract between a writer, producer, director or performer and a network, studio or production company employer.

more talent elements together forms a packaged product. Plaintiff alleges that, in 2001/2002, 157 scripted series were packaged by 15 Agencies that controlled 96% of the scripted series packaging market. Thirty-one (31) of those packages were split amongst a handful of Agencies. However, in 2014/2015, again by massive contrast, 353 packaged scripted series were packaged by 11 Agencies, with just the 4 Uber Agencies dominating 93% of the scripted series packages. Plaintiff is informed that 105 of the 353 scripted series packages were split between Agencies, but only a mere 16 of the 105 packages were split with a non-core Uber Agency. On information and belief, Defendants UTA and ICM have engaged and continue to engage in exclusive co-packaging contracts with the other two Uber Agencies (WME and CAA), which defeats and lessens competition, encourages oligopoly behavior, horizontal price fixing, and restrains trade in the scripted series marketplace. On information and belief, Plaintiff is informed, believes, and alleges that the 4 Uber Agencies have a policy to *not* split packaging fees with non-Uber Agencies and that they are engaged in horizontal price-fixing, horizontal market division, and a concerted refusal to deal. Plaintiff alleges that scripted series' packaging is dominated by the 4 Uber Agencies (including Defendants), who, in essence, own "stock" in each other's packaging assets. Plaintiff is informed, believes, and thereon alleges that, by virtue of the above agreement and practice, the 4 Uber Agencies have formed a "cartel" that controls the market. As a result, Plaintiff is informed, believes, and alleges, there is an extremely high – perhaps, impossible – barrier for all other Agencies to compete for this market, let alone a new entrant to the market.

74. <u>Diversity And Restricting Output (*See* Exhibit I & J)</u> – Plaintiff alleges that the general effect of this cartel by the 4 Uber Agencies is that it has crushed competition between all 611 Licensed Talent Agencies for the representation of diversified talent and their shows. As gatekeepers in the television development process, Plaintiff alleges, the 4 Uber Agencies have failed to produce scripted series packages that promote significant advances in

-26-

television diversity.  Indeed, between the 2001-2002 and 2014-2015 television seasons, minorities have fallen further behind today as elements that drive a package (a 2.3% increase) relative to their growing population (8% increase), and women increased a mere 1.6% of all packaging drivers, this despite the 4 Uber Agencies controlling 92.4% of all scripted series television packages.  As a result, the presence of diversity artists, their ideas, and their shows have been stifled and are not proportionately reflected in the triple digit increase in the number of shows between 2001/2002 and the 2014/2015 scripted series market.  This dismal record with respect to diversity, Plaintiff is informed and believes, can be attributed to the 4 Uber Agencies shifting their proper focus from representing the Artist-person to "the package."  Consequently, today's scripted series staffing, production, and end-user programming fundamentally deprives the consumer freedom of choice of a truly balanced and diversified scripted series market, that is representative of society and reflects today's demographic realities.  Even though there was close to a 300% increase in the amount of scripted series produced between 2001/2002 and 2014/2015, the average consumer would not know the difference between types of shows between then and now, primarily because of this lack of diversity in today's market.  Plaintiff alleges that today's shows are just as homogeneous as before, and there are even more of them, which fundamentally reduce the consumer's option to watch diversity driven shows.  Diversity is not just a social policy observation. The reduction of diversity talent and packages in television "output" is quantifiable in the market, and will only self-equalize with a healthy and competitive Agency market.

75.    Plaintiff alleges that this domination of the market would not be possible without the ability to "package" and tie together a group of the major talent or star components of a television program or series.  Further, Plaintiff alleges, the oligopolization of the television market has been made possible by the choreographed "planned implosion" of Rule 16(g) and, thereafter, the financial investment opportunities that Defendants UTA and ICM knew would

-27-

be coming their way as a result.

### h.   Packaging

76.     According to the WGA (Writers Guild of America – a recognized labor union)/Artists' Manager Basic Agreement of 1976 [the franchise agreement between agents and writers negotiated by the William Morris Agency and ICM and untouched in over thirty-nine (39) years], the fee, commission, or compensation that may be earned by an Artists' Manager [Agent] of a television program or series is termed a "package commission."

77.     While, under the above WGA Basic Agreement, an Artists' Manager cannot require that a Writer sign a package representation agreement as a condition of representing the Writer, an Artists' Manager may request a Writer to sign a package representation agreement.

78.     Further, when package representation agreements are entered into, the WGA Basic Agreement calls for annual franchise fees (referred to as "Negotiator's Fees") that are to be deposited into a "Negotiator's Fund" established by the WGA and the AMG (Artist's Managers Guild), which is currently known as the ATA.

79.     Plaintiff reserves the right to supplement and amend this complaint with more details concerning whether UTA and ICM have adhered to the WGA Rider W Contract between Agent and Artist, which, Plaintiff alleges, discloses Exhibit "N" in transparent fashion to its clients.

### i.   Predatory Practices:  Poaching and "Pricing"

80.     Plaintiff alleges that, in addition to expanding into its production, advertising, among other ventures, it was the further agreement and plan of UTA and ICM, commencing in 2002 and continuing to the present, to poach clients from smaller Agencies, particularly in the television market.

81.     Plaintiff is informed, believes, and thereon alleges that, Defendants UTA and ICM, acting as apex predators, have been engaged in a willful and wanton policy and practice of poaching top-tiered clients of smaller Agencies earmarked as "low hanging fruit" under the guise of the "right to compete" in

order to stockpile talent for packaging.

82.     As set forth herein, Plaintiff alleges that, as with its recent clients that UTA and ICM lured away, UTA and ICM make representations to prospective clients (who are already under contract with smaller Agencies) that they are in the "process of packaging a TV series" or that UTA is representing an "executive producer/show runner" – which is "code" for, "we can offer you work, and you will be part of a package and will not have to pay the 10% commission you are paying XYZ Agency."

83.     Plaintiff alleges that the packaging opportunity, which is, effectively, unavailable to smaller Agencies (because the 4 Uber Agencies have poached the vast percentage of top-tiered talent), allows the largest Agencies to engage in "predatory pricing."  In other words, Plaintiff alleges, the smaller Agencies, who charge ten percent (10%), are undercut by the largest Agencies, including UTA and ICM, who can offer to charge the prospective television client *zero*.  Additionally, this is "below cost pricing" as the agency makes more money than the packaged client(s) and thus sells the agency's services below its costs (the per average cost of representing all of their clients) for the purposes of harming competition and self-enrichment, and thus making the cost of representation above a competitive level for smaller agencies.  Despite what is represented to talent in order to lure them away from the non-core agencies, however, Plaintiff alleges that the packaging fee is actually a hidden, imputed "commission."  This is because the packaging agency receives a guaranteed fee of three percent (3%) of the budget, which is often more than the client's fee, plus the agency receives a three percent (3%) deferred fee and a ten percent (10%) gross profit participation *before* the talent's net profit participation.  Because the agency is first in line on the back end of a deal, the talent's profit participation is reduced by the very party [the packaging agent(s)] who purportedly represents the talent.  Based on a net computation, the talent can pay more – not less – for representation by Defendants UTA and ICM.  Moreover, because the packaging fee is a line item

in the budget, Plaintiff alleges that production quality is often negatively affected, forcing the production to lose a valuable component, such as set, music, a scene, storyline, or, perhaps, talent.  In the 2015 WGA election, WGA Board candidate, Meredith Stiehm, took on the issue of packaging, which she called "a raw deal for writers."  She knows this, she said, from personal experience.  "When I created *Cold Case*, my agents packaged it.  It was my first show, and I was a rube – when they told me I would benefit too, since they wouldn't take their 10% from my salary, I bought it.  I just didn't do the math.  It wasn't until year seven of my show when I was tasked with slashing the budget that I finally noticed that my agency was making $75,000 per episode – more than I was.  I was stunned.  And even worse, they had a percentage of the profits.  When I suggested to the studio that we slash that episodic expense [the agency packaging fee] they wouldn't hear of it.  Again I was stunned, and confused.  I have since come to understand how the studios and agencies collude to keep packaging as a norm, securing money for them that belongs in our pockets.  We writers should never have opened this door; we now need to close it.  We do the work, not our agencies.  We should get the profits."  Essentially, agency product packaging takes a large percentage of the production budget, a percentage of the gross proceeds, but the agency bears none of the responsibility of owning or managing the asset. The Agency gets paid a minimum of three percent (3%) of the budget whether the product is successful or not.  Other notable cases where the Agency enriched themselves more than the client: *William Morris Endeavor vs. Scripps Networks, Michael Elias vs. CAA, UTA vs. World Of Wonder Productions, Roseanne Arnold vs. Triad Artists.*  Finally, as more fully set forth herein, Plaintiff alleges that the refusal on the part of the buyers (studios/networks) to deal with non-core talent agencies in favor of the 4 Uber Agencies and their packaging (or co-packaging deals) is not based on sound, independent business judgment.  Rather, the refusal to deal stems from the buyers' fear of losing product (scripted TV programming), which is, today, controlled by an oligopoly or "cartel"

comprised of 4 Uber Agencies.

