Michael B. Garfinkel (SBN 156010)
mgarfinkel@perkinscoie.com
Charles H. Samel (SBN 182019)
csamel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.843.1284

Jacqueline E. Young, State Bar No. 280374
JYoung@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile: 415.344.7050

Attorneys for Defendant
INTERNATIONAL CREATIVE
MANAGEMENT PARTNERS, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENHOFF ENTERPRISES, INC., a California corporation dba LENHOFF & LENHOFF, <br><br> Plaintiff, <br><br> v. <br><br> UNITED TALENT AGENCY, INC., a California corporation; INTERNATIONAL CREATIVE MANAGEMENT PARTNERS LLC, a Delaware limited liability company; and DOES 1 through 5, inclusive, <br><br> Defendants. | Case No. 2:15-CV-01086-BRO (FFMx) <br><br> **DEFENDANT INTERNATIONAL CREATIVE MANAGEMENT PARTNERS, LLC'S NOTICE OF MOTION TO DISMISS SECOND AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES;** <br><br> [Fed. R. Civ. P. 12(b)(6)] <br><br> Date:      December 21, 2015 <br> Time:      1:30 p.m. <br> Place:     Courtroom 14 <br> Judge:    Hon. Beverly Reid O'Connell |

## **NOTICE**

TO THE COURT, ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 21, 2015, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 14 of the United States District Courthouse, 312 North Spring Street, Los Angeles, California, before the Honorable Beverly Reid O'Connell, Defendant International Creative Management Partners, LLC will, and hereby does, move this Court for an order dismissing the Second Amended Complaint ("SAC"). This Motion is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the SAC fails to allege facts sufficient to state any claim upon which relief can be granted.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice, the [Proposed] Order Granting Defendant International Creative Management Partners LLC's Motion To Dismiss Second Amended Complaint, any reply memorandum, the filings in this action, and such other matters as may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on November 2, 2015.

DATED: November 9, 2015

**PERKINS COIE LLP**

By: */s/ Michael Garfinkel*
Michael B. Garfinkel

Attorneys for Defendants
INTERNATIONAL CREATIVE
MANAGEMENT PARTNERS, LLC

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................ 1

FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS ................... 4

APPLICABLE STANDARD OF REVIEW .................................................. 7

ARGUMENT ....................................................................................... 8

I.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A
     VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................ 8

     A.   Plaintiff Fails To Allege Facts To Plead That ICM Partners
          Participated In The Formation And Operation Of An Antitrust
          Conspiracy. ......................................................................... 9

          1.   Plaintiff Has Not Alleged Facts To Plead That ICM
               Partners Entered Into An Agreement In Restraint Of
               Trade. ......................................................................... 9

          2.   Plaintiff Has Not Alleged Facts To Plead That ICM
               Partners Engaged In Parallel Conduct From Which It Is
               Plausible To Infer An Agreement In Restraint Of Trade. ....... 11

          3.   Plaintiff Has Not Alleged Facts To Plead That ICM
               Partners Coerced Studios, Networks, Or Producers To
               Refuse To Deal With Plaintiff. ...................................... 15

          4.   The Random Antitrust "Buzz Words" In The Second
               Amended Complaint, Without Any Accompanying
               Factual Allegations, Also Fail to State a Claim Under
               Section 1. .................................................................. 17

     B.   Plaintiff Fails To Allege That It Suffered Any Antitrust Injury ......... 19

II.  THE SECOND AMENDED COMPLAINT FAILS TO STATE A
     CLAIM FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC
     ADVANTAGE ................................................................................ 21

III. THE SECOND AMENDED COMPLAINT FAILS TO STATE A
     CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT .... 22

CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ............................................................... 11

*Aguilar v. Atl. Richfield Co.*,
25 Cal. 4th 826; 107 Cal. Rptr. 2d 841; 24 P.3d 493 (2001) ............... 18

*Ashcroft v. Iqbal*,
556 U.S. 662; 129 S. Ct. 1937; 173 L. Ed. 2d 868 (2009) ..................... 7

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters*,
459 U.S. 519; 103 S. Ct. 897; 74 L. Ed. 2d 723 (1983) ......................... 7

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328; 110 S. Ct. 1884; 109 L. Ed. 2d 333 (1990) ............... 19, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544; 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007) ............. passim

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .................................................. 8, 17, 19

*Brennan v. Concord EFS, Inc.*,
369 F. Supp. 2d 1127 (N.D. Cal. 2005) ............................................. 11

*Carrico v. City & Cty. of S.F.*,
656 F.3d 1002 (9th Cir. 2011) ............................................................ 8

*City of L.A., Harbor Div. v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) ............................................................ 18

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) .......................................................... 21

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376; 45 Cal. Rptr. 2d 436 (1995) ............................... 21, 22

*G.H.I.I. v. MTS, Inc.*,
147 Cal. App. 3d 256; 195 Cal. Rptr. 211 (1983) .............................. 16

*In re Elec. Carbon Prods. Antitrust Litig.*,
  333 F. Supp. 2d 303 (D.N.J. 2004) ...................................................... 11

*In re Musical Instruments & Equipment Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015).....................................................passim

*In re TFT-LCD Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................ 10

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
  2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) ................................. 9, 17

*The Jeanery, Inc. v. James Jeans, Inc.*,
  849 F.2d 1148 (9th Cir. 1988) .......................................................... 16

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008)..................................................passim

*Marconi Wireless Tel. Co. of Am. v. United States*,
  320 U.S. 1; 63 S. Ct. 1393; 87 L. Ed. 1731 (1943)........................... 18

*Metro Indus., Inc. v. Sammi Corp.*,
  82 F.3d 839 (9th Cir. 1996)................................................................ 19

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
  465 U.S. 752; 104 S. Ct. 1464; 79 L. Ed. 2d 775 (1984).................... 16

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1; 78 S. Ct. 514; 2 L. Ed. 2d 545 (1958)............................. 17

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
  202 F.3d 1088 (9th Cir. 2000)............................................................ 11

*Pac. Express, Inc. v. United Airlines, Inc.*,
  959 F.2d 814 (9th Cir. 1992) ............................................................. 22

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001)............................................................ 19

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)......................................................... 18, 19

*Reeves v. Hanlon*,
  33 Cal. 4th 1140; 17 Cal. Rptr. 289; 95 P.3d 513 (Cal. 2004)............ 22

*Reudy v. Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010) ................................................ 19

*Rosenthal v. Fonda*,
    862 F.2d 1398 (9th Cir. 1988)................................................................ 23

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................... 9

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................. 7

*State Oil Co. v. Khan*,
    522 U.S. 3; 118 S. Ct. 275; 139 L. Ed. 2d 199 (1997)........................... 8

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) ................................................................. 19

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
    346 U.S. 537; 74 S. Ct. 257; 98 L. Ed. 273 (1954)............................... 11

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ................................................................. 19

*Watkins & Son Pet Supplies v. Iams Co.*,
    254 F.3d 607 (6th Cir. 2001) ................................................................. 20

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003).............................................................. 15

*Yentsch v. Texaco, Inc.*,
    630 F.2d 46 (2d Cir. 1980) .................................................................... 16