84.    Plaintiff is informed, believes, and alleges that the 4 Uber Agencies have a policy to not split packaging fees with non-Uber Agencies and are engaged in horizontal price-fixing, horizontal market division, and a concerted refusal to deal. Plaintiff is further informed, believes, and alleges that scripted series packaging is dominated by a "cartel" of 4 apex predator Uber Agencies that control 96% of the packaging market. Plaintiff alleges that the Uber Agencies' packaging inducement of not having to pay commissions is a *pricing* strategy intended to drive competitors out of the market or to create barriers to entry for potential new competitors.

85.    Plaintiff further alleges that the largest talent Agencies earn packaging fees *in perpetuity*, whether or not they continue to represent the client driving the package. Meanwhile, the smaller Agencies are capped at a ten percent (10%) commission of fees received from procuring employment for the client and/or they are restricted by California's "7 Year Rule", pursuant to California Labor Code Section 2855.

### G.    Anticompetitive Conduct and Effects

86.    The most important driver of the economic success of an Agency is fair competitive access to talent.

87.    Packaging agreements or understandings (expressed or implied) allow the dominant Uber Agencies to use their market power to sign and stockpile talent, despite the fact that such talent representation agreements are not in the independent economic best interest of the talent coerced or induced to grant such rights.

88.    Plaintiff alleges that Packaging Agreements, therefore, function as devices for stifling competition and for diverting the talent cream of the business to the 4 Uber Agencies.

89.    By virtue of, *inter alia*, their high market share and packaging power, the 4 Uber Agencies have market – indeed, oligopolistic – buying power in the scripted series product packaging market.

90.     Plaintiff alleges that the oligopoly power is further evidenced by their ability to force talent to exclude other Agencies from the market, and the high barriers to entry into the market.

91.     In order to survive economically, all Agencies need fair competitive access to talent.  UTA and ICM's poaching activities essentially have the effect of denying, at least in part, the revenue Plaintiff needs to stay in business.

92.     Plaintiff alleges that Defendants UTA and ICM's poaching activities essentially have the effect of lowering the overall quality of Agency representation by forcing talent to be represented by a packaging Agency or else not at all.  Until 2001/2002, small agencies have promised greater attention to their clients and greater focus.  From this perspective, small Agencies, like Plaintiff's, have always subsisted alongside larger Agencies, since the visible size of the 6 largest Agencies could always be reframed and exploited as a mode of distinction by smaller Agencies in their own competitive strategy.  Also, some smaller Agencies specialize in certain areas as a way of distinguishing their services both to clients and to buyers, a business tactic acknowledging market focus and differentiation.  A fairly common industry practice, this strategy rests on the premise that the smaller Agency is thus able to serve its narrow strategic target more efficiently than the largest competitors who are competing more broadly.  But that changed with the demise of SAG 16(g).

93.     Devised with the predatory intent to deprive Plaintiff of a fair competitive opportunity to obtain the supply of talent needed for effective competition, Plaintiff alleges that the conduct of Defendants UTA and ICM, as more fully set forth herein, violates antitrust principles long established by the United States Supreme Court.

94.     The 4 Uber Agencies represent the world's largest pool of talent.  Plaintiff is informed, believes, and thereon alleges that these Agencies use their worldwide and national market and oligopoly power in a substantial number of

non-competitive talent representation areas to coerce Hollywood networks, studios, and other production companies to deny their competitors (like Plaintiff) fair competitive access to talent, with the intent to drive them out of business, prevent them from earning the revenues needed for expansion, and to foreclose competition.

95.    Plaintiff offers the same, or higher, quality individual Agency representation experience per commission dollar paid as UTA or ICM do. Therefore, for every artist of which Plaintiff is deprived – not on the merits but as a result of UTA and ICM's leveraging its producing and oligopolistic power to strong arm Studios, production companies, and their own clients into not hiring Plaintiff's clients – consumers, talent and buyers are left with only 4 choices (UTA, ICM, WME and CAA), which, Plaintiff alleges, is no choice at all.

96.    UTA and ICM's poaching, packaging and oligopoly campaign has injured, and will continue to injure, Plaintiff and the consuming public unless enjoined.

97.    Plaintiff alleges that UTA's and ICM's anticompetitive conduct described herein, over the past few years and continuing today, has been pursued with the predatory intent to deprive Plaintiff an opportunity to obtain clients needed for effective competition, thereby constituting violations of the Sherman Act.

98.    The 4 Uber Agencies possess oligopolistic power in the scripted series marketplace, as demonstrated by their 76% market share of scripted series staffing, a 91% market share of term deals at the studios and networks, and a 93% market share of scripted series packaging, its actual exclusion of competition and control over production, and the high barriers to entry into the marketplace.

99.    Plaintiff is informed, believes, and alleges that UTA and ICM have used their power to coerce Studio employers to buy their packages and to employ their talent, or else not have access to top tiered talent, thus denying

Plaintiff the opportunity to compete fairly with them for talent. This coercion has had a direct adverse effect on competition by preventing Plaintiff from competing with UTA and ICM on the merits.

100.   By such acts, practices, and conduct, UTA and ICM have directly insulated themselves from competition with Plaintiff for talent, and they have thereby restrained trade in and have willfully maintained or expanded their oligopoly power in the scripted series marketplace.

101.   UTA and ICM's conduct has no pro-competitive benefit or justification. The anticompetitive effects of their behavior outweigh any purported pro-competitive justifications. Talent has been deprived of the freedom to choose where to be represented for fear of not being validated by their peers and the buyers, or not being considered packageable. The public has been deprived of the freedom to choose what will be seen and has been forced to consume only what is packaged.

102.   Plaintiff alleges that UTA's and ICM's disregard for other Agencies' client contracts is an abuse of power and anticompetitive scheme that has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success.

103.   Over the past 77 years and continuing today, Plaintiff is informed, believes, and alleges that the combined 4 Uber Agencies have engaged in a course of conduct that amounts to exclusive dealing in violation of the Sherman Act.

104.   Plaintiff is informed, believes, and thereon alleges that Defendants UTA and ICM have engaged and continue to engage in exclusive contracts with the other 2 Uber Agencies (WME and CAA).

105.   In addition to exclusive co-packaging agreements amongst the Big 4, Plaintiff is informed, believes, and thereon alleges that the Big 4 have exerted pressure on buyers (studios/networks/producers) not to deal with non-core agencies and the talent they represent, despite the fact that such decision means that the buyer has opted to pay a *higher* price for talent by agreeing to

pay a packaging fee, as more fully set forth below.

## H. Lack of Diversity in Scripted Series Television and the Effect on the Consumer

106.   Plaintiff alleges that there is a problem in Hollywood with Diversity, or the lack thereof.  Since 2002, Plaintiff alleges that there has been a consolidation of media power and Agency representation whereby 4 Uber Agencies are packaging/selling scripted series only to a handful of buyers.

107.   Historically, there has been a dearth of gender, racial and ethnic diversity in film and television – both in front of and behind the camera. This reality has meant limited access to employment for women and minorities and to a truncating of the domain of media images contributing greatly to how we think about ourselves in relation to others. When marginalized groups in society are absent from the stories a nation tells about itself, or when media images are rooted primarily in stereotypes, inequality is normalized and is more likely to be reinforced over time through prejudices and practices.[6] The facts show the following:

- Minorities are underrepresented by a factor of 7 to 1 among lead roles in scripted series
- Minority writing staffs on scripted series are 10 percent or less
- Diversity and minority directors on scripted series are 10 percent or less
- The Academy of Motion Picture Arts and Sciences are 93% white, and even though the Academy of Television Arts & Sciences' 18,000 plus  members demographic breakdown has not been made public, the organizations Emmy scripted series nominees and winners have historically lacked diversity
- Scripted television series Network and Studio Executives, for

[6] Dr. Darnell Hunt, Dr. Ana-Christina Ramon, and Dr. Zachary Price *"2014 Hollywood Diversity Report"*; Dr. Darnell Hunt and Dr. Ana-Christina Ramon  *2015 Hollywood Diversity Report"*

which greenlighting decisions are made, were 96% white and 71% male

- Minority show creators in scripted television are underrepresented by factor of 9 to 1

108.   Talent Agencies wield tremendous influence and are brokers of scripted series packaging.  Without scripted series packaging, the buyers have nothing to produce, specifically in the scripted series television market. Nothing produced means nothing new and relevant to consume, which harms the consumer.