STATUTES/REGULATIONS

California's Cartwright Act ........................................................................ 16

California's Unfair Competition Law ............................................... 4, 5, 18

Sherman Act § 1 ................................................................................ passim

Sherman Act § 2 ................................................................................... 4, 18

1

**OTHER AUTHORITIES**

2

Order Granting in Part the Haymon Defendants' Motion to Dismiss
Pursuant to Rule 12(b)(6) and Order Granting Waddell Defendants' Motion
to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of
Civil Procedure 12(b)(6), *Top Rank, Inc. v. Haymon*, No. 2:15-cv-4961-JFW
(C.D. Cal. Oct. 16, 2015), ECF No. 85 .................................................................. 9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In the latest iteration of its complaint, Plaintiff Lenhoff Enterprises, Inc. dba Lenhoff and Lenhoff ("Plaintiff") concedes that four of the most successful talent agencies—Defendant United Talent Agency ("UTA"), Defendant International Creative Management Partners LLC ("ICM Partners"), William Morris/Endeavor ("WME") and Creative Artists Agency ("CAA")—vigorously and intensely compete against each other and other talent agencies for the opportunity to represent the directors, writers, and actors sought by studios, networks, producers and other buyers of talent for the production of scripted television series. Plaintiff affirmatively alleges that no single talent agency dominates the others, and the top four talent agencies each have roughly similar shares of the alleged relevant market, as Plaintiff proposes to define it. At the same time, the market is characterized by steady and robust growth, with the number of packaged scripted television series having more than doubled, according to Plaintiff, during the relevant time period. These are the well-recognized hallmarks of a competitive market, not the stuff of antitrust.

Despite those real-world economic facts, or perhaps because of them, Plaintiff attempts to conjure a Section 1 antitrust conspiracy claim from three baseless hypotheses, each of which takes the catch phrase "conspiracy theory" to new heights since they are based on nothing more than rank speculation. Lacking any factual support whatsoever, Plaintiff alleges that Defendants UTA and ICM Partners violated federal antitrust law by agreeing among themselves, and with alleged co-conspirators WME and CAA: (1) "that it was in their best interests to proceed without Rule 16(g)," (2) to "engage and continue to engage in exclusive co-packaging contracts," and "have a policy not to split packaging fees" with agencies other than themselves, and (3) to threaten and coerce studios, networks,

1   and producers to refuse to deal with talent agents, such as Plaintiff, who were not

2   part of the alleged conspiracy.

3       Not surprisingly, the Second Amended Complaint ("SAC") contains not a

4   single factual allegation that describes the formation and operation— the "who, did

5   what, to whom (or with whom), where, and when?"— of the supposed conspiracy,

6   as required by well-established Ninth Circuit precedent when the plaintiff attempts

7   to plead a Section 1 claim based on direct evidence of an illegal agreement.

8   Similarly, Plaintiff has not pled facts to show that UTA and ICM Partners engaged

9   in parallel conduct from which a conspiracy could be inferred.  Even if Plaintiff

10  could allege that Defendants both engaged in sudden and simultaneous

11  anticompetitive conduct, as required to plead an antitrust conspiracy using

12  circumstantial evidence, Plaintiff fails to do so.  The conduct that Plaintiff alleges,

13  which is taken as true for present purposes only—joint opposition to Rule 16(g),

14  avoiding co-packaging to retain more of the package commission for itself, and

15  "pressuring" common customers to choose Defendants' clients over clients of their

16  competitors—is all fully consistent with the unilateral adoption of rational and legal

17  competitive business strategies prompted by competitors' common perception of

18  marketplace events, which, as a matter of law, renders implausible any inference of

19  an illegal agreement.

20      In any event, the antitrust claim fails because Plaintiff has not, and cannot,

21  allege that it suffered injury *as a result of* the alleged antitrust conspiracies.  The

22  core of this case is Plaintiff's claim that it failed to retain two clients—Client #1

23  hired UTA, and Client #2 engaged ICM Partners—because those agencies, in

24  effect, offer clients more opportunities and charge lower commissions, not because

25  of the demise of Rule 16(g), a refusal to co-package with Plaintiff, or any imagined

26  studio boycott of Plaintiff.  Despite multiple attempts to amend its pleading, there is

27  no factual allegation in the SAC that remotely suggests a causal link between

28  Plaintiff's alleged injuries, *i.e.*, the departure of Clients #1 and #2, and the various

1   antitrust conspiracies that Plaintiff has concocted.  Thus, try as it might, Plaintiff

2   cannot convert these run-of-the-mill, state law tort claims into a federal antitrust

3   case, even if those state law claims were not otherwise defective, which they are.

4         Despite being afforded a third opportunity to re-plead, and having the added

5   benefit of the Court's guidance about the deficiencies it observed in Plaintiff's

6   previous pleading, Plaintiff's tortious interference claims still fail as a matter of

7   law.  Since Plaintiff has failed to plead an antitrust claim, the new pleading still

8   lacks any factual allegations that could satisfy the independently wrongful act

9   element that is required to state a claim for both tortious interference with

10  prospective economic advantage and tortious interference with contract.

11        In addition, Plaintiff's tortious interference with contract claim is defective

12  because Plaintiff now concedes that its agreement with Client #2 was oral, not

13  written, and Plaintiff has failed to allege any additional facts that could demonstrate

14  that the oral agreement between it and Client #2 was for a specified term, and not

15  terminable at will.  Plaintiff alleges that the oral agreement had an initial term of

16  two years, followed by a two-year and multiple one-year renewal terms, which

17  means it would be unenforceable because of the statute of frauds.  Similarly,

18  Plaintiff's attempt to rely on Rider D to the ATA/DGA Agreement fails because

19  Rider D cannot apply to create a term agreement where none existed in the first

20  place, and Plaintiff's claim that Rider D prohibits Client #2 from terminating

21  Plaintiff's agreement rests upon a flawed interpretation and misapplication of Rider

22  D that is apparent on its face.  Finally, Plaintiff has not alleged any facts to show

23  that Client #2 was under contract at the time Client #2 left Plaintiff, for example, by

24  electing to renew the agreement, since the agreement commenced some five years

25  earlier.

26        No amount of re-pleading can cure the legal defects in the SAC, and,

27  consequently, the Court should dismiss Plaintiff's antitrust and tortious interference

28  claims with prejudice.  In the interests of judicial economy, the Court may also

1   consider reassessing its interlocutory order denying ICM Partners' motion to

2   dismiss Plaintiff's claim under the California UCL because, as pled, it too requires

3   sufficient factual allegations of a conspiracy that are wholly lacking from the SAC,

4   in which case the entire action should be dismissed with prejudice.

5              **FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS**

6              On September 18, 2015, this Court granted Defendants' respective motions

7   to dismiss Plaintiff's First Amended Complaint with respect to its causes of action

8   for conspiracy to monopolize under Section 2 of the Sherman Act, as well as claims

9   for tortious inference with contract and with prospective economic advantage.[1]

10  Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, Dkt

11  No. 28, at 12 ("Order").  Specifically, as to the Sherman Act claim, the Court held

12  that Plaintiff could not sustain a conspiracy to monopolize claim under Section 2

13  based on a "joint" or "shared" monopolization theory, unless Plaintiff could allege

14  "facts indicating that a conspiracy exists to create a monopoly in a single entity."