109.   Today's Uber Agency has supplanted the Agencies built around the personality and connections of one or two individuals.  The 4 Uber Agencies form a triumvirate of power that shapes the scripted series labor market in which representation by an Uber Agency provides scripted series diversity talent (writers, directors, producers, performers, etc.).  These Agencies offer the perceived reputation, legitimacy, and resources that flow from a central location in a network of recurrently contracting parties (the cartel of Uber Agencies).  By packaging a scripted series, the Uber Agency, in effect, becomes the gatekeeper of scripted series television product-labor markets.

110.   Plaintiff alleges that the 4 Uber Agencies contribute little to scripted series diversity, considering the scripted series market has almost tripled in growth since 2002.

111.   Since 2002, the Uber Agency packaging monopoly has risen by twenty (20) points to a dominating 93% of the market, while diversity packaging has only risen by 2.3 points.

112.   Diversity groups account for more than a quarter of total U.S. buying power, about $3.2 trillion, but are woefully underrepresented amongst the scripted series the 4 Uber Agencies are packaging.

113.   The combination of all the facts above creates a vicious cycle that virtually guarantees the marginalization and restriction of diversity driven scripted series output available to the consumer.

114.  Diversity (*See* Exhibit I & J) – Plaintiff incorporates by reference the allegations contained in Paragraph 74 hereinabove.

### H.  Interstate Commerce

115.  Plaintiff alleges that Defendants' conduct substantially affects interstate commerce throughout the United States and has caused and continues to cause antitrust injury throughout the United States.

### I.  Statute Of Limitations/Conspiracy:  Continuing Violation

116.  Plaintiff alleges that Defendants' conspiracy, combination, and/or agreement, as more fully alleged hereinabove, has been a continuing violation to the present time.  As recently as October 2014, four principals of UTA, ICM, WME, and CAA met with The Hollywood Reporter for an article entitled "Four Top Sharks on 'Destructive' Network Execs, Clients They'd Poach and What a Hit Showrunner Can Earn" (*See* Exhibit K).  They were Matt Rice (for UTA), Ted Chervin (ICM), Ari Greenburg (WME), and Adam Berkowitz (CAA).  During the interview, Defendant UTA's Matt Rice stated, "We'll create a new monetary system.  We'll hunker down and come up with a system of mathematics, in which *the four of us [UTA, ICM, WME and CAA] will judge what everything's worth.*"  (Emphasis)  Plaintiff alleges that the above evidences, among other things, an agreement, combination, or common motive to conspire (as opposed to "parallel" actions) by Defendants UTA and ICM, together with WME and CAA, to fix the *de facto* single-firm price of a product, the package (in the relevant market of scripted TV programming), and to control the marketplace, to the exclusion of non-core talent agencies, including Plaintiff, and evidences high level inter-firm communications between the 4 Uber Agencies, including Defendants UTA and ICM.  Additionally, during the interview, Defendant UTA's Matt Rice stated, "I was working at Broder with Ted" [ICM] and WME's Ari Greenburg stated, "Adam [CAA] and I worked the True Detective deal, and it was a pretty remarkable thing for that kind of material to throw off that kind of money."  Plaintiff alleges that industry conditions are very favorable to collusion because there are only four major

-37-

sellers. They – and no one else – get together to decide prices, bids, buyers and territories. As more fully set forth herein and below, there are 4 Uber Agencies. The rest are fringe sellers. Other packaged productions with non-core agencies cannot easily be substituted for the 4 Uber Agencies' packaged products since the 4 Uber Agencies pick-off and stockpile the majority of top-tiered talent. The 4 Uber Agencies have standardized the packaged product fee and profit structure, making it harder for all other agencies to compete. This repetitive purchasing of the 4 Uber Agencies' packages by the studio buyers increases the level of collusion, and refusals to deal by buyers with non-core agencies, through this familiarity, as more fully set forth herein.

## FIRST CAUSE OF ACTION

### (For Violations Under The Sherman Act – Section 1)

117. Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

118. Plaintiff alleges that Defendants UTA and ICM have agreed and conspired with WME and CAA to form a "cartel" or oligopoly in violation of 15 U.S.C. § 1, as more fully set forth herein.

119. Plaintiff alleges that Defendants UTA and ICM have agreed and conspired, together with WME and CAA, with the intent to form an oligopoly for the unlawful purpose of allocating amongst themselves the scripted TV relevant market and, particularly, the scripted TV packaging submarket, and with the specific, unlawful intent to *exclude and deny entry* to non-core talent agencies (including Plaintiff) into the scripted TV market, including the scripted TV packaging submarket. Plaintiff alleges that Defendants UTA and ICM have conspired and agreed to form a group boycott, whereby buyers of top-tiered talent services (studios/networks/producers) are coerced by the Uber Agencies (including UTA and ICM) to refuse deals with non-core agencies and those they represent (talent), particularly with respect to scripted TV terms deals (where UTA, ICM, WME, and CAA control, currently, 91% of the market) and with respect to scripted series packaging deals (where UTA, ICM,

WME, and CAA control, currently, 93% of the market). This boycott is supported, Plaintiff is informed, believes, and alleges, by i) agreements between UTA and ICM to restrict co-packaging scripted TV deals to each other and/or with WME and CAA, but to the exclusion of non-core agencies; and by (ii) the use of veiled threats by UTA and ICM (together with WME and CAA) against the buyers of talent services (studios/networks/producers) *not* to deal with non-core talent agents in the scripted TV market or else face the loss of future packages and, therefore, the loss of TV programming

120. Plaintiff alleges that Defendants' conduct has actually caused injury to competition, itself, in at least two respects: i) the cartel or "oligopoly", of which Defendants UTA and ICM are members, allocates the scripted TV market amongst themselves by their horizontal and tying agreements (including co-packaging agreements that are exclusive to the cartel) to set the price (the packaging fee) paid by buyers of scripted TV programming (studios/producers/networks); and ii) UTA and ICM have acted and continue to act, in concert with WME and CAA, to exclude non-core talent agencies from either participating in co-packaging and/or from dealing directly with buyers, thereby eliminating price competition from non-core agencies. Plaintiff alleges that the buyers' refusal to deal with non-core agencies and pay less for talent (by not paying a packaging fee) is not based on sound, independent business judgment. Rather, Plaintiff is informed, believes, and thereon alleges, the inflated price paid by buyers (the packaging fee) and refusal to deal with non-core agencies is motivated by the fear that product and talent will be limited or withheld by the gatekeepers of TV programming (the Uber Agencies) and evidences a restraint of trade in the form of the "boycott" alleged hereinabove. As set forth more fully hereinabove, Plaintiff alleges that the oligopoly formed by Defendants UTA and ICM, together with WME and CAA, harms both choice (the consumer/talent represented by non-core agencies has limited access to the market) and quality (the budgetary item in each TV episode is

paid to the Uber Agency, rather than going to a true production value, harming production quality and talent).

121.   As a direct and proximate cause, Plaintiff alleges that it has been harmed by Defendants' anti-competitive contract, combination, or conspiracy and that such harm has flowed from an anti-competitive aspect of Defendants' practices, causing damages to Plaintiff in an amount according to proof. Specifically, Plaintiff alleges that its harm has and continues to flow from an anti-competitive aspect of the practice under scrutiny.  The poaching of top-tiered talent that can either "drive" a package or form a package (such as Clients #1 and #2 herein) is the lifeblood and essential to the oligopoly in suit. The oligopoly cannot exist without packageable elements.  Plaintiff alleges that the loss of its clients herein was directly related to the appetites of Defendants UTA and ICM and their unlawful intent to oligopolize and control the relevant market, to the exclusion of other agencies.

## SECOND CAUSE OF ACTION
### (For Unlawful/Unfair Business Practices)

122.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

123.   Plaintiff alleges that Defendants' conduct, alleged above, constitutes unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code §§ 17200 *et seq.*

124.   Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own right and because they violated the Sherman Act.

125.   Defendants' conduct injured Plaintiff; accordingly, Plaintiff is a "person" that has suffered an injury in fact and that has lost money or property as a result of unfair and/or unlawful competition, pursuant to California Business and Professions Code § 17204.

126.   Plaintiff alleges that it is entitled to disgorgement of Defendants' unlawful gains and restitution, pursuant to California Business and Professions Code § 17203.

-40-

### THIRD CAUSE OF ACTION

#### (For Intentional Interference With Contract)

127.    Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

128.    Plaintiff and the clients identified herein (Clients #1 and #2) had valid, exclusive contracts.  With respect to Client #1, Plaintiff alleges that there was a verbal contract, with an unspecified term.  This verbal contract commenced on or about September 28, 2010.  On the date of breach (on or about November 4, 2014), Client #1 was a member of the Directors Guild of America ("DGA").  Plaintiff was, at all material times, a member of the ATA, which, in turn, had in place an agreement with the DGA ("ATA/DGA Agreement").  As alleged hereinabove, the ATA/DGA Agreement contains (and contained during all relevant times) Rider "D", which terms apply to agency agreements with DGA members, including the subject agreements with Clients #1 and #2 herein.  Rider "D" contains a "90 Day Clause."  The 90 Day Clause provides, in pertinent part:  "If during any period of ninety (90) consecutive days immediately preceding the giving of notice of termination herein described, the Director (1) fails to be employed or (2) fails to receive a bona fide offer then either Director or Agent may terminate the employment of Agent hereunder by giving written notice of termination to the other party, subject to the following provisions:

A.    Actual employment of or contracts or bona fide offers for the employment of the Director in any field whatever in which the Director is represented by the Agent shall be deemed to be employment.  If the Director has been employed or has had contracts or bona fide offers for employment in any field in which Director is represented by Agent the Director *may not terminate* so long as Director is entitled to an amount equal to his last compensation at a pro rata equivalent to 3 weeks of services."