15  *Id.* at 7.  As to the interference claims, the Court held that Plaintiff had failed to

16  plead "whether the contractual relationships were at will or for a specified term"

17  and failed to allege a predicate violation under the Sherman Act sufficient to defeat

18  the competitor's privilege.  *Id.* at 9-10.  The Court granted leave to amend.  *Id.*

19             On October 2, 2015, Plaintiff filed its Second Amended Complaint.  *See*

20  *generally* Dkt. No. 31 ("SAC").  Rather than pleading additional facts sufficient to

21  state a claim under Section 2 of the Sherman Act, Plaintiff instead attempts to

22  resuscitate the antitrust claim by purporting to allege a conspiracy in restraint of

23  trade under Section 1 of the Sherman Act.  *Id.* ¶¶ 117-21.  Plaintiff also attempts to

24  re-plead claims for intentional interference with contract, intentional interference

25  with prospective economic advantage, and continues to assert its claim for violation

26  ───────────────

27       [1] The Court also granted Defendants' motions to dismiss Plaintiff's unjust
    enrichment and declaratory relief claims, but allowed Plaintiff's claim under
    California's Unfair Competition Law ("UCL") to proceed.  *See generally* Dkt. No.

28  28 at 7-8, 12.

1   of the UCL.  *See generally id.*  Despite adding more than *thirty* pages to the

2   operative complaint, however, Plaintiff's new, pertinent allegations against ICM

3   Partners are barely noticeable and contained in but a handful of paragraphs,

4   amounting to only the following:

5          **"*Conspiracy*" Allegations**

6        Without alleging any additional details surrounding the formation or

7   operation of the alleged conspiracy, Plaintiff now alleges the following three

8   putative agreements.

9        *First*, Plaintiff continues to allege that ICM Partners, UTA, WME, and CAA

10  (collectively, the "Agencies") "conspired and agreed, amongst themselves, that it

11  was in their best interests to proceed without Rule 16(g)."  SAC at ¶ 50.

12       *Second*, Plaintiff continues to allege that the Agencies "engaged and continue

13  to engage in exclusive co-packaging contracts" and "have a policy to not split

14  packaging fees with other non-[Agencies]."  *Id.* ¶¶ 73, 84, 104.

15       *Third*, Plaintiff alleges that the Agencies "conspired and agreed to form a

16  group boycott, whereby buyers of top-tiered talent services," including studios,

17  networks, and producers are "coerced by the [Agencies] … to refuse deals with

18  non-core agencies and those they represent (talent)."  *Id.* ¶ 119.  Plaintiff claims

19  that this alleged boycott is carried out through "(i) agreements between UTA and

20  ICM [Partners] to restrict co-packaging scripted TV deals to each other and/or with

21  WME and CAA, but to the exclusion of non-core agencies; and by (ii) the use of

22  veiled threats . . . against the buyers of talent services (studios/networks/producers)

23  not to deal with non-core talent agents in the scripted TV market or else face the

24  loss of future packages."  *Id.*

25       In addition to attempting to allege that UTA and ICM Partners entered into

26  alleged anticompetitive agreements, Plaintiff sprinkles into the SAC nearly every

27  buzzword available in antitrust jurisprudence, without any factual or logical

28  support.  For example, Plaintiff uses the words "horizontal price fixing," "market

1  division," "allocating . . . [the] market," "tying," and "predatory pricing," without

2  attempting to plead any of the facts that could support the elements of those

3  potential violations.  *E.g. id.* ¶¶ 73, 83-84, 119-20.  Nowhere, however, does

4  Plaintiff plead any meaningful details supporting a conspiracy to carry out these

5  alleged acts.

6      ***Contract Allegations***

7      Plaintiff alleges that Client #2 "terminat[ed] his exclusive contract with

8  Plaintiff" on June 26, 2014.  *Id.* ¶¶ 25-26, 128.  Plaintiff admits that the purported

9  contract with Client #2 "was a verbal contract," not a written one.  *Id.* ¶ 128.

10  Plaintiff claims that the oral contract with Client #2 "commenced on or about

11  February 10, 2009, for an initial term of 2 years, with a 2-year renewal term,

12  followed by 1-year terms," but Plaintiff fails to plead whether Client #2 elected to

13  renew, under what terms such renewal occurred, or whether any term was in effect

14  at the time that Client #2 "terminat[ed]" his contract with Plaintiff in June of 2014.

15  *Id.*

16      Perhaps recognizing this failing, Plaintiff additionally claims its purported

17  oral contract with Client #2 was "not terminable at will," not under its own terms,

18  but because it was subject to Rider D to a separate agreement between the

19  Association of Talent Agents (ATA) and the Directors Guild of America (DGA).

20  *Id.* ¶¶ 9, 128.[2]  Specifically, Plaintiff claims that "because [Client #2 was] at all

21  material times, acting under the aegis of the [DGA], and because Plaintiff was, at

22  all material times, a member of the [ATA], Plaintiff alleges that those practices,

23  procedures, and terms set forth in Rider 'D' to the Agreement between the ATA

24  and the DGA were/are applicable to the subject agreements between Plaintiff and

25  Client [#2]."  *Id.* ¶8; *see also id.* ¶ 128.  Plaintiff goes on to allege that under Rider

26  D, "Client #2 was unable to terminate his contract with Plaintiff, because he had

27  _____

28  [2] Rider D is attached as Exhibit A to ICM Partners' Request for Judicial Notice ("RJN") filed concurrently herewith.

DEF. ICM PARTNERS' NOT. OF MOTION AND MOTION TO DISMISS SAC
Case No. 2:15-CV-01086-BRO (FFMx)

1   signed a contract of employment [with a third party] just days before and well

2   within the 90-day period." *Id.* ¶ 128.  In other words, Plaintiff claims that, under

3   Rider D, because Client #2 had signed a contract of employment on June 18, 2014,

4   which work Plaintiff procured, Client #2 was prohibited from terminating his verbal

5   agreement with Plaintiff for the 90 days following June 18, 2014.  *Id.*  Suffice it to

6   say that Plaintiff misconstrues and misapplies Rider D, as explained in more detail

7   below.

8                          **APPLICABLE STANDARD OF REVIEW**

9           To survive a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, Plaintiff's factual

10  allegations "must be enough to raise a right to relief above the speculative

11  level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555; 127 S. Ct. 1955, 1965;

12  167 L. Ed. 2d 929 (2007).  The allegations must "plausibly suggest[]," and not

13  merely be consistent with, claimed wrongful conduct.  *Id.* at 557.  While factual

14  allegations are assumed true, Plaintiff must offer "more than labels and conclusions,

15  and a formulaic recitation of the elements of a cause of action."  *Id.* at 555.  Courts

16  are "not bound to accept as true a legal conclusion couched as a factual allegation,"

17  and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

18  conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678; 129 S.