ATA/DGA Agreement, Rider "D" (Emphasis).    As DGA Franchised Agents, UTA and ICM knew or should have known that they interfered with Plaintiff's contracts.

In the case of Client #1, Plaintiff alleges that she gave notice of termination (on or about November 4, 2014) *during her employment* on a TV show entitled "A to Z." This employment had been procured by Plaintiff, and the final payment for Client #1's services on "A to Z" was dated on or about January 7, 2015, several months after Client #1's notice of termination. Plaintiff alleges that, because of Rider "D", which restricts the conditions under which a contract between the agent and client may be terminated, Plaintiff's contract with Client #1 (as well as with Client #2) was *not* terminable at will. Specifically, Plaintiff alleges that, because Client #1 was employed at the time she gave notice of termination, her notice was null and void and constituted a breach of contract, as more fully set forth below.

In the case of Client #2, Plaintiff alleges that there was a verbal contract, with specific terms. Plaintiff alleges that its agreement with Client #2 commenced on or about February 10, 2009, for an initial term of 2 years, with a 2-year renewal term, followed by 1-year terms, in accordance with the ATA/DGA Agreement. On or about June 26, 2014, Client #2 gave notice of termination to Plaintiff. However, prior to June 26th, Client #2 had been made an offer, on or about May 1, 2014, to direct an episode of "Lottery" (which offer was, clearly, procured by Plaintiff) and had been presented with a contract to direct, dtd. June 16, 2014. Client #2 *signed* the contract on or about June 18, 2014 – eight (8) days before giving notice of termination to Plaintiff. Again, pursuant to Rider "D" to the ATA/DGA Agreement, subparagraph (C) to the 90 Day Clause, Plaintiff alleges that Client #2 was unable to terminate his contract with Plaintiff, because he had signed a contract of employment just days before and well within the 90-day period. As with Client #1, Client #2's contract was *not* terminable at will (because of termination restrictions under

Rider "D"), Client #2's notice of termination was null and void and constituted a breach of contract.

129.   Plaintiff alleges that Defendants' had knowledge of such contracts. Pursuant to DGA practices, the DGA conducted semiannual audits of agencies, including Plaintiff, requesting information on DGA members represented.  In response to these audits, Plaintiff alleges that it provided the names of Client #1 and Client #2, during all times they were members of the DGA.  Plaintiff alleges that the notice given to the DGA concerning its representation of DGA members, including Clients #1 and #2, gave, at least, constructive notice to Defendants UTA and ICM of its representation.  Plaintiff alleges, Defendant UTA had been given notice of Plaintiff's complete exclusive client list.  Defendant ICM had unabated access to Plaintiff's complete exclusive client list.  Further, Plaintiff alleges that UTA had actual notice of Client #1's contract with Plaintiff and, on information and belief, Plaintiff alleges that UTA held a private screening (of the show "A to Z" which was a UTA packaged show that Plaintiff procured for Client #1), on or about September 14, 2014, attended by Client #1, wherein UTA began the process of encouraging Client #1 to break her contract with Plaintiff.  As for Client #2, Plaintiff alleges that ICM had actual knowledge of its agreement with Client #2.  Plaintiff is informed, believes, and alleges that ICM invited Client #2, several weeks before Client #2 gave notice of termination, to a meeting at ICM to discuss representation/packaging with the full knowledge that Client #2, at that time, was represented by Plaintiff.  Finally, Plaintiff alleges that ICM induced Client #2's breach, knowing that Client #2 had already signed a contract that had been procured by Plaintiff.

130.   Plaintiff alleges that Defendants committed intentional acts designed to induce a breach of such contract, as well as committing acts in order to disrupt other contractual relationships between Plaintiff and its clients.

-43-

131.   Plaintiff further alleges that Defendants actually induced the breach of its clients, as more fully alleged above, and has continued to disrupt other contractual relationships between Plaintiff and its other clients.

132.   As a direct and proximate cause, Plaintiff alleges that it has sustained damage in an amount according to proof.

133.   Plaintiff is further informed and believes and thereon alleges that the above-described conduct by Defendants was done with malice and/or oppression and/or fraud in that its purpose was/is to eliminate Plaintiff as a competitor.  Thus, Plaintiff seeks an award of punitive damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

### (For Intentional Interference With Prospective Economic Advantage)

134.   Plaintiff hereby adopts, incorporates, and reiterates all the preceding allegations of this complaint.

135.   Plaintiff and the clients identified herein had an economic relationship that would have resulted in a future economic benefit beyond the scope of the contract above.

136.   Plaintiff alleges that Defendants had knowledge of such relationship.

137.   Plaintiff alleges that Defendants committed intentional acts designed to disrupt the relationship.

138.   Plaintiff alleges that Defendants engaged in wrongful acts through its unlawful, unfair, and predatory practices in violation of the Sherman Act, as more fully set forth above.

139.   Plaintiff alleges that Defendants actually disrupted Plaintiff's relationship with the client identified herein.

140.   As a direct and proximate result, Plaintiff alleges that it was harmed.

141.   Plaintiff is further informed and believes and thereon alleges that the above-described conduct by Defendants was done with malice and/or

oppression and/or fraud in that its purpose was/is to eliminate Plaintiff as a competitor.  Thus, Plaintiff seeks an award of punitive damages in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

## AS TO THE FIRST CAUSE OF ACTION FOR VIOLATIONS UNDER THE SHERMAN ACT

1.     For appropriate injunctive and declarative relief pursuant to the Sherman Act and California Business and Professions Code §§ 17200 *et seq.* and any other extraordinary relief as this court may deem just and proper to remedy the violations and to prevent future violations of a like or similar nature, as more fully set forth below;

2.     For actual damages; and

3.     For treble damages for each and every violation of the Sherman Act, pursuant to 15 U.S.C. §§ 15 and 26.

## AS TO THE SECOND CAUSE OF ACTION FOR UNLAWFUL/UNFAIR BUSINESS PRACTICES

1.     For disgorgement and/or restitution, pursuant to California Business and Professions Code § 17203.

## AS TO THE THIRD CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACT

1.     For general damages in an amount according to proof;

2.     For special damages in an amount according to proof; and

3.     For exemplary and punitive damages in an amount necessary to punish and set an example of Defendants;

## AS TO THE FOURTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

1.     For general damages in an amount according to proof;

2.     For special damages in an amount according to proof; and

3.     For exemplary and punitive damages in an amount necessary to punish and set an example of Defendants.

### AS TO ALL CAUSES OF ACTION

1.     For attorney's fees pursuant to 15 U.S.C. §§ 15 and 26, California Code of Civil Procedure Section 1021.5, and as otherwise permitted under law;

2.     For costs of suit incurred herein, including without limitation prejudgment interest, pursuant to 15 U.S.C. §§ 15 and 26 and as otherwise permitted under law; and

3.     For such other and further relief as this court may deem just and proper.

DATED:  October 2, 2015       LAW OFFICES OF PHILIP J. KAPLAN

By_____
              Philip J. Kaplan
              Attorney for Plaintiff
              LENHOFF ENTERPRISES, INC.


### Demand For Jury Trial

Plaintiff hereby demands a jury trial in this action pursuant to Federal Rules of Civil Procedure, Rules 38 and 81.