19  Ct. 1937, 1949-50; 173 L. Ed. 2d 868 (2009).  In this regard, the Supreme Court has

20  observed that it is improper to assume Plaintiff "can prove facts that it has not

21  alleged."  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

22  459 U.S. 519, 526; 103 S. Ct. 897, 902; 74 L. Ed. 2d 723 (1983).

23          Ultimately, the factual allegations "must plausibly suggest an entitlement to

24  relief, such that it is not unfair to require the opposing party to be subjected to the

25  expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216

26  (9th Cir. 2011).  Thus, "to allege an agreement between antitrust co-conspirators,

27  the complaint must allege facts such as a 'specific time, place, or person involved in

28  the alleged conspiracies' to give a defendant seeking to respond to allegations of a

1   conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

2   1047 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 565 n.10).  Finally, a complaint

3   may be dismissed without leave to amend "if amendment would be futile." *Carrico*

4   *v. City & Cty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011).

5                                                **ARGUMENT**

6   **I.    THE SECOND AMENDED COMPLAINT FAILS TO STATE A**

7   **       VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

8           Under its strict terms, Section 1 of the Sherman Act prohibits "[e]very

9   contract, combination in the form of trust or otherwise, or conspiracy, in restraint of

10  trade or commerce among the several States." *Brantley v. NBC Universal, Inc.*, 675

11  F.3d 1192, 1196-97 (9th Cir. 2012).  Because the statutory language is so broad, the

12  courts have interpreted Section 1 to prohibit only those "unreasonable restraints" of

13  trade. *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10; 118 S. Ct. 275; 139 L. Ed.

14  2d 199 (1997)).  Except in rare circumstances, the courts "evaluate whether a

15  practice unreasonably restrains trade in violation of Section 1 under the 'rule of

16  reason.'" *Id.*

17          In order to state a Section 1 claim under this standard, Plaintiff must plead

18  four elements, including "(1) a contract, combination or conspiracy among two or

19  more persons or distinct business entities; (2) by which the persons or entities

20  intended to harm or restrain trade or commerce among the several States, or with

21  foreign nations; (3) which actually injures competition . . . . [and] (4) that [Plaintiff

22  was] harmed by the defendant's anti-competitive contract, combination, or

23  conspiracy, and that this harm flowed from an 'anti-competitive aspect of the

24  practice under scrutiny.'" *Id.* (quoting *Kendall*, 518 F.3d at 1047 (internal citation

25  omitted)).

26          Here, because Plaintiff fails, at a minimum, to allege facts that could support

27  the first and fourth elements of a Section 1 violation, the Sherman Act claim should

28  be dismissed with prejudice.

**A.    Plaintiff Fails To Allege Facts To Plead That ICM Partners Participated In The Formation And Operation Of An Antitrust Conspiracy.**

**1.    Plaintiff Has Not Alleged Facts To Plead That ICM Partners Entered Into An Agreement In Restraint Of Trade.**

"[D]iscovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall*, 518 F.3d at 1047. Consequently, courts, including the Ninth Circuit, require plaintiffs to allege specific facts as to each defendant describing the circumstances of the alleged agreement. *Id.* at 1047-48 (affirming order granting motion to dismiss Section 1).

In other words, to pass muster under *Twombly*, conspiracy allegations must "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048; *see also In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("*In re Musical Instruments*") (same); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1073-74 (E.D. Cal. 2011) (granting motion to dismiss Section 1 claim where Plaintiffs failed to allege any specific details such as "the specific corporate players along with names of key executives," "where the agreement was made, or if there were multiple agreements or one global agreement made at one time"); *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, 2007 WL 4976364, at *10 (C.D. Cal. Oct. 29, 2007) (plaintiff "has not alleged when the purported agreement was made . . . who made the decision, how it was made or what the parameters of the agreement were"); Order Granting in Part the Haymon Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Order Granting Waddell Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) at 17, *Top Rank, Inc. v. Haymon,* No. 2:15-cv-4961-JFW (C.D. Cal. Oct. 16, 2015), ECF No. 85 ("Haymon Order") (granting motion to dismiss claims under Section 1 because, *inter alia*, Plaintiff had alleged only that

1   the "Defendants were involved in a 'conspiracy,' agreed to enter into an 'illegal

2   scheme,' and 'actively participated in, and materially furthered, the plot to take over

3   the boxing promotion business', [which] are conclusory statements coupled with

4   legal conclusions that cannot support the existence of an agreement to restrain trade

5   in violation of Section 1'").

6        Here, however, the SAC contains no facts describing the origin of the alleged

7   conspiracies and agreements, who participated, when and how, or any other fact

8   necessary to describe their formation and operation.  *See* SAC ¶¶ 50, 73, 84, 119.

9   Without more, the factual allegations of the SAC are insufficient to state a claim

10  under Section 1, and the SAC is exactly the sort of imprecise pleading that

11  *Twombly* and *Kendall* prohibit—particularly given the potentially massive

12  discovery expenditures that could be required to proceed on alleged conduct that

13  purportedly spans more than a decade (*see* SAC ¶ 80).  Indeed, given the period of

14  time over which Plaintiff claims the alleged "agreements" may have occurred, it is

15  unclear even where ICM Partners should begin in assessing what the alleged

16  conspiracy was, how or when it was formed, or what Plaintiff contends ICM

17  Partners supposedly did to participate in it.

18       As the Ninth Circuit observed in *Kendall*, because "[a] bare allegation of a

19  conspiracy is almost impossible to defend against, particularly where the defendants

20  are large institutions with hundreds of employees entering into contracts and

21  agreements," antitrust conspiracy allegations should be specific enough to "give a

22  defendant seeking to respond to allegations of a conspiracy an idea of where to

23  begin."  518 F.3d at 1047 (citing *Twombly*, 550 U.S. at 565 n.10.)  Complicating

24  matters, Plaintiff lumps together allegations about the "Defendants" rather than

25  alleging facts to show the purported conduct of each individual actor as required to

26  plead a claim under Section 1.  *See, e.g.*, SAC ¶¶ 50, 73, 84, 119.  This is

27  insufficient to sustain a claim.  *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d

28  1109, 1117 (N.D. Cal. 2008) (granting motion to dismiss Section 1 claims where

plaintiffs failed to "allege that each individual defendant joined the conspiracy and played some role in it" (quoting *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 311-12 (D.N.J. 2004)) and noting that "general allegations as to all defendants, to 'Japanese defendants,' or to a single corporate entity . . . is insufficient to put specific defendants on notice of the claims against them"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005) (granting motion to dismiss Section 1 claim where "the complaint lumps [certain defendants] in with the other bank defendants for purposes of pleading the conspiracy"); *see also* Haymon Order at 10 (granting motion to dismiss claims under Section 1 because, *inter alia*, Plaintiff "has impermissibly relied on group pleading, especially by lumping the . . . Defendants together").