DATED:  October 2, 2015       LAW OFFICES OF PHILIP J. KAPLAN

_____
Philip J. Kaplan
Attorney for Plaintiff
LENHOFF ENTERPRISES, INC.

-46-

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

<u>**EXHIBITS TO COMPLAINT:**</u>

- Exhibit A – 2001/2002 Scripted Series Staffing Representation Breakdown Pie Chart

- Exhibit B – 2001/2002 Scripted Series Staffing Representation Breakdown Column Chart

- Exhibit C – 2014/2015 Scripted Series Staffing Representation Breakdown Pie Chart

- Exhibit D – 2014/2015 Scripted Series Staffing Representation Breakdown Column Chart

- Exhibit E – 2001/2002 Scripted Series Term Deals Pie Chart

- Exhibit F – 2014/2015 Scripted Series Term Deals Pie Chart

- Exhibit G – 2001/2002 Scripted Series Packaging Drivers Pie Chart

- Exhibit H – 2014/2015 Scripted Series Packaging Drivers Pie Chart

- Exhibit I - 2001/02 and 2014/15 TV Seasons Percentage Point Increases between Diversity, Agency Packaging and Scripted Series Staffing Pie Chart

- Exhibit J – Dr. Darnell Hunt's declaration

- Exhibit K – The Hollywood Reporter: "Four Top Sharks on "Destructive" Network Execs, Clients They'd Poach and What a Hit Showrunner Can Earn" – The Hollywood reporter 10/9/14

# EXHIBIT "A"

## 2001 - 2002 SCRIPTED SERIES STAFFING REPRESENTATION BREAKDOWN

Criteria: 147 shows sampled from 55 of 571 licensed agencies representing 1348 artists/persons

Data compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Casting Breakdown Services, Hollywood Creative Directory, Academy Players Directory, ICM, UTA, Paradigm, and several industry experts

Note: Producers that are talent managers or studio executives are not factored



William Morris Agency, 79, 6%

UTA, 72, 5%

Endeavor, 58, 4%

Rothman Agency, 23, 2%

Kaplan-Stahler-Gumer Agency, 21, 2%

Paradigm, 21, 2%

Major Clients Agency, 16, 1%

Broder/Kurland/Webb/Uffner, 79, 6%

Gersh, 15, 1%

APA, 9, 1%

Vision Art, 9, 1%

Jim Preminger Agency, 6, 0%

Preferred Artists, 6, 0%

Bruce Brown Agency, 5, 0%

Dyteman & Associates, 5, 0%

Ibd, 2, 0%

Innovative Artists, 4, 0%

Metropolitan, 4, 0%

Richland/Wunsch/Hohman, 4, 0%

Shapiro/Lichtman/Stein, 4, 0%

all other agencies, 51, 4%

ICM, 82, 6%

CAA, 118, 9%

no exclusive agency representation listed, 657, 49%

EXHIBIT A - Last Modified: 6/10/201511:10 AM

Exhibit "A"

-48-

Lenhoff Lenhoff - Copyright, All Rights Reserved

# EXHIBIT "B"



2001-2002 SCRIPTED SERIES STAFFING REPRESENTATION BREAKDOWN
Criteria: 147 shows sampled / 55 agencies / 1348 artists-persons

EXHIBIT B

Last Modified: 6/10/201511:13 AM

Lenhoff Lenhoff - Copyright, All Rights Reserved

Exhibit "B"

-49-

# EXHIBIT "C"



**2014-2015 SERIES STAFFING REPRESENTATION BREAKDOWN**

Criteria: 381 shows sampled from 53 of 611 licensed agencies representing 3297 artists/persons

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note: Producers that are talent managers or studio executives are not factored

Conclusion: 4 Uber Agencies control 79% of the series staffing market

no exclusive agency representation listed, 241, 7%

Paradigm, 140, 4%

APA, 91, 3%

Gersh, 58, 2%

Rothman Brecher Agency, 47, 1%

all other agencies, 144, 4%

ICM, 318, 10%

UTA, 708, 22%

CAA, 746, 23%

WME, 804, 24%

EXHIBIT C



Exhibit "C"

-50-

EXHIBIT "D"



Exhibit "D"

-51-

# EXHIBIT "E"



**2001 - 2002  SCRIPTED SERIES TERM DEALS**

Criteria: 26 out of 571 licensed agencies sampled 373 term deals at the studios and networks

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Conclusion: 26 Agencies control 44% of the term deals market

EXHIBIT E

All Other Agencies, 32, 9%

William Morris Agency, 27, 7%

Endeavor, 24, 6%

ICM, 23, 6%

UTA, 14, 4%

Broder/Kurland/Webb/Uffner, 12, 3%

CAA, 32, 9%

no exclusive agency representation listed, 209, 56%

Exhibit __"E"__

Last Modified: 6/10/201511:21 AM

Lenhoff Lenhoff - Copyright, All Rights Reserved

# EXHIBIT "F"

## 2014 - 2015 SCRIPTED SERIES TERM DEALS

Criteria: 9 out of 611 licensed agencies sampled 393 term deals at the studios and networks

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several other industry experts

Conclusion: 4 Uber Agencies control 91% of the term deals market



EXHIBIT F



Lenhoff Lenhoff - Copyright, All Rights Reserved

Last Modified: 6/10/201511:22 AM

# EXHIBIT "G"



## 2001-2002 SCRIPTED SERIES PACKAGING DRIVERS
### Criteria: 157 packaged shows sampled

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note: 31 of the 157 packages were split between 2 or 3 agencies

Conclusion: 15 agencies controlled 96% of the packaging market

CAA, 34, 22%
UTA, 30, 19%
Endeavor, 19, 12%
ICM, 19, 12%
Broder/Kurland/Webb/Uffner, 15, 10%
William Morris Agency, 11, 7%
no exclusive agency representation listed, 7, 4%
Paradigm, 4, 3%
Metropolitan, 3, 2%
Major Clients Agency, 3, 2%
Vision Art, 3, 2%
Rothman Agency, 2, 1%
APA, 2, 1%
Kaplan-Stahler-Gumer Agency, 2, 1%
IFA, 1, 1%
Jim Preminger Agency, 1, 1%

EXHIBIT G



Exhibit "g"
-54-

# EXHIBIT "H"

## 2014 - 2015 SERIES PACKAGING DRIVERS

Criteria: 353 packaged shows sampled

Data: compiled from a variety of sources that industry stakeholders rely upon for day-to-day updates on industry developments. These sources include the WGA, DGA, Studio System, Variety Insight, Internet Movie Database (IMDB), Deadline Hollywood, Breakdown Services, ICM, UTA, and several industry experts

Note: 105 of the 353 packages were split between 2 or 3 agencies

Analysis: 4 Uber agencies control 93% of the packaging market and reluctantly split the package with the non-Uber agency in only 16 instances, maintaining the Uber Agency cartel "lock" on packaging



EXHIBIT H



Exhibit ___"H"___

-55-

Lenhoff Lenhoff - Copyright, All Rights Reserved

# EXHIBIT "I"

## Percentage Point Increases between 2001-2002 and 2014-2015 TV Seasons: Diversity, Agency Packaging and Scripted Series Staffing

**Data compiled by:** Darnell M. Hunt, Ph.D., Professor in the Department of Sociology and the Department of African American Studies, in the Division of the Social Sciences, and Director of the Ralph J. Bunche Center for African American Studies at the University of California, Los Angeles (UCLA). Author and/or Editor of four scholarly books, of which one is directly related to matters of diversity in Hollywood — *Channeling Blackness: Studies on Television and Race in America* (Oxford University Press, 2005). Most recently, Dr. Hunt published a scholarly article on diversity and television writing — "Hollywood Story: Diversity, Writing, and the End of Television as We Know It" — in *The Sage Handbook of Television Studies* (Sage Publications, 2015), and a series of reports examining the state of diversity in the Hollywood entertainment industry. These include *The 2015 Hollywood Diversity Report: Flipping the Script* (with Ana-Christina Ramon) and *The 2014 Hollywood Diversity Report: Making Sense of the Disconnect* (with Ana-Christina Ramon and Zachary Price), both released by UCLA's Bunche Center; *The Hollywood Writers Report*, issued by the Writers Guild of America with installments in 2005, 2007, 2009, 2011, and 2014; and *The African American Television Report*, released by the Screen Actors Guild in June of 2000.

**Conclusion:** Between the 2001-02 and 2014-15 television seasons, the 4 Uber Agencies increased their share of talent driven scripted television packaging by 20 percentage points, to an industry dominating 92.4 percent. As gatekeepers in the television development process, the Agencies have failed to produce packages that promote significant advances in television diversity. Indeed, between the 2001-02 and 2014-15 seasons, minorities have fallen further behind relative to their growing population share with respect to agency packaging drivers.



Lenhoff Lenhoff · Copyright, All Rights Reserved

EXHIBIT I

Last Modified: 6/12/2015 2:36 PM

# EXHIBIT "J"

**DECLARATION OF DARNELL HUNT, PH.D.**

**REGARDING LENHOFF V. UTA and ICM**

I, Darnell M. Hunt, Ph.D., declare as follows:

1. I am Professor in the Department of Sociology and the Department of African American Studies, in the Division of the Social Sciences, and Director of the Ralph J. Bunche Center for African American Studies at the University of California, Los Angeles (UCLA), where I have been employed since 2001. On July 1, 2015, I will begin a three-year term as Chair of the Department of Sociology at UCLA, while completing my final term as Director of the Bunche Center. The Bunche Center, which operates as a campus-based "think tank," is an organized research unit (ORU) within the University of California system devoted to the study of African American history, culture, and contemporary life. Prior to my tenure at UCLA, I was promoted from Assistant Professor, to Associate Professor, and to Professor of Sociology at the University of Southern California (USC), where I began my academic career as a sociologist in 1994. I chaired the Department of Sociology at USC prior to leaving for my current positions at UCLA. I received my A.B. degree in journalism from USC in 1984, my M.B.A. from Georgetown University in 1988, and my M.A. and Ph.D. in sociology from UCLA in 1991 and 1994, respectively. My areas of expertise include race relations, media, Hollywood diversity, and popular culture.