Despite having the benefit of Defendants' motions to dismiss the FAC, which described at length the deficiencies in Plaintiff's conspiracy allegations, Plaintiff did not attempt to add new factual details but instead chose to rest its allegations of conspiracy on the fact that ICM Partners and its alleged co-conspirators are all members of the ATA.  SAC ¶¶ 41, 49.  But mere membership in a trade association is insufficient to plead an antitrust conspiracy by two or more of its members; Plaintiff must allege facts sufficient to show that each defendant participated in the alleged conspiracy.  *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999).  Plaintiff has not done so, after repeated attempts.  The Section 1 claim should therefore be dismissed with prejudice.

**2.    Plaintiff Has Not Alleged Facts To Plead That ICM Partners Engaged In Parallel Conduct From Which It Is Plausible To Infer An Agreement In Restraint Of Trade.**

Where a plaintiff fails to plead direct evidence of collusion, "a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement.'" *Twombly*, 550 U.S. at 553-54 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540; 74 S. Ct. 257;

1   98 L. Ed. 273 (1954)).  Still, "an allegation of parallel conduct and a bare assertion

2   of conspiracy will not suffice.  Without more, parallel conduct does not suggest

3   conspiracy . . . . [Allegations of parallel conduct] must be placed in a context that

4   raises a suggestion of a preceding agreement, not merely parallel conduct that could

5   just as well be independent action."  *Id.* at 556-57.  To achieve this balance, the

6   Ninth Circuit "has distinguished permissible parallel conduct from impermissible

7   conspiracy by looking for certain 'plus factors.'"  *In re Musical Instruments*, 798

8   F.3d at 1194.  "Plus factors" are defined as those "economic actions and outcomes

9   that are largely inconsistent with unilateral conduct but largely consistent with

10   explicitly coordinated action."  *Id.*

11        Here, beyond bare, conclusory allegations that Defendants "conspired" or

12   "agreed," Plaintiff fails to allege that Defendant engage in the same conduct

13   suddenly and simultaneously, *and* that any of the alleged conduct that forms the

14   basis for Plaintiff's Section 1 claim is "inconsistent with unilateral conduct" or

15   "largely consistent with explicitly coordinated action."  To the contrary, Plaintiff

16   alleges, at best, that ICM Partners engages in self-interested conduct that

17   "suggest[s] rational, legal business behavior."  *Kendall*, 518 F.3d at 1049.

18        *First*, Plaintiff suggests that because UTA, ICM Partners, WME, and CAA

19   have received package commissions paid by studios for certain scripted television

20   series, in lieu of charging their clients a 10% commission, the trier-of-fact may infer

21   (from that similar conduct) that Defendants entered into an antitrust conspiracy.

22   *E.g.* SAC ¶¶ 24, 28-29.  But Plaintiff also alleges that packages can be lucrative for

23   any agency that can receive them, which means Plaintiff concedes it is

24   economically rational for talent agencies to decide independently to seek out

25   opportunities for their clients for which a package commissions will be paid.  *E.g.*

26   SAC ¶ 28 (packaging fees "dwarf[] what the smaller agent (such as Plaintiff) could

27   ever earn"); *id.* ¶ 83 (implying that smaller agencies, such as Plaintiff, would

28   participate in packaging arrangements if they were able).  Indeed, Plaintiff's

1    allegations imply that Plaintiff, too, would offer and participate in packages if it

2    could. *Id.*

3         More importantly, Plaintiff offers no factual allegations to suggest that UTA,

4    ICM Partners, WME, and CAA suddenly and simultaneously began participating in

5    packaging arrangements, or any other fact suggesting that the decisions were made

6    in "parallel." *In re Musical Instruments*, 798 F.3d at 1195-96 (reasoning that where

7    plaintiffs had alleged only that "defendants adopted [challenged] policies over a

8    period of several years, not simultaneously" that "[a]llegations of such slow

9    adoption of similar policies does not raise the specter of collusion"). To the

10   contrary, Plaintiff affirmatively alleges that television packages have been in use

11   for more than half a century. *See, e.g.*, SAC ¶¶ 28, 34 (referring to "1959 Labor

12   Commissioner's packaging agreement exemption"). That UTA, ICM Partners,

13   WME, and CAA, each acting in its own rational, economic self-interest, received

14   package commissions from studios in lieu of charging their clients a 10%

15   commission, a practice that has been in existence for decades, thus, does not "raise

16   a suggestion of preceding agreement" and is therefore insufficient to state a Section

17   1 claim. *In re Musical Instruments*, 798 F.3d at 1194.

18        *Second*, Plaintiff claims that when a studio agrees to apportion the package

19   commission among two agencies, the recipients of those split packages are more

20   often than not are some combination of UTA, ICM Partners, WME, or CAA. *E.g.*

21   SAC ¶ 73. Yet Plaintiff again fails to allege that the Agencies supposedly adopted

22   policies to co-package only with each other suddenly and simultaneously, and

23   Plaintiff also admits that the Agencies do not co-package with one another

24   *exclusively*. Indeed, Plaintiff alleges that the Agencies split packaging fees with

25   other talent agencies in at least 16 instances in 2014/2015 alone. *Id.* Further, since

26   Plaintiff alleges that packaged scripted television series are created by "tying two or

27   more talent elements together," and Plaintiff admits that the Agencies "represent

28   the world's largest pool of talent," it is unsurprising that when the studios pay a co-

1  package commission to two agencies for a particular series, the recipients of those

2  split package commissions would be agencies that "represent the world's largest

3  pool" of "top-tiered talent," which basic probability confirms would more often

4  than not include UTA, ICM Partners, WME, or CAA.  *See* SAC ¶¶ 73, 94; *see also*

5  SAC ¶ 83.

6      Indeed, whenever possible, basic economics dictates that it is rational for a

7  talent agency to prefer to retain the entire package commission, rather than being

8  forced to earn less by splitting the commission with anyone else.  Thus, far from

9  being conduct "inconsistent with unilateral conduct," the allegation that unilaterally

10  adopting a policy to reduce the number of situations in which an agency could be

11  forced to split package commissions, even if it were true, demonstrates rational

12  business behavior and, if likewise adopted by other agencies, "does not reveal

13  anything more than similar reaction[s] to similar pressures within an interdependent

14  market." *In re Musical Instruments*, 798 F.3d at 1196.

15      *Third*, Plaintiff alleges that UTA, ICM Partners, WME and CAA each

16  advocated for the "termination of Rule 16(g)" within the auspices of their roles in

17  the ATA.  *E.g.* SAC ¶¶ 49-51.  But again, that fact does not permit the inference

18  that UTA, ICM Partners, WME, and CAA entered into an illegal conspiracy:

19  "[M]ere participation in trade-organization meetings where information is

20  exchanged and strategies are advocated does not suggest an illegal agreement." *In*

21  *re Musical Instruments*, 798 F.3d at 1196.  The allegation that the Agencies took

22  part in a trade association and advocated for positions that were in the individual

23  economic self-interest of each (indeed, according to Plaintiff, "in their own best

24  interests," SAC ¶ 50) is also no evidence of collusion because such conduct is

25  equally consistent with independent, economically rational, business decision

26  making.  Moreover, as Plaintiff affirmatively alleges, it was SAG—*not ATA*—that

27  ultimately rejected the tentative agreement to continue Rule 16(g).  SAC ¶¶ 46-48.