2. First as a staff consultant for the U.S. Commission on Civil Rights for its 1993 Los Angeles Hearing, and later as a professor and researcher at USC and UCLA, I have studied issues related to diversity (or the lack thereof) in the Hollywood industry for more than 20 years. For more than 15 years, I have served as a consultant on these matters to



Exhibit "J"

- 57 -

several industry stakeholders, including the Writers Guild of America, West and the Screen Actors Guild. In 2010, I testified before the House Judiciary Committee on the likely impact of the then-proposed merger of Comcast and NBC Universal on industry diversity.

3. I have written or edited four scholarly books, of which one is directly related to matters of diversity in Hollywood — Channeling Blackness: Studies on Television and Race in America (Oxford University Press, 2005). Most recently, I published a scholarly article on diversity and television writing —"Hollywood Story: Diversity, Writing, and the End of Television as We Know It" — in The Sage Handbook of Television Studies (Sage Publications, 2015).

4. I have also authored a series of reports examining the state of diversity in the Hollywood entertainment industry. These include The 2015 Hollywood Diversity Report: Flipping the Script (with Ana-Christina Ramon) and The 2014 Hollywood Diversity Report: Making Sense of the Disconnect (with Ana-Christina Ramon and Zachary Price), both released by UCLA's Bunche Center; The Hollywood Writers Report, issued by the Writers Guild of America with installments in 2005, 2007, 2009, 2011, and 2014; and The African American Television Report, released by the Screen Actors Guild in June of 2000.

5. I am currently a member of the American Sociological Association and the Association of Black Sociologists.

### The Case Regarding UTA and ICM

6. I have been asked by attorney Philip Kaplan to analyze data pertaining to 122



packaged television series for the 2001-02 season and 353 packaged series for the 2014-15 season. The spreadsheets provided to me contained information about the talent agencies responsible for each packaged television series, as well as the names of talent included as part of each project. Of particular interest were the race/ethnicity and gender of the subset of talent that the agencies used to sell packaged series to the networks. These package "drivers" were flagged for each series in the spreadsheet.

## Talent Agencies as TV Development Gatekeepers

7. "Packaging" is the process by which talent agencies initiate projects for their clients, as opposed to simply securing work for their clients on projects that are already in the development pipeline. As previous research shows, core (or "uber") agencies are uniquely situated to participate in packaging because of their large, exclusive, and in-demand talent rosters.[1] In the television arena, these core agencies are able to package together top acting, writing, producing and directing talent for a given project and —— unlike their smaller counterparts — provide an invaluable service to broadcast and cable networks seeking to develop new series. The uber agencies are thus gatekeepers in the television development process. On the one hand, these dominant agencies are in a position to provide the talent they represent with unparalleled access to lucrative industry work. On the other, by selling packaged ideas and talent to the networks, these agencies directly shape the types of scripted television series most likely to see the light of day.

---

[1] Bielby and Bielby, "Organizational Mediation of Project-Based Labor Markets: Talent Agencies and the Careers of Screenwriters," *American Sociological Review*, Vol. 64., No. 1, 1999.

The power of the uber agencies, as one study put it, "rivals that of the major studios at the height of the studio system."[2]

8. In 2015, four core talent agencies — William Morris Endeavor (WME), Creative Artists Agency (CAA), ICM Partners, and United Talent Agency (UTA) — occupied a privileged position in the Hollywood entertainment industry. Through mergers, the acquisition of private equity capital, and vertical integration into a number of entertainment-related domains (e.g., music, literary, sports, commercials), these uber agencies have been able to stockpile in-demand acting, writing, producing, and directing talent. Indeed, my analysis shows that the agencies represented nearly all of the talent who were "drivers" (i.e., particularly attractive to the networks) of the 353 packaged television series for the 2014-15 season (92.4 percent). Though still dominant, the uber agencies[3] had claimed on their rosters just 72.4 percent of the package drivers for the 2001-02 television season — a figure 20 percentage points lower than the 2014-15 figure (See Exhibit 1). In other words, the dominance of the uber agencies as gatekeepers has increased over time. This finding is consistent with findings from earlier studies that document the increasing influence the core talent agencies exert over the television development process.[4]

---

[2] Ibid, p. 67.
[3] Because the 2001-02 season was before the merger of William Morris and Endeavor, five separate agencies were included in the totals for that season.
[4] See the 2014 Hollywood Diversity Report: Making Sense of the Disconnect and the 2015 Hollywood Diversity Report: Flipping the Script, both released by the Ralph J. Bunche Center for African American Studies at UCLA.

## Uber Agencies as Barriers to Diversity

9.  While the uber agencies' influence over the television development process has skyrocketed since the 2001-02 season, the diversity of the talent driving their packaging has remained flat.  My analysis shows that minorities constituted 10.7 percent of all agency package drivers for the 2014-15 season, up just a mere 2.3 percentage points from the 8.3 percent figure posted for the 2001-02 season (see Exhibit 1).  But over the same period, the minority share of the U.S. population grew by 8 percentage points, from about 30 percent to 38 percent.  Relative to the increasing diversification of American society, minorities have thus made no progress over the past 14 television seasons as the drivers of television packaging. The degree of minority underrepresentation for the 2014-15 season — a factor of 3.6 to 1 — exactly matches the figure for the 2001-02 season.

10.  While comprehensive studies of agent diversity at the uber agencies are not available, anecdotal observations and other information suggest that the agents responsible for nearly all television packaging are almost exclusively white and overwhelmingly male. This lack of agent diversity most certainly affects the types of packages the uber agencies are predisposed to initiate. This idea, of course, is consistent with my finding that minorities have remained woefully underrepresented among the talent driving packages over the past 14 seasons (see #9 above).  It is also consistent with my finding that women — nearly 51 percent of the population — constituted just 18.6 percent of package drivers for the 2001-02 season and 20.2 percent for 2014-15, a mere 1.6 percentage point increase over 14 seasons (see Exhibit 1).

11. A treasure trove of data documents the severe and persistent underrepresentation of minorities and women among the corps of television writers.[5] Minorities, in particular, constituted just 13.7 percent of the writer/producers staffing television series for the 2013-14 season — up 4.9 percentage points from the 8.3 percent figure posted for the 2001-02 season (see Exhibit 1). When the television writer/producers with the most influence over the creative process are considered, the numbers are even worse for minorities. Only 5.5 percent of executive producers for the 2013-14 television season were minorities, which corresponds to underrepresentation for the group by a factor of nearly 7 to 1 among the corps of executive producers.[6] These data, too, are consistent with a television development process dominated by uber agencies that fail to package series with diverse "drivers."

### The Costs of Lagging Diversity

12. The stranglehold the uber agencies have achieved over the television development process does more than just erect barriers to employment for diverse talent deemed unworthy of representation by these gatekeepers; it also limits the diversity of the stories to which audiences have access. Because a packaged television series is largely a function of the package drivers an uber agency uses to sell it to a network, and because minorities have been so severely underrepresented among this talent, the diversity of

---

[5] See The 2014 Hollywood Writers Report: Turning Missed Opportunities Into Realized Ones, Writers Guild of America, West.
[6] See WGAW 2015 TV Staffing Brief, Writers Guild of America, West.

stories available to the public has undoubtedly suffered.[7]

13.  As humans, we are addicted to story.[8]  The television industry caters to our thirst for stories by providing us with a seemingly endless supply of scripted television series.  We live vicariously through the pleasures and pains of the characters presented in these productions as we try their predicaments on for size. In this way, television images contribute greatly to how we think about ourselves in relation to others.[9]  A large body of social science research underscores the normalizing role television plays in society.[10] When marginalized groups in society are absent from the stories a nation tells about itself, or when media images are rooted primarily in stereotype, inequality is normalized and is more likely to be reinforced over time through our prejudices and practices.

14.  Moreover, new research has repeatedly demonstrated that audiences prefer television programming that reflects the nation's population diversity. The Bunche Center's 2014 and 2015 Hollywood Diversity Reports document that scripted television series featuring casts that are from 31 percent to 40 percent diverse post, on average, the highest ratings.  Meanwhile, the lion's share of the series packaged by the uber agencies continues to fall far short of this diversity threshold.

---

[7] Ibid.
[8] Gottschall, Jonathan. 2013.  *The Storytelling Animal:  How Stories Make Us Human*, Mariner Books.
[9] Hall, Stuart, Jessica Evans and Sean Nixon. 2013.  *Representation: Cultural Representations and Signifying Practices.* London: Sage.
[10] For example, see Entman, Robert M. and Andrew Rojecki. 2001.  *The Black Image in the White Mind:  Media and Race in America.*  Chicago:  University of Chicago Press. See also, Hunt, Darnell M. 2005.  *Channeling Blackness:  Studies on Television and Race in America.* New York:  Oxford University Press.