28  Thus, Plaintiff's allegation that UTA, ICM Partners, WME, and CAA "conspired"

1   to force the termination of Rule 16(g) is implausible on its face and insufficient to

2   state a claim for violation of Section 1.

3       *Finally*, Plaintiff alleges that its proposed relevant markets have become

4   more concentrated during the past decade or more. *See, e.g.*, SAC ¶¶71-73.

5   However, the mere fact that the market is concentrated, or has become more

6   concentrated over time, is not a "plus factor" indicating collusion; it would merely

7   be an indication that the "industry is an oligopoly, which is perfectly legal." *See*

8   *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003). In

9   any event, there is no allegation in the SAC that the purported decline in the

10  number of talent agencies has any causal link to the antitrust conspiracy that

11  Plaintiff is alleging in this lawsuit. Nor does Plaintiff attempt to connect those dots.

12  To the contrary, Plaintiff admits, and affirmatively alleges, that the number of talent

13  agencies has declined due to natural market forces and independent business

14  decisions, such as mergers and acquisitions with other talent agencies, or the

15  decisions of some agents to close their agencies and become business managers.

16  *See* SAC ¶ 29.

17      In short, Plaintiff has repeatedly failed to plead any facts from a conspiracy

18  may be inferred, and its Section 1 claim should be dismissed with prejudice.

19          **3.    Plaintiff Has Not Alleged Facts To Plead That ICM Partners
                    Coerced Studios, Networks, Or Producers To Refuse To
20                  Deal With Plaintiff.**

21      Apart from attempting to allege that the Agencies entered into an illegal

22  conspiracy among themselves, Plaintiff goes on to suggest some form of vertical

23  conspiracy between the Agencies, on the one hand, and the networks, studios, and

24  producers who employ the Agencies' clients, on the other. Specifically, Plaintiff

25  claims that these parties all "conspired and agreed to form a group boycott,

26  whereby buyers of top-tiered talent services," including studios, networks, and

27  producers were "coerced" by the Agencies "to refuse deals with non-core agencies

28  and those they represent (talent)." SAC ¶ 119. Plaintiff claims that the Agencies

1   orchestrated the alleged boycott by "the use of veiled threats . . . against the buyers

2   of talent services (studios/networks/producers) not to deal with non-core talent

3   agents in the scripted TV market or else face the loss of future packages." *Id.*

4         But even if true—which they are not—these allegations are insufficient as a

5   matter of law to demonstrate a conspiracy in restraint of trade.  The mere fact that a

6   market participant may be able to exert economic pressure on another vertical

7   participant in an attempt to convince it to behave in a certain way is not sufficient,

8   as a matter of law, to state a claim under Section 1.  *In re Musical Instruments*, 798

9   F.3d at 1195 (allegations that vertical players were "pressured" or "coerc[ed]" into

10  adopting certain policies insufficient to establish collusion because "decisions to

11  heed similar demands made by a common, important customer do not suggest

12  conspiracy or collusion"); *see also Monsanto Co. v. Spray–Rite Serv. Corp.*, 465

13  U.S. 752, 761; 104 S. Ct. 1464; 79 L. Ed. 2d 775 (1984) ("A distributor is free to

14  acquiesce in the manufacturer's demand in order to avoid termination."); *The*

15  *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1158-59 (9th Cir. 1988)

16  ("exposition, persuasion, argument, or pressure" insufficient to establish coercion

17  (citation omitted)); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2d Cir. 1980) (same);

18  *cf. G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 269; 195 Cal. Rptr. 211 (1983)

19  (allegations of "economic leverage" to "coerce" more favorable terms from vertical

20  distributors insufficient to establish unlawful conspiracy under California's

21  Cartwright Act).

22        Thus, Plaintiff's claim that the UTA, ICM Partners, WME, and CAA exert

23  economic pressure on studios, networks, and producers who employ directors,

24  writers, and actors for scripted televisions series to refuse to deal with other

25  agencies, such as Plaintiff, (SAC ¶ 119), even if it were not untrue, is insufficient as

26  a matter of law to plead a conspiracy in restraint of trade.  *Monsanto Co.*, 465 U.S.

27  at 761; *In re Musical Instruments*, 798 F.3d at 1195.  The Section 1 claim must

28  therefore be dismissed.

### 4. The Random Antitrust "Buzz Words" In The Second Amended Complaint, Without Any Accompanying Factual Allegations, Also Fail to State a Claim Under Section 1.

It is well-established that antitrust buzz words or "magic words" standing alone are legal conclusions and, without more, are insufficient to state a claim under Section 1. *Int'l Norcent Tech.*, 2007 WL 4976364, at *10 (referring to insufficiency of "magic words" like "conspiracy"); *see also Twombly*, 550 U.S. at 557. Nonetheless, in a last ditch effort to support its claim, Plaintiff peppers the SAC with antitrust buzz words, untethered to any factual or logical support. Plaintiff alternatively alleges that Defendants have engaged in "horizontal price fixing," "market division," "allocating . . . [the] market," and "tying." *E.g.* SAC ¶¶ 73, 83-84, 119-20. Yet nowhere does Plaintiff plead any facts that could support any of the elements of those potential violations. Nor does Plaintiff attempt to articulate a legal theory under which the alleged conduct would constitute a claim of relief.

For instance, with respect to "tying," Plaintiff fails to allege any agreement between Defendants and their alleged co-conspirators, or to suggest which products are "tied" together. *See Brantley*, 675 F.3d at 1199 (defining tying arrangements as "an agreement where a supplier agrees to sell a buyer a product (the tying product), but 'only on the condition that the buyer also purchases a different (or tied) product'") (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5; 78 S. Ct. 514; 2 L. Ed. 2d 545 (1958)). To the contrary, Plaintiff claims only that Defendants have agreed not to share fees from a single product—the package—with other talent agencies. SAC ¶ 73. Similarly, the SAC contains no factual allegations describing an agreement to fix prices or allocate markets, such as how the market has been allocated amongst the alleged co-conspirators or any reduction in competition between them. Rather, Plaintiff's own allegations prove that the market lacks one or two dominant agencies, that Defendants and their alleged co-conspirators remain

1   in hot competition with one another, and that packaged scripted series opportunities

2   have more than doubled.  *See* SAC ¶ 73 & Exs. C, F–H.