**Conclusion**

15.  In sum, between the 2001-02 and 2014-15 television seasons, the uber agencies increased their share of the talent driving scripted television packaging by 20 percentage points, to an industry dominating 92.4 percent share.  As gatekeepers in the television development process, these agencies have failed to produce packages that promote significant advances in television diversity.  Minorities — relative to their growing population share — have made no progress with respect to agency packaging drivers between the 2001-02 and 2014 seasons.  As a result, the public has been denied access to a menu of television storytelling more resonant with the needs and desires of a rapidly diversifying America.

16.  The foregoing is true and correct and executed under the penalty of perjury under the laws of the United States and the State of California on June 12, 2015.

Darnell M. Hunt, Ph.D.
Los Angeles, CA

-64-

# EXHIBIT "K"

# TV Agents Smackdown: Four Top Sharks on "Destructive" Network Execs, Clients They'd Poach and What a Hit Showrunner Can Earn



by Matthew Belloni and Lacey Rose
10/9/2014 9:00am PDT

In a candid conversation, CAA's Adam Berkowitz, ICM Partners' Ted Chervin, WME's Ari Greenburg and UTA's Matt Rice discuss what they'd change about the development process, why they don't care how many people are watching shows on Netflix or Amazon, and how clients perceive broadcast vs. cable: "You're not going to



HOLLYWOOD, ESQ   INTERNATIONAL   POLITICS   LABOR   ASIA

*magazine.*

"Everyone wants to do television now," observed **Adam Berkowitz**, co-head of CAA's television department, of the current boom in scripted programming. As the fall TV season began, Berkowitz, 53, had accepted *THR*'s invitation to join three of his biggest agency rivals — **Ted Chervin**, 51, founding partner and board member at ICM Partners; **Ari Greenburg**, 42, a WME partner who co-runs its TV department; and **Matt Rice**, 43, a UTA board member and head of television — for a candid discussion about the state of TV and their unique perspectives on the so-called new "golden age." Together they represent the creators of *House of Cards*, *Parks and Recreation*, *Cougar Town*, *Once Upon a Time* and dozens of other top shows, packaging series and negotiating rich backend deals.

As Greenburg noted, there are now about 300 scripted series that are active, and more than 50 buyers of high-quality programming all are competing for the next *Breaking Bad* or *Big Bang Theory*, leading to unprecedented opportunity. But the boom also has brought growing pains, especially for talent. Digital upstarts such as Netflix and Amazon are challenging accepted deal structures, and writers work longer hours on ambitious cable shows that don't pay as well as 22-episode network programs. At the same time, the networks say they can't find qualified showrunners to whom they can entrust their priciest projects. "There are about 60 people who are capable, or approved and capable, of running a show," Greenburg noted. "It's why you have a number of people who are running three shows. If you think about the math, [with] a CBS drama, that's $100 million you're handing someone."

**Read more** Power Showrunners: 10 to Watch for 2014

**What's your biggest frustration with the television business?**

**ARI GREENBURG** The biggest frustration is the biggest opportunity: a ton of buyers, so there are a lot of people to keep track of. There are 300 projects being produced.

_-66 -_

**TED CHERVIN** So many of the business models are being reinvented. Certain studios don't have a template for a certain cable channel. There's an issue when writers are working on shows and doing many fewer episodes, getting paid per episode but having extended weeks of work. You do 10 episodes in 40 weeks.

**ADAM BERKOWITZ** And [it's] weeks until the show's picked up. A lot of traditional studios haven't kept up in the deals they make because they are going based on precedent.

**GREENBURG** And everybody seems to have just enough great success in the old model to hold onto those precedents. It's hard to tell the people at Warner Bros. to change when they have a show on the air, [*The Big Bang Theory*], that's worth $2.5 billion.

**BERKOWITZ** Well, we tell them but they don't listen.

**With so many outlets now, how do you determine the hierarchy of whom you prefer to sell to? Is it just money?**

**BERKOWITZ** No, it depends on the idea. A certain idea is more suited to the niche players.

**MATT RICE** I like to see how they market a show. You can often see the way they're marketing on your drive to work even: the billboards and the buses and the bus stops.

**GREENBURG** ABC used to buy billboards specifically along [former ABC Entertainment president] **Steve McPherson**'s path to work. (*Laughs.*) He's like, "Wow, *Pushing Daisies* seems to be everywhere!" It was really only six strategically placed billboards.

**CHERVIN** The first time I really saw the strength of that in cable was when a client created the [2003 ESPN] show *Playmakers*. I remember going to Staples Center and seeing this massive billboard, and I remember thinking, "Wow, ESPN has so much muscle and they have such a different way of thinking about how they want to market." And that show had a huge cable audience even though the NFL

forced ESPN to cancel it.

**Read more**  Complete Guide to TV Premiere Dates 2014

**Do clients now say, "I want to have the first hit at this new outlet," or are they still looking to do broadcast?**

**GREENBURG** I would say 90 percent of the people I work with all want that big cable hit.

**BERKOWITZ** Five years ago, you wouldn't have said that.

**GREENBURG** The big surprise is that if you have a big cable hit, you can actually make a fortune as well.

**BERKOWITZ** It's not the same, though.

**GREENBURG** Yeah, well, you're not going to make $100 million, per se, from a cable show, though you can make $50 million.

**See more** TV Agents Smackdown: Four Top Sharks, One Room

**Besides Matthew Weiner, who has made $50 million from a cable show?**

**RICE** David Chase.

**GREENBURG** There are more than you realize. You can surprise somebody with a backend. I don't think when Fox TV Studios sold *Burn Notice*, they expected that it would have a strip sale north of half a million bucks [per episode]. I don't think Warner Bros. thought they were going to have an off-net hit with *The Closer*. There are certain shows that break through, and there are surprises. Matt and I both have shows on FX on the comedy side, and they're really lucrative. By design, they're produced super cheap, and nobody knew 11 years ago that those shows were going to have a run on Comedy Central or Netflix.

**BERKOWITZ** *Sex and the City* was the first comedy on cable that had a second run.

−68−

**CHERVIN** But the clients are predominantly artists so they're not making decisions about wanting to be first on a channel or fourth on a channel.

**GREENBURG** For the clients that have never had a show, the priority is having a show — and having the show they want, no matter where it is. Bravo's going to have its first scripted show shortly. BBC America has a big show now, a couple of them. Then, once they've had a show, they want people to see their show and talk about it. You talked about the good marketing story. We've all had the bad one, where a show came and it was over the next day. You remember that when you think about where to go the next time.

**BERKOWITZ** We were involved with *House of Cards*; we took it all over town. And everyone wanted it. People committed to a pilot; someone committed to a pilot, a writing staff and said they were going to pick it up. And then Netflix committed to 26 episodes. You have to take a chance on something like that, and now going to Netflix isn't scary anymore.

**What was that conversation like with the *House of Cards* creative team?**

**BERKOWITZ** There were many conversations. It was a new model. HBO was a new model at one point.

**GREENBURG** I remember speaking to one of the players on the team, who is not my client.

**BERKOWITZ** Thanks. (*Laughs.*)

**GREENBURG** But I was curious about the whole thing, and his take was, "I hope it works, but I don't have Netflix and my friends don't have Netflix." Now they all have Netflix.

**But Netflix is the one that's paying huge money. Not every new outlet is, necessarily.**

**BERKOWITZ** Hulu just made a huge, huge, huge commitment to **J.J.**

*– 69 –*

**Abrams** [for a JFK assassination series].

**GREENBURG** Amazon's making full-budget pilots. The pilot they're shooting in Seattle right now, [*The Man in the High Castle*], is one of the highest-budget pilots.

**RICE** Yahoo [acquired *Community* and] is spending more this year than NBC did last year. It comes down to need. Netflix needed *House of Cards*.

**See more** 2014's New Broadcast and Cable TV Shows

**Do you care that you don't know how many people are watching on Netflix or Amazon?**

**BERKOWITZ** Not at all.

**RICE** The only way it's going to affect us is when you get to season four and five of these shows, and they're deemed worthy of lasting. That's the only place where they may have to share some of that information.

**GREENBURG** It's going to put a lot of power in the hands of the writer versus the producers, the director, the stars, etc. Because even Netflix is going to find that most of these deals for our writer clients are two-year deals, and unless they figure out how to write the shows themselves, they're going to need these writers for season three, four, five. And that's when, if they don't give us the data, we're going to have to make up our own data and that data's going to have a lot of zeros on it, and we're going to get people paid.

**BERKOWITZ** All of our agencies, our foundations are on backends, and when you sell to a streaming service, and they have a perpetual deal, you don't know where the backend's going to come from because there may never be a second sale. That's a potentially big problem for our clients down the line that we have to address.