3           Finally, Plaintiff's liberal use of the antitrust buzz words "predatory pricing"

4   does not state a claim under Section 1.  Predatory pricing typically involves

5   unilateral conduct that may be actionable under Section 2 of the Sherman Act—

6   which claim the Court dismissed in connection with the FAC, and which Plaintiff

7   elected not to re-plead in the SAC.  Order at 7.  In any event, in order to plead

8   predatory pricing, Plaintiff must include factual allegations to demonstrate that

9   Defendants priced below their costs and then later had a dangerous probability of

10  recouping their losses by charging supracompetitive prices after rivals were

11  eliminated or substantially weakened during the predation period.  *See, e.g.*, *Rebel*

12  *Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433-34 (9th Cir. 1995) (describing two

13  "stages" of predatory pricing, including a "price war" stage in which defendant

14  "prices below its marginal cost hoping to eliminate rivals," followed by a

15  "recoupment" stage in which defendant "can collect the fruits of the predatory

16  scheme by charging supracompetitive prices").  Yet Plaintiff affirmatively alleges

17  that packaging fees are profitable, and therefore cannot plausibly allege that

18  Defendants are pricing below their costs.  *E.g.* SAC ¶¶ 24, 28.

19          Because Plaintiff fails in every instance to plead sufficient facts to

20  demonstrate a conspiracy, the Section 1 claim should be dismissed with prejudice.[3]

21

22

---

23      [3] Although claims under California's UCL do not necessarily require proof of conspiracy, where a plaintiff bases a UCL claim entirely upon a purported

24  conspiracy, then the UCL claim rises and falls with the alleged conspiracy.  *See Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866-67; 107 Cal. Rptr. 2d 841; 24

25  P.3d 493 (2001).  Here, because Plaintiff has failed to adequately plead a conspiracy, its UCL claim likewise must fail.  Although the Court previously ruled

26  that the UCL claims could stand, the Court has inherent authority to revisit interlocutory orders and to change them at any time prior to final judgment or

27  permission is granted for appeal.  *Marconi Wireless Tel. Co. of Am. v. United States*, 320 U.S. 1, 47; 63 S. Ct. 1393, 1415; 87 L. Ed. 1731 (1943); *City of L.A.,*

28  *Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).

**B.     Plaintiff Fails To Allege That It Suffered Any Antitrust Injury.**

"It can't be said often enough that the antitrust laws protect competition, not competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990). Thus, to sustain a private right of action for an alleged federal antitrust violation, a private plaintiff must plead that it "[was] harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'" *Brantley*, 675 F.3d at 1197 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334; 110 S. Ct. 1884; 109 L. Ed. 2d 333 (1990) ("*ARCO*"). But "while 'conduct that eliminates rivals reduces competition,' 'reduction of competition does not invoke the Sherman Act until it harms consumer welfare.'" *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) (quoting *Rebel Oil*, 51 F.3d at 1433).   In other words, to state a claim, a private plaintiff must allege facts that plausibly demonstrate harm not to competitors but to consumers, meaning an increase in price or reduction in output. *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1128 (N.D. Cal. 2010); *see also Rebel Oil*, 51 F.3d at 1433.   In this regard, "a decrease in profits from a reduction in a competitor's prices, so long as the prices are not predatory, is not an antitrust injury." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001); *cf. ARCO*, 495 U.S. at 340.

Plaintiff cannot demonstrate antitrust injury because the SAC does not allege facts to show that Plaintiff suffered harm *as a result of* any alleged anticompetitive conduct.  Plaintiff's sole alleged injury is the loss of Clients #1 and #2.[4]  Nowhere

---

[4] Although Plaintiff also refers to loss of choice and diversity in support of its claim, these do not constitute actionable antitrust injuries either.  As the Ninth Circuit has explained, even if an "agreement has the effect of reducing consumers' choices or increasing prices," that "does not sufficiently allege an injury to competition" because each is "fully consistent with a free, competitive market." *Brantley*, 675 F.3d at 1202.  In the absence of injury to competition, such concerns are simply not actionable. *See id.*

1  does Plaintiff allege that Clients #1 and #2 left *because* Defendants or their alleged

2  co-conspirators refused to split a particular package with Plaintiff, or *because*

3  buyers of talent refused to employ Clients #1 or #2 due to some fear of, threat from,

4  or loss of opportunity at the hands of Defendants—to the contrary, Plaintiff alleges

5  that these clients left because Defendants offered them lower commissions. *See,*

6  *e.g.*, SAC ¶ 27. Consequently, Plaintiff's complaint stems from *more* vigorous

7  competition, not less. *See, e.g.*, *ARCO*, 495 U.S. at 339. Plaintiff's injury, thus, is

8  merely an injury to a competitor (Plaintiff), not to competition and is not an

9  actionable antitrust injury. *Cf. Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d

10  607, 616 (6th Cir. 2001) (where Plaintiff alleged that manufacturer granted

11  exclusive contract to Plaintiff's competitor and terminated a distribution contract

12  with Plaintiff, holding that Plaintiff failed to plead antitrust injury "because the

13  injury to [Plaintiff] flows from the termination; the antitrust violation was not a

14  necessary predicate of the injury").

15       In this respect, circumstances here mirror those in the court's recent decision

16  in *Top Rank, Inc. v. Haymon*. There, the court granted Defendants' motion to

17  dismiss claims under Section 1 for lack of antitrust injury where Plaintiff had

18  claimed that Defendants had "frozen" competing boxing promoters out of the

19  market by blocking venues, preventing them from promoting, and inducing

20  networks to refuse to broadcast certain promotors' fights. Haymon Order at 7. The

21  court pointed out that although this conduct might have caused some competitors to

22  suffer an antitrust injury, Plaintiff had "not identified a single bout that it has

23  attempted to promote but was precluded from promoting by the [] Defendants, a

24  single venue from which it has been blocked, or a single network that has refused to

25  broadcast a fight promoted by [Plaintiff]." *Id.* Thus, Plaintiff had failed to allege

26  any facts demonstrating that it had suffered any antitrust injury. Likewise, here,

27  where Plaintiff has not identified a single package or co-package that it was

28

1  refused, or a single studio, network, or producer that has refused to deal with

2  Plaintiff or Plaintiff's clients.

3       Because Plaintiff has had multiple opportunities and has failed to plead facts

4  to show how ICM Partners participated in the formation and operation of any

5  antitrust conspiracy, or facts that could show that Plaintiff has suffered antitrust

6  injury, the Section 1 claim should be dismissed with prejudice.

7  **II.   THE SECOND AMENDED COMPLAINT FAILS TO STATE A**

8       **CLAIM FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

9       "The elements of interference with prospective economic advantage resemble

10  those of intentional interference with contract.  They are: '(1) an economic

11  relationship between the plaintiff and some third party, with the probability of

12  future economic benefit to the plaintiff; (2) the defendant's knowledge of the

13  relationship; (3) intentional acts on the part of the defendant designed to disrupt the

14  relationship; (4) actual disruption of the relationship; and (5) economic harm to the

15  plaintiff proximately caused by the acts of the defendant.'" *CRST Van Expedited,*

16  *Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107-08 (9th Cir. 2007) (Citation

17  omitted).

18       Because interference often signals vigorous competition, not all acts of

19  interference are actionable in California.  To protect healthy competition, California

20  has adopted the doctrine of competitor's privilege: "Perhaps the most significant

21  privilege or justification for interference with a prospective business advantage is

22  free competition." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th

23  376, 389; 45 Cal. Rptr. 2d 436 (1995).  Thus, in order to plead a claim for

24  interference with prospective economic advantage, Plaintiff must affirmatively

25  "allege an act that is wrongful independent of the interference itself." *CRST Van*

26  *Expedited*, 479 F.3d at 1108.  "[A]n act is independently wrongful if it is unlawful,

27  that is, if it is proscribed by some constitutional, statutory, regulatory, common law,

28  or other determinable legal standard." *Id.* at 1109.