**GREENBURG** The Netflix ratings issue is not dissimilar from what Matt Weiner went through on *Mad Men*. He was just looking for a

- 70 -

way to get the value that the distributor was taking, move some of that into his pocket because he helped define AMC. So if Netflix doesn't want to share the ratings for *House of Cards* with the people involved in the show, I would start counting the trophies. I would start counting the subscriber base. I mean, it's all public information.

**RICE** We'll create a new monetary system. We'll hunker down and come up with a system of mathematics, in which the four of us will judge what everything's worth.

**Do you feel that the broadcast networks each have a clear identity now?**

**GREENBURG** We all have a pretty good idea of like, "OK, this feels like a CBS show, but we're taking it everywhere to set the market," and then cut to a week later and you're closing a deal at ABC. They're all looking for hits. A lot of what the decision-making is about is: Is this pilot going to get made at that network? Do they like this writer? Who's the studio involved? Does it compete with something else on that network?

**BERKOWITZ** Do they have a place to launch it?

**If you could change one thing about the development process, what would it be?**

**BERKOWITZ** Too many people are involved in making a decision. If you go to a cable network, you will have direct interaction with the president. When at broadcast, because the numbers are so much bigger, you don't have that interaction. You're dealing with the people at the studio, who are telling you what they think the network wants. And by the time it gets to the person at the highest level, you don't really know what their initial thoughts were, and that creates confusion.

**RICE** The truth is, it doesn't matter if the senior vice president of drama might love these shows. In the end, it won't get them picked

up.

**CHERVIN** Clients often go in and pitch four networks; there's a bidding war; a network acquires it with a significant penalty; and then all of a sudden in the notes process, they go so far afield from what was originally sold. It's confusing for the client because the client says, "They wanted this badly enough to put this big penalty up against it to get it away from the other networks, but the notes don't seem consistent at all with what they seem to have loved when I went in and pitched it." The leaders are too disconnected from the real nuts-and-bolts creative process, and that anticipatory note-giving, that sort of guessing at what your boss wants, is really destructive.

### What is a mistake you made early in your career that you learned from?

**CHERVIN** I was too nice to my fellow agents. I wasn't aggressive enough.

**GREENBURG** [I passed on] **Greg Berlanti**. He tortured me for seven years and I got him back. I left some money on the table, but I'm proud to represent him.

**RICE** I didn't have a ton of composure early on. But eventually it got a lot easier, and I stopped flop-sweating. I mean, I was a pretty big loser. (*Laughs.*)

**See more**  Hollywood's Notable Deaths of 2014

### What was your first big deal and how did you celebrate it?

**CHERVIN Bill Lawrence**, when he created *Spin City* with **Gary David Goldberg**. It's funny how you give advice and then all of a sudden your advice shifts. I remember telling Bill that he shouldn't develop early. He should stay on a show, develop his producing skills and his writing skills. And then all of a sudden, he calls me from his car and says, "Gary David Goldberg says he wants to bring **Michael J.**



**Fox** back to TV and he'd like for me to write the script." And I immediately went, "Well, forget that advice I gave you!"

**BERKOWITZ** One of the first shows I was involved in that was successful was *Seinfeld*. I represented **Larry David**. He had not really done TV. He had a feature script, and he knew **Jerry Seinfeld**. I went out for all four tapings because I was based in New York. It was *Seinfeld Chronicles*, and they didn't even pick it up until the next year, only 13 episodes at midseason. No one knew.

**RICE** I was working at Broder with Ted, and **Will Forte** got hired on *SNL* as a castmember.

**CHERVIN** Matt knew Will from UCLA, and there was some big fraternity brawl or something, and Matt and Will, who were in rival fraternities, were basically the two guys who weren't beating each other up. And that's how they became friends, and then Matt signed him.

**RICE** Will's girlfriend at the time was a good friend of mine. I was out of college at this very small agency. And I'd just been promoted. I was 23. She called me and said, "Hey, Will's in the Groundlings writing program. He has some stuff. He's too nervous to call you. Would you read it?" I said, "Yeah, I'd love to read it." "OK, great," she said. "Also, it's not funny." Click.

**GREENBURG** Most of my early years, I sold reality shows, mainly because I was bored and they wouldn't let me talk to the writers. I was driving in, and *World's Scariest Police Chases* had aired on Fox the night before, and we were anticipating a nine share [rating]. This was the dumbest show ever. I can say that because the producers, including my father, may he rest in peace, are no longer with us. And I was driving in, and I pulled out my cellphone and checked the ratings. We used to call the ratings hotline. And it was: "Fox 18-to-49 rating at 8 p.m.: 18.3 rating, 29 share." (*Laughs.*) I hit it again, and then I called the CBS hotline, thinking, "That's a glitch." We ended up making 100 episodes of the show.

**BERKOWITZ** And he became his father's favorite child!

**What's the craziest thing you've done to sign a client?**

**GREENBURG** I had a writing team for a long time that was on *Will & Grace*. And **Scott Schwartz** stole the client from me. Scott's an independent agent and he repped their bosses, and I was so upset. The woman in the writing team, **Tracy Poust**, was a spin teacher in her spare time. I used to weigh a lot more. I was not in very good shape, and I attended her spin class as a way to woo her back. I lasted about six minutes. I nearly died. I had to lie down on the floor of the Sports Connection on Santa Monica Boulevard. And I think she felt bad for me, so she came back.

**See more From 'Arrested Development' to 'House of Cards,' Exclusive Portraits of Netflix's Stars**

**Is it harder or easier to court and sign clients today?**

**GREENBURG** It's weirdly happening at a much earlier time in people's careers. All of us have probably sat in a room with unproduced non-guild members.

**RICE** That's the majority of my business! (*Laughs.*)

**BERKOWITZ** The thing is, there are so many places to sell, there are not that many people with really wonderful, original voices. Each agency could use a lot more clients that are talented, because that's why the drama shows were selling so sparsely this year at the networks. There aren't that many people who can develop.

**RICE** There aren't enough talented people. Let's [give out] the address to CAA. (*Laughs.*)

**GREENBURG** It's been a little slow at CAA.

**BERKOWITZ** Do you disagree?

**RICE** I'm totally with you. If we had 50 more interesting comedy



writers, one of them would probably get a job. So it's just really difficult.

**What's a recent deal that you really envy?**

**CHERVIN** The *House of Cards* deal: the elements that were involved, the commitment that was made, the caliber of the show. And it was first.

**GREENBURG** Adam and I worked on the *True Detective* deal, and it was a pretty remarkable thing for that kind of material to throw off that kind of money, and a lot of the money going to the artists involved in the show and not just the studio layer or something else.

**BERKOWITZ** That changed the model also.

**GREENBURG** It worked on top of it. I was impressed with the audience for tuning into something so smart.

**Which client would you love to poach?**

**GREENBURG** I'd love to be in the *Game of Thrones* business. I think you can sell better when you're passionate about a show, and I love the show.

**CHERVIN** I love *Justified*. I think **Graham Yost** is a great writer. I loved *Friday Night Lights*. I think **Jason Katims** is a great writer.

**RICE Mike Judge** is working with another client of mine, [**Alec Berg**], on *Silicon Valley*.

**GREENBURG** He's had the same agent for 22 years.

**RICE** I would never call him or anything. I just think —

**BERKOWITZ** But would you write to him? (*Laughs.*)

 @THR
THRnews@thr.com



## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within entitled action.  I am employed at 3278 Wilshire Blvd., Suite 106, Los Angeles, CA 90010.

On October 2, 2015, I served the within **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, UNFAIR COMPETITION LAW, INTENTIONAL INTERFERENCE WITH CONTRACT, AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** upon interested parties in this proceeding or action by depositing a true and correct copy enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Postal Service at Los Angeles, California, addressed as follows:

### See Attached Service List

(X)    **CM/ECF:** via Filing in Court's electronic docket.

()    **BY U.S. MAIL:**  I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, such envelope(s) would be deposited with the U.S. Postal Service on that same day, with postage thereon fully prepaid, at Los Angeles, California.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing contained in the affidavit.

()    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

(X)    (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 2, 2015, at Los Angeles, California.

_____
Philip J. Kaplan

| | |
|---|---|
| **Case Name:** | **LENHOFF & LENHOFF v. UNITED TALENT AGENCY** |
| **Case No.:** | **2:15-cv-1086 BRO (FFMx)** |

## MAILING/SERVICE LIST

### Attorneys for Defendant United Talent Agency, Inc.

Steven A. Marenberg, Esq.
smarenberg@irell.com
IRELL & MANELLA
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Bryan J. Freedman, Esq.
bfreedman@ftllp.com
FREEDMAN + TAITELMAN, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067

### Attorneys for Defendant International Creative Management Partners LLC

Michael B. Garfinkel, Esq.
mgarfinkel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067

Jacqueline E. Young, Esq.
JYoung@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105