As the Court previously recognized in its Order, Plaintiff relies on the alleged Sherman Act violations to satisfy the independently wrongful act element of its interference with prospective economic advantage claim. Order at 10; *see also* SAC ¶ 138. Plaintiff's allegations in the SAC do nothing to save its Sherman Act claim, for the reasons discussed above; thus, the interference with prospective economic advantage claim must likewise be dismissed with prejudice.

## III. THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT

As discussed above, California has adopted the doctrine of competitor's privilege as a bar to interference claims. *See Della Penna*, 11 Cal. 4th at 389 (discussing competitor's privilege and holding that a plaintiff must plead wrongful conduct to state an interference claim). Although the competitor's privilege does not apply to all interference with contract claims, the privilege does apply to interference with contracts that are terminable at will. *See, e.g., Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 819 (9th Cir. 1992). Thus, as the Court previously recognized, Plaintiff must either adequately allege that the purported contractual relationship between it and Client #2 was for a specified term, rather than terminable at will, or Plaintiff must plead an independently wrongful act for the tortious interference with contract claim to survive. *See Order at 9; see also Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152; 17 Cal. Rptr. 289; 95 P.3d 513 (Cal. 2004) (discussing independently wrongful act element). Plaintiff has alleged neither.

*First*, as discussed above, Plaintiff has failed to plead a violation of Section 1 of the Sherman Act. Thus, Plaintiff has not pleaded an independently wrongful act to defeat the competitor's privilege. *See Order at 9; cf.* SAC ¶ 138.

*Second*, Plaintiff failed to allege any additional facts establishing that the purported agreement between it and Client #2 was for a specified term rather than terminable at will. In its SAC, Plaintiff now acknowledges that there was no

1   written contract with Client #2, instead alleging that "there was a verbal contract,

2   with specific terms." SAC ¶ 128.  Plaintiff claims that this verbal contract with

3   Client #2 "commenced on or about February 10, 2009, for an initial term of 2 years,

4   with a 2-year renewal term, followed by 1-year terms," but Plaintiff fails to plead

5   whether Client #2 elected to renew, under what terms such renewal occurred, or

6   whether any term was in effect at the time that Client #2 "terminat[ed]" his contract

7   with Plaintiff in June of 2014. *Id.*

8        Tellingly, rather than alleging that the verbal contract itself was not

9   terminable at will, Plaintiff relies upon Rider D to the ATA/DGA Agreement and

10  argues that Client #2 could not terminate the alleged verbal contract because Client

11  #2 signed an employment contract with a third party to direct one episode of

12  "Lottery" on June 18, 2014, eight days before Client #2 terminated his relationship

13  with Plaintiff. *Id.* ¶ 128.  But Plaintiff's new allegations do not salvage its

14  interference with contract claim because such a verbal contract would not be

15  enforceable, as a matter of law; and because Rider D cannot apply to create a term

16  agreement where there was none to begin with.

17       At the outset, even if Plaintiff's allegations could plausibly be read to suggest

18  that the alleged verbal agreement with Client #2 was for a specified term rather than

19  terminable at will—which it cannot—the agreement still would not be enforceable

20  because it would run afoul of the statute of frauds.  This is so because a verbal

21  agreement with the alleged terms, namely an initial term of two years, followed by

22  a two-year and multiple one-year renewal terms, could not possibly be performed

23  within a year. *Rosenthal v. Fonda*, 862 F.2d 1398, 1400-01 (9th Cir. 1988).  Thus,

24  at most, Plaintiff's alleged verbal contract with Client #2 was terminable at will.

25       Plaintiff's reliance upon Rider D fares no better.  Although Plaintiff fails to

26  attach Rider D to the SAC, Plaintiff is referring to the Agreement between the

27  Association of Talent Agents and Directors Guild of America, Inc. of January 1,

28  1977 (as restated January 1, 2004) (the "ATA/DGA Agreement").  *See* RJN, Ex. A.

The purpose of the ATA/DGA Agreement is to promulgate a Code of Fair Practice which establishes minimum practices in the relationship between agents and DGA members, eliminates certain undesirable practices, and introduces a uniform procedure in the agency relationship.[5] *Id.* at 1.  To that end, the ATA/DGA Agreement provides that Rider "D" "shall be attached to, and made a part of existing or future agency contracts between DGA members and agents . . . with respect to services to be rendered by said DGA members as Directors." *Id.*

Plaintiff relies upon a tortured misinterpretation of Rider D for its argument that Client #2 was prohibited from terminating Plaintiff.  SAC ¶ 128.  It is clear from the plain language of Rider D's 90 Day Clause that its purpose is not to prevent a DGA member from terminating a verbal agreement with no specified term, but rather to provide the DGA member with the ability to terminate an unfruitful agreement with a specified term, by delivering written notice. *See* RJN Ex. A at 14-15 (dictating that, in the event of a fruitless relationship, "either Director or Agent may terminate the employment of Agent").  Otherwise, a DGA member could be locked into a long-term exclusive relationship with an agent who has been unable to generate any fruitful employment opportunities.

Plaintiff's reliance on subparagraph (C) of the 90 Day Clause is also misplaced.  Subparagraph (C) merely contains one of the "terms and provisions" for the application of the 90 Day Clause. *Id.* at 14.  While the ATA/DGA Agreement is expressly limited to the representation of DGA members as Directors, subparagraph (C) provides that employment or a bona fide offer for employment in another field, such as an Executive Producer, may in certain circumstances be counted for the purpose of determining whether the Director-member can invoke the 90 Day Clause. *Id.*  Therefore, if Plaintiff had a written, two-year exclusive agency contract with Client #2 for his directing services (governed by the ATA/DGA

---

[5] It is worth noting that Paragraph 17 of the ATA/DGA Agreement expressly approves of the practice of packaging. *See id.* at 4-5.

1  Agreement and therefore incorporating the terms contained in Rider "D"), and

2  obtained a bona fide offer as an Executive Producer satisfying the requirements of

3  subparagraph (C) within the last 90 days, Client #2 would be unable to invoke the

4  90 Day Clause to terminate the written contract.

5      Here, because Plaintiff did not have a written contract with a specified term,

6  Client #2 did not need to invoke the 90 Day Clause to terminate his relationship

7  with Plaintiff, and whether or not specific employment qualifies under

8  subparagraph (C) is irrelevant.

9      Thus, because Plaintiff has failed to plead any facts demonstrating that the

10 alleged contract was for a specified term rather than terminable at will, and because

11 Plaintiff failed to plead any independently wrongful act to defeat the competitor's

12 privilege, Plaintiff's intentional interference with contract claim must be dismissed.

13                          **CONCLUSION**

14     For the foregoing reasons, ICM Partners respectfully requests that the Court

15 dismiss the entire SAC with prejudice.

16

17 DATED:  November 9, 2015                **PERKINS COIE LLP**

18

19                                        By: */s/ Michael Garfinkel*
                                          Michael B. Garfinkel

20                                        Attorneys for Defendants
                                          INTERNATIONAL CREATIVE
21                                        MANAGEMENT PARTNERS, LLC

22

23

24

25

26

27

28