Michael B. Garfinkel, State Bar No. 156010
mgarfinkel@perkinscoie.com
Charles H. Samel, State Bar No. 182019
csamel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.843.1284

Jacqueline E. Young, State Bar No. 280374
JYoung@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105
Telephone:  415.344.7000
Facsimile:  415.344.7050

Attorneys for Defendant
INTERNATIONAL CREATIVE
MANAGEMENT PARTNERS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENHOFF ENTERPRISES, INC., a California corporation dba LENHOFF & LENHOFF,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED TALENT AGENCY, INC., a California corporation; INTERNATIONAL CREATIVE MANAGEMENT PARTNERS LLC, a Delaware limited liability company; and DOES 1 through 5, inclusive,<br><br>                    Defendants. | Case No. 2:15-CV-01086-BRO (FFMx)<br><br>**DEFENDANT INTERNATIONAL CREATIVE MANAGEMENT PARTNERS, LLC'S NOTICE OF MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Fed. R. Civ. P. 12(b)(6)]<br><br>Date:      March 21, 2016<br>Time:      1:30 p.m.<br>Place:     Courtroom 14<br>Judge:     Hon. Beverly Reid O'Connell |

## NOTICE

TO THE COURT, ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 21, 2016, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 14 of the United States District Courthouse, 312 North Spring Street, Los Angeles, California, before the Honorable Beverly Reid O'Connell, Defendant International Creative Management Partners, LLC will, and hereby does, move this Court for an order dismissing the Third Amended Complaint ("TAC"). This Motion is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the TAC fails to allege facts sufficient to state any claim upon which relief can be granted.

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice, the [Proposed] Order Granting Defendant International Creative Management Partners LLC's Motion To Dismiss Third Amended Complaint, any reply memorandum, the filings in this action, and such other matters as may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on February 5, 2016.

DATED:  February 12, 2016

**PERKINS COIE LLP**

By: */s/ Michael Garfinkel*
Michael B. Garfinkel

Attorneys for Defendants
INTERNATIONAL CREATIVE
MANAGEMENT PARTNERS, LLC

-1-

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................... 1

APPLICABLE STANDARD OF REVIEW ............................................................ 5

ARGUMENT ........................................................................................................... 6

I.  THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................................................................................................................ 6

    A.  Plaintiff Fails To Allege Facts To Plead That ICM Partners Participated In The Formation And Operation Of An Antitrust Conspiracy. ................................................................................... 6

        1.  Plaintiff Has Not Alleged Facts To Plead That ICM Partners Entered Into An Agreement In Restraint Of Trade. ......................................................................... 6

        2.  Plaintiff Has Not Alleged Facts To Plead That ICM Partners Engaged In Parallel Conduct From Which It Is Plausible To Infer An Agreement In Restraint Of Trade. ........ 11

        3.  Plaintiff Has Not Alleged Facts To Plead That ICM Partners Coerced Studios, Networks, Or Producers To Refuse To Deal With Plaintiff. .................................. 14

    B.  Plaintiff Fails To Allege That It Suffered Any Antitrust Injury......... 16

II.  THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNFAIR COMPETITION IN VIOLATION OF SECTION 17200 ....................................................................................... 18

    A.  Plaintiff Fails To Allege Facts Sufficient To Plead A UCL "Unfair" Claim ....................................................................... 18

    B.  Plaintiff Fails To Allege Facts Sufficient To Plead A UCL "Unlawful" Claim ................................................................. 20

III.  THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE ............................................................. 21

IV.  THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT .... 22

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999) ...................................................................... 8

*Aguilar v. Atl. Richfield Co.*,
    25 Cal. 4th 826; 107 Cal. Rptr. 2d 841; 24 P.3d 493 (2001) ....................... 19, 20

*Ashcroft v. Iqbal*,
    556 U.S. 662; 129 S. Ct. 1937 (2009) ....................................................... 5

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters*,
    459 U.S. 519; 103 S. Ct. 897; 74 L. Ed. 2d 723 (1983) ......................... 5

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328; 110 S. Ct. 1884; 109 L. Ed. 2d 333 (1990) .......................... 16, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544; 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007) ....................... 5, 9, 11

*Biljac Assocs. v. First Interstate Bank of Or., N.A.*,
    218 Cal. App. 3d 1410; 267 Cal. Rptr. 819 (1990) *overruled on
    other grounds by Demps v. S.F. Housing Auth.*, 149 Cal. App. 4th
    564; 57 Cal. Rptr. 3d 204 (2007) ............................................................... 20

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ............................................................ 6, 16, 17

*Carrico v. City & Cty. of S.F.*,
    656 F.3d 1002 (9th Cir. 2011) ................................................................... 5

*Cel–Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163; 83 Cal. Rptr. 2d 548; 973 P.2d 527 (1999) ................... 18, 20

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363; 113 Cal. Rptr. 2d 175 (2001) .................................... 19, 20

*Chicago Title Ins. Co. v. Great W. Fin. Corp.*,
    69 Cal. 2d 305; 70 Cal. Rptr. 849; 444 P.2d 481 (1968) ...................... 21

*City of San Jose v. Office of the Comm'r of Baseball,*
    776 F.3d 686 (9th Cir. 2015) ............................................................... 19

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.,*
    No. SACV 12-2146 JGB (MLGx), 2013 WL 3337676
    (C.D. Cal. June 28, 2013) ....................................................................... 8

*CRST Van Expedited, Inc. v. Werner Enters., Inc.,*
    479 F.3d 1099 (9th Cir. 2007) ........................................................ 21, 22

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
    11 Cal. 4th 376; 45 Cal. Rptr. 2d 436 (1995) ..................................... 21

*Filco v. Amana Refrigeration, Inc.,*
    709 F.2d 1257 (9th Cir. 1983) ............................................................. 14

*Fox v. HCA Holdings, Inc.,*
    No. 15-CV-02073-LHK, 2015 WL 6744565
    (N.D. Cal. Nov. 4, 2015) ........................................................................ 6

*Freeman v. San Diego Ass'n of Realtors,*
    77 Cal. App. 4th 171; 91 Cal. Rptr. 2d 534 (1999) ............................ 21

*G.H.I.I. v. MTS, Inc.,*
    147 Cal. App. 3d 256; 195 Cal. Rptr. 211 (1983) .............................. 15

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999) ............................................................... 8

*In re Late Fee & Over-Limit Fee Litig.,*
    528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................. 8, 13

*In re Musical Instruments & Equipment Antitrust Litig.,*
    798 F.3d 1186 (9th Cir. 2015) .......................................................passim

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.,*
    No. CV 07-00043 MMM (SSx), 2007 WL 4976364
    (C.D. Cal. Oct. 29, 2007) .................................................................. 7, 16

*The Jeanery, Inc. v. James Jeans, Inc.,*
    849 F.2d 1148 (9th Cir. 1988) ............................................................. 15

*Jones v. H. F. Ahmanson & Co.,*
    1 Cal. 3d 93; 81 Cal. Rptr. 592; 460 P.2d 464 (1969) ........................ 21

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)................................................................passim

*Leadsinger, Inc. v. BMG Music Publ'g*,
    512 F.3d 522 (9th Cir. 2008)..........................................................................5

*Marsh v. Anesthesia Servs. Med. Grp.*,
    200 Cal. App. 4th 480; 132 Cal. Rptr. 3d 660 (2011).......................................20

*Metro Indus., Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996)...........................................................................17

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015).........................................................................13

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
    465 U.S. 752; 104 S. Ct. 1464; 79 L. Ed. 2d 775 (1984)..................................15

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000).........................................................................8

*People v. McKale*,
    25 Cal. 3d 626; 159 Cal. Rptr. 811, 602 P.2d 731 (1979)..............................20

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001).......................................................................17

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)....................................................................16, 17

*Reeves v. Hanlon*,
    33 Cal. 4th 1140; 17 Cal. Rptr. 289; 95 P.3d 513 (2004) ...............................22

*Reudy v. Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010)..........................................................17

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
    133 Cal. App. 4th 1277; 35 Cal. Rptr. 3d 469 (2005)......................................19

*Rosenthal v. Fonda*,
    862 F.2d 1398 (9th Cir. 1988).......................................................................25

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011)............................................................7

-iii-

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ............................................................. 5

*Sterling Merch., Inc. v. Nestle, S.A.,*
    656 F.3d 112 (1st Cir. 2011) ............................................................. 17

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,*
    346 U.S. 537; 74 S. Ct. 257; 98 L. Ed. 273 (1954) .......................... 11

*United States v. Syufy Enters.,*
    903 F.2d 659 (9th Cir. 1990) ............................................................. 16

*Watkins & Son Pet Supplies v. Iams Co.,*
    254 F.3d 607 (6th Cir. 2001) ............................................................. 18

*Williamson Oil Co. v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) ......................................................... 13

*Yentsch v. Texaco, Inc.,*
    630 F.2d 46 (2d Cir. 1980) ............................................................... 15

**STATUTES**

California's Unfair Competition Law Bus. & Prof. Code § 17200 *et
    seq.* ........................................................................................... passim

Cartwright Act § 16720 ............................................................... passim

Sherman Act § 1 ........................................................................... passim

**OTHER AUTHORITIES**

Rule 16(g) ................................................................................... passim

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff concocted its antitrust theory in an effort to up the ante, perhaps believing that a run-of-the mill (and baseless) "poaching" case would not garner the same interest from the industry trade publications as would an imaginative tale about how for more than a decade Hollywood's four leading talent agencies supposedly have been engaged in a secret antitrust conspiracy.  But after three attempts, Plaintiff still cannot muster the factual allegations necessary to move its complaint across the line from merely theoretical to sufficiently plausible, as the law requires.  Despite new rhetoric perhaps more familiar to antitrust lawyers, the repackaged conclusory allegations in the Third Amended Complaint, Dkt. No. 49, 49-1 ("TAC") nonetheless fail to cure any of the deficiencies in the Second Amended Complaint, Dkt. No. 31 ("SAC"), and, thus are nothing more than "lipstick on the same pig."

At its core, Plaintiff's antitrust claim rests on its gripe that Plaintiff lacks sufficient capital, and, while it remains a mystery how, Defendants supposedly are to blame.  According to Plaintiff, the absence of investors has impeded its ability to compete with larger rivals to attract and retain the writers, directors, producers, and performers who are sought by studios, networks, and production companies for popular scripted television series (although at the time the shows are sold, of course, success is unknown and uncertain).  But Plaintiff never explains how Defendants supposedly have prevented private equity firms or others from investing in Plaintiff.  That means, as far as antitrust law is concerned, Plaintiff is no different than smaller retailers in other industries that wish they had the economies of scale of their big box or mass merchant rivals, smaller manufacturers that complain about competing for decreasing profit margins while ignoring their larger competitors' greater efficiency, or smaller broker firms which believe that growing their size will result in a greater number of transactions and larger commissions.

-1-

1  Antitrust law is indifferent to a competitor's size alone, and it is not illegal
2  for firms to grow, especially by investment, to scale and become more efficient, to
3  use that capital to innovate, and to increase their market shares.  Much more is
4  required for a private plaintiff to state a claim for antitrust damages.

5  The conspiracy theory in the TAC tracks the SAC and continues to postulate
6  that Defendants UTA and ICM Partners conspired to organize a group boycott in an
7  effort to "exclude and deny entry to non-Uber talent agencies (including Plaintiff)
8  into the scripted TV market and the scripted TV packaging submarket."  TAC, ¶ 76.
9  But the TAC relies upon the same defective allegations of agreement already
10  rejected by the Court.  Plaintiff again asserts in conclusory terms, without any
11  supporting facts, that the purported conspiracy "was hatched by the ATA's
12  Strategic Planning Committee" (*id.* ¶ 75) when sometime between the "late 1990's
13  and continuing to 2002," Defendants UTA and ICM Partners agreed it was "in their
14  best interests to proceed without Rule 16(g)." *Id.* ¶ 25.  Plaintiff further speculates
15  that "this boycott is supported by":  (1) agreements between UTA and ICM
16  Partners to "restrict co-packaging scripted deals to each other and/or with WME
17  and CAA, but to the exclusion of non-Uber agencies"; and (2) "the use of veiled
18  threats by UTA and ICM (together with WME and CAA) against studios, networks
19  and producers not to deal with non-Uber talent agents …." *Id.* ¶ 76.

20  But apart from the effort to rephrase its legal theory, the TAC contains no
21  new *factual* allegations in response to the Court's guidance that the allegations in
22  the SAC, which are repeated in the TAC, fail to state a claim under the Sherman
23  Act.  For instance, adding the dates of the Strategic Planning Committee meetings
24  (*id.* ¶ 23), ignores the Court's conclusions that "merely stating that Defendants'
25  agents served on the [ATA's] Strategic Planning Committee and discussed Rule
26  16(g) does not plead a claim of conspiracy," or, likewise, the fact "that the
27  expiration of Rule 16(g) would ultimately benefit the agencies does not establish
28

1   that Defendants conspired to bring about its demise." Order Granting Defendants'
2   Motions to Dismiss, Dkt. 43 at 11.

3        Similarly, the TAC again fails to provide the names of any of the individuals
4   who allegedly entered into the agreement to co-package scripted television series to
5   the exclusion of smaller agencies, or address the Court's observation that "Plaintiff
6   concedes in its SAC that Defendants do in fact participate in co-packaging
7   agreements with non-Big 4 Agencies" *Id.* at 11. To be sure, Plaintiff attempts to
8   wriggle out from under its own prior allegations by attaching new exhibits
9   containing suspiciously self-serving "data" without attributing their source or
10  explaining how they were compiled. TAC, Exs. A & B, Dkt. No. 49-1. But these
11  efforts are to no avail, because these new contradictory allegations do not negate
12  the old.

13       Finally, the claim that the Defendants used "veiled threats" to coerce
14  compliance with the supposed boycott fares no better because the TAC, as the
15  Court recognized with respect to the SAC, "fails to plead a specific instance of a
16  threat against a studio, network, or producer," (Dkt. 43 at 11), and in any event,
17  cannot satisfy the legal requirements for pleading coercion, even if Plaintiff's
18  conclusory statements were true, which they are not.

19       Plaintiff's state law claims remain defective as well. The Court previously
20  ruled that Plaintiff's unfair competition and interference with prospective economic
21  advantage claims necessarily rise and fall with its antitrust claim. Plaintiff
22  nonetheless attempts to prop up its UCL claim by including the allegation that ICM
23  Partners' conduct is also a violation of the Cartwright Act, apparently believing that
24  it would provide an independent predicate violation of law upon which the claim
25  can be based. However, Plaintiff's attempted "end around" fails because, as with
26  the Sherman Act, pleading a violation of the Cartwright Act requires Plaintiff to
27  allege facts sufficient to show concerted action in the form of a contract,
28  combination, or conspiracy, with a high degree of particularity. Likewise,

Plaintiff's interference with prospective economic advantage claim remains insufficient because it is based entirely upon its deficient antitrust allegations for its "independent wrongful act."

Plaintiff also cannot salvage its interference with contract claim because it again fails to plead facts sufficient to demonstrate that its oral agency agreement with Client #2 was not terminable at will. In its SAC, Plaintiff attempted to inject the ATA/DGA Agreement into its claim, arguing that the "90 Day Clause" of Rider D prohibited Client #2 from terminating the oral agency agreement because Client #2 obtained a directing engagement for one episode of a series entitled "Lottery." The Court expressly did not reach the issue of the applicability of the 90 Day Clause, because it determined that even if it applied, Plaintiff failed to sufficiently allege the two preconditions for its application. Specifically, Plaintiff failed to allege the second condition that the "Lottery" engagement met the 3-weeks of employment or bona fide offer of employment threshold. Plaintiff did not heed the Court's instruction and instead merely repeated the condition verbatim in the TAC. Moreover, even if Plaintiff had alleged such facts, the 90 Day Clause cannot turn an oral at-will agency agreement into one of a fixed term that cannot be terminated. Plaintiff's flawed interpretation, if accepted, would lead to the absurd result that a director under an oral agency agreement could never terminate his agent so long as he periodically received a minimum threshold of employment. Clearly, that would violate both the letter and spirit of the 90 Day Clause.

The TAC confirms that permitting Plaintiff to attempt to re-plead would be futile. If Plaintiff could plead the facts necessary to state a claim, it certainly would have done so by now, especially after the Court provided it with a roadmap. The fact is that Plaintiff is unable to cure the defects in the TAC, and, consequently, the Court should dismiss Plaintiff's antitrust and state law claims with prejudice.

## APPLICABLE STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678; 129 S. Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570; 127 S. Ct. 1955; 167 L. Ed. 2d 929 (2007)). A claim is plausible on its face only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.* In this regard, the Supreme Court has observed that it is improper to assume Plaintiff "can prove facts that it has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526; 103 S. Ct. 897, 902; 74 L. Ed. 2d 723 (1983).

Ultimately, the factual allegations "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Thus, "to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 565 n.10).

Finally, a complaint may be dismissed without leave to amend "if amendment would be futile." *Carrico v. City & Cty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011); *see also Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (undue delay and resulting prejudice, including from "repeated

failure to cure deficiencies by amendments previously allowed" justifies dismissal with prejudice); *Fox v. HCA Holdings, Inc.*, 2015 WL 6744565, at *15 (N.D. Cal. Nov. 4, 2015) (denying leave to amend where amendment "would result in undue delay and unduly prejudice Defendant by requiring Defendant to file repeated motions to dismiss").

## ARGUMENT

## I.     THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

In order to state a claim for damages under Section 1 of the Sherman Act, Plaintiff must plead facts to support four elements, including "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition . . . . [and] (4) that [Plaintiff was] harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1196-97 (9th Cir. 2012) (quoting *Kendall*, 518 F.3d at 1047) (internal citation omitted).  Here, because Plaintiff fails, at a minimum to allege facts that could support the first and fourth elements of a Section 1 violation, its Sherman Act claim should be dismissed with prejudice.

### A.     Plaintiff Fails To Allege Facts To Plead That ICM Partners Participated In The Formation And Operation Of An Antitrust Conspiracy.

#### 1.     Plaintiff Has Not Alleged Facts To Plead That ICM Partners Entered Into An Agreement In Restraint Of Trade.

"[D]iscovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall*, 518 F.3d at 1047.  Consequently, courts, including the Ninth Circuit, require plaintiffs to allege specific facts as to each defendant

1   describing the circumstances of the alleged agreement.  *Id.* at 1047-48 (affirming

2   order granting motion to dismiss Section 1).

3        In other words, to pass muster under *Twombly*, conspiracy allegations must

4   "answer the basic questions: who, did what, to whom (or with whom), where, and

5   when?"  *Id.* at 1048; *see also In re Musical Instruments & Equipment Antitrust*

6   *Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) ("*In re Musical Instruments*")

7   (same); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059,

8   1073-74 (E.D. Cal. 2011) (granting motion to dismiss Section 1 claim where

9   plaintiffs failed to allege specific details such as "the specific corporate players

10  along with names of key executives," "where the agreement was made, or if there

11  were multiple agreements or one global agreement made at one time"); *Int'l*

12  *Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, 2007 WL 4976364, at *10 (C.D.

13  Cal. Oct. 29, 2007) (same).

14       Acknowledging these precepts, this Court held that Plaintiff failed to allege

15  sufficient factual detail to plead a conspiracy under Section 1 of the Sherman Act,

16  where Plaintiff alleged only the names of individuals Plaintiff claims were involved

17  in a conspiracy to "bring[] about the demise of Rule 16(g)."  Dkt. 43 at 10.

18  Likewise, the Court noted Plaintiff's failure to plead any facts demonstrating that

19  Defendants conspired "to co-package to the exclusion of non-Big 4 Agencies, and

20  the conspiracy to coerce studios, networks, and producers to boycott smaller

21  agencies," such as the names of individuals involved, any specific time or place for

22  these purported conspiracies, or any specific instance of a threat against a studio,

23  network, or producer, to support these allegations.  *Id.* at 11.

24       Despite this guidance, in what is now Plaintiff's third attempt to plead an

25  antitrust claim, Plaintiff merely repackages and repeats its allegations from the SAC

26  and does nothing to plead the facts necessary to support conspiracy under Section 1.

27       *First*, the only "new" factual allegations in the TAC purporting to

28  demonstrate the formation of an antitrust conspiracy "to bring[] about the demise of

-7-

Rule 16(g)" is Plaintiff's claim that the previously-named individuals associated with the Agencies took part in meetings, conference calls, and e-mail communications on specified dates in furtherance of their service on the ATA's Strategic Planning Committee.  TAC ¶ 23.  Plaintiff claims not that these individuals actually did conspire to do anything during these Committee meetings, calls, or emails, but rather that the individuals had the "opportunity"  to collude "to eliminate Rule 16(g)."  *Id.* ¶ 23.

This is simply not enough, for the reasons this Court has already articulated. "[M]erely stating that Defendants' agents served on the Strategic Planning Committee [of the ATA] and discussed Rule 16(g) does not plead a claim of conspiracy."  Dkt. 43 at 11; *see also Nova Designs, Inc. v. Scuba Retailers Ass'n, 202 F.3d 1088, 1092 (9th Cir. 2000)*; *AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999)* (mere membership in a trade association insufficient to plead an antitrust conspiracy).  Hence, merely adding allegations listing the specific dates upon which the Defendants' purported agents serving on the Strategic Planning Committee had the opportunity to discuss Rule 16(g) in meetings, calls, or emails, does nothing to cure this defect.  It is well-established that allegations of communications among defendants and the mere opportunity to reach an agreement is no evidence of a conspiracy.  *In re Citric Acid Litig., 191 F.3d 1090, 1103 (9th Cir. 1999)* (noting that allegations of meetings and telephone conversations between competitors was insufficient "to infer participation in the conspiracy from the opportunity to do so"); *In re Late Fee & Over-Limit Fee Litig., 528 F. Supp. 2d 953, 963 (N.D. Cal. 2007)* (dismissing claims for conspiracy under Section 1 and noting that mere opportunity to conspire is not sufficient to support an inference of conspiracy); *see also Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc., 2013 WL 3337676, at *6 (C.D. Cal. June 28, 2013)* (dismissing claims for conspiracy under Section 1 where the allegations showed merely "that Defendants had the opportunity to conspire, but fall short of pleading 'allegations

plausibly suggesting (not merely consistent with) agreement.'") (quoting *Twombly*, 550 U.S. at 557).

Moreover, even if Plaintiff could plead facts sufficient to show that Defendants theoretically conspired to "bring about the demise of Rule 16(g)" in these meetings, calls, and emails—which Plaintiff cannot do—such factual allegations would be insufficient because, as the Court has observed, Plaintiff cannot allege facts to demonstrate that Defendants actually brought about the demise of Rule 16(g), since Plaintiff admits that "SAG members independently rejected the proposed amendments to Rule 16(g)." Dkt. 43 at 11; *see also* TAC ¶ 33.

*Second*, Plaintiff continues to allege that the Agencies formed "agreements . . . to restrict co-packaging scripted deals [amongst one another] to the exclusion of non-[Agencies] . . . ." TAC ¶¶ 67, 75-76.[1] Plaintiff attempts to address the defects in the SAC and support an inference of the existence of such agreements with two new "exhibits," of Plaintiff's own invention, in which Plaintiff purports to show that the Agencies were parties to 12 co-packaging arrangements with buyers of scripted television series that also involved two different non-Agencies in 2014-2015 and that the Agencies were parties to 85 co-packaging arrangements with buyers of scripted television series that also involved one another in 2014-2015. *See id.* ¶ 45 & TAC Exs. A & B.  Without attributing the source of the data in the exhibits or describing the methodology used to prepare them, Plaintiff contends that these figures "defy coincidence and could not have occurred but for an agreement between and among the [Agencies.]" *Id.* ¶ 45.

---

[1] It is worth noting that the agencies, large or small, do not enter into agreements to co-package at all.  In fact, it is the studios and other buyers of scripted television series that agree to packaging arrangements, and while multiple agencies may be beneficiaries of that arrangement, those agencies do not enter into co-packaging agreements amongst themselves.

As this Court has recognized, Plaintiff's own prior allegations that multiple packaging arrangements involved both Agencies and non-Agencies in 2014-2015 directly contradict Plaintiff's claim that the Agencies engage in "exclusive" co-packaging because, as the Court explained "Plaintiff concedes in its SAC that Defendants do in fact participate in co-packaging agreements with non-Big 4 Agencies." Dkt. 43 at 11; *see also* SAC, ¶ 73, Dkt. No. 31 (alleging co-packaging arrangement with non-Agencies in 16 out of 105 instances). Although Plaintiff attempts to revise its figures in the TAC to claim now that Agencies participated in co-packaging arrangements involving non-Agencies in 12 out of 97 instances in 2014-2015, this is a distinction without a difference. *See* TAC, Exs. A & B (showing 12 co-packages involving non-Agencies out of a total of 97 co-packages). These "new" allegations still directly contradict the assertion that the Agencies do not participate in co-packages involving other agencies and belie the existence of any purported agreement among the Agencies not to participate in packages that also involve non-Agencies.[2]

*Third*, with respect to the allegations both that Defendants conspired "to co-package to the exclusion of non-Big 4 Agencies," and that there is a "conspiracy to coerce studios, networks, and producers to boycott smaller agencies," the Court held that Plaintiff failed to provide any facts demonstrating the names of individuals involved, any specific time or place for these purported conspiracies, or any specific instance of a threat against a studio, network, or producer, to support these allegations. Dkt. 43 at 11. Despite the Court specifically identifying these defects, the TAC contains not a single new factual allegation to describe either the alleged exclusive co-packaging agreement or the purported agreements to coerce any of the buyers of scripted televisions shows or the talent who create and perform

---

[2] Notably, Plaintiff's prior allegations that 16 out of 105 similarly contradict this claim. *See* Dkt. 43 at 11; SAC ¶ 73.

DEF. ICM PARTNERS' NOT. OF MOTION AND MOTION TO DISMISS TAC
Case No. 2:15-CV-01086-BRO (FFMx)

1  them.  Thus, after multiple attempts, Plaintiff has demonstrated that it is unable to

2  plead direct evidence of an antitrust conspiracy.

3          **2.      Plaintiff Has Not Alleged Facts To Plead That ICM Partners
                      Engaged In Parallel Conduct From Which It Is Plausible To
4                     Infer An Agreement In Restraint Of Trade.**

5          As the Court observed, "it is apparent from Plaintiff's SAC that it relies on

6  circumstantial evidence, not direct evidence, to plead the existence of a

7  conspiracy." *Dkt. 43 at 9*.  Where a plaintiff fails to plead direct evidence of

8  collusion, "a showing of parallel 'business behavior is admissible circumstantial

9  evidence from which the fact finder may infer agreement.'"  *Twombly*, 550 U.S. at

10 *553-54* (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S.

11 *537, 540; 74 S. Ct. 257; 98 L. Ed. 273 (1954)*).  Still, "an allegation of parallel

12 conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel

13 conduct does not suggest conspiracy . . . . [Allegations of parallel conduct] must be

14 placed in a context that raises a suggestion of a preceding agreement, not merely

15 parallel conduct that could just as well be independent action." *Id. at 556-57*.

16         To achieve this balance, the Ninth Circuit "has distinguished permissible

17 parallel conduct from impermissible conspiracy by looking for certain 'plus

18 factors.'"  *In re Musical Instruments*, 798 F.3d at 1194.  "Plus factors" are

19 "economic actions and outcomes that are largely inconsistent with unilateral

20 conduct but largely consistent with explicitly coordinated action," such as "extreme

21 action against self-interest [that] would be so perilous in the absence of advance

22 agreement that no reasonable firm would make the challenged move without such

23 an agreement." *Id. at 1193–95*.

24         *First*, Plaintiff offers no factual allegations to suggest that the Agencies

25 suddenly and simultaneously began participating in packaging, or any other fact

26 suggesting that the decisions were made in "parallel."  *In re Musical Instruments*,

27 *798 F.3d at 1195-96* ("[a]llegations of such slow adoption of similar policies does

28 not raise the specter of collusion").  Thus, the fact that each of the Agencies

1    participate in packaging is insufficient to "raise a suggestion of preceding

2    agreement" and is therefore insufficient to state a Section 1 claim.

3        *Second*, even if the TAC were construed as pleading parallel conduct from

4    which a conspiracy could be inferred, Plaintiff once again fails to take the Court's

5    guidance to heart and neglects to add any new factual allegations demonstrating

6    that Defendants engaged in parallel conduct that is "inconsistent with unilateral

7    conduct" or "largely consistent with explicitly coordinated action." *In re Musical*

8    *Instruments*, 798 F.3d at 1194.  To the contrary, Plaintiff continues to concede that

9    ICM Partners engaged in self-interested conduct that "suggest[s] rational, legal

10   business behavior," (*Kendall*, 518 F.3d at 1049), because it avers in the TAC that

11   "it was in [Defendants'] best interests to proceed without Rule 16(g)."  TAC ¶¶ 25,

12   75.  Thus, by Plaintiff's own admission, and as the Court previously observed, the

13   purported conduct is self-interested and commensurate with independent action and

14   cannot support an inference of conspiracy for purposes of alleging a Section 1

15   violation.  Dkt. 43 at 11 ("[T]he decision to permit Rule 16(g) to expire was in all

16   agencies' best interest, and thus is as much evidence of a conspiracy as it is

17   evidence that each individual agency acted for its own independent benefit . . . .").[3]

18       *Third*, Plaintiff admits in the TAC that the "[b]igger talent agencies are

19   uniquely and advantageously situated to participate in packaging because of their

20   large, exclusive, and in-demand talent rosters."  TAC ¶ 14.  In other words, Plaintiff

21   affirmatively alleges that more talent means more packaging opportunities.  *See id.*

22   Given that Plaintiff admits that the Agencies "represent the world's largest pool of

23   talent," TAC ¶ 62, it is to be expected that some combination of the Agencies

24

25       [3] Despite the Court's observation that a quote in Plaintiff's SAC from an
     Hollywood Reporter interview involving representatives from the Agencies was no
26   evidence of conspiracy, "ha[d] nothing at all to do with the purported conspiracy,"
     and was "made in jest" (Dkt. 43 at 9 n.3), Plaintiff continues to rely on the same
27   interview and quote in an attempt to support the existence of a conspiracy.  *See*
     TAC ¶ 47.  This allegation fails to support any antitrust conspiracy for the same
28   reasons the Court previously indicated.

would be included in the majority of co-packaging arrangements.  Far from demonstrating that the Agencies collude to exclude non-Agencies or engage in conduct "inconsistent with unilateral conduct," Plaintiff's allegations merely confirm principles of basic probability.  *In re Musical Instruments*, 798 F.3d at 1194; *Kendall*, 518 F.3d at 1049.

Moreover, whenever possible, basic economics dictates that it is rational for a talent agency to prefer to retain the entire package commission, rather than being forced to earn less by splitting the commission with anyone else.[4]  Plaintiff's own allegations bear this out: Plaintiff alleges that co-packages occurred in only about 25% of cases in 2014-2015.  TAC, Exs. A & B (claiming 97 co-packages out of 353 packages).  Thus, far from being conduct "inconsistent with unilateral conduct," the allegation that unilaterally adopting a policy to reduce the number of situations in which an agency could be forced to split package commissions, even if it were true, demonstrates rational business behavior and, if likewise adopted by other agencies, "does not reveal anything more than similar reaction[s] to similar pressures within an interdependent market."  *In re Musical Instruments*, 798 F.3d at 1196.

*Finally*, Plaintiff continues to suggest in conclusory terms that its proposed relevant markets have become more concentrated during the past decade or more. *See, e.g.*, TAC ¶¶ 6, 17, 27, 44-45.  But the mere fact that a relevant antitrust market is concentrated, or has become more concentrated over time, is not a "plus factor" indicating collusion; it would merely be an indication that the "industry is an oligopoly, which is perfectly legal."  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003); *In re Late Fee & Over-Limit Fee*

---

[4] Notably, an independent decision not to co-package with non-Agencies is not actionable under the antitrust laws. *See, e.g.*, *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) ("[A] single firm's refusal to deal does not entail a conspiracy if it makes that decision independently.").  Hence, Plaintiff must be able to allege that the Agencies formed an agreement to exclude non-Agencies.  Plaintiff has not done so.

1   *Litig.*, 528 F. Supp. 2d at 964 ("[E]ven if the alleged market were concentrated, this

2   would not render the asserted conspiracy plausible.").  In any event, there is no

3   allegation in the TAC that the purported decline in the number of talent agencies

4   has any causal link to the antitrust conspiracy that Plaintiff is alleging in this

5   lawsuit.  Nor does Plaintiff attempt to connect those dots.  To the contrary, Plaintiff

6   admits, and affirmatively alleges, that the number of talent agencies has declined

7   due to natural market forces and independent business decisions, such as mergers

8   and acquisitions with other talent agencies, or the decisions of some agents to close

9   their agencies and become business managers.  *See* TAC ¶¶ 13, 17.

10      In short, Plaintiff has repeatedly failed to plead any facts from a conspiracy

11   may be inferred, and its Section 1 claim should be dismissed with prejudice.

    **3.    Plaintiff Has Not Alleged Facts To Plead That ICM Partners Coerced Studios, Networks, Or Producers To Refuse To Deal With Plaintiff.**

14      Plaintiff continues to allege that the Agencies "use[d] veiled

15   threats . . . against studios, networks and producers not to deal with non-[Agencies]

16   in the scripted TV market or else face the loss of future packages and, therefore, the

17   loss of TV programming."  *Id.* ¶¶ 68, 75-76.  But as this Court previously observed,

18   such conduct does not amount to a conspiracy in restraint of trade unless Plaintiff

19   pleads sufficient facts to demonstrate whether the purported coercion was illegal or

20   whether it was "mere exposition, persuasion, argument, or pressure."  Dkt. 43 at 13

21   (citing *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1263 (9th Cir. 1983))

22   (stating that "[d]emands or threats, however, must be distinguished from mere

23   exposition, persuasion, argument, or pressure," and that the issue in that case was

24   whether the statements at issue were "enough to raise an inference of coercion and

25   thus create an inference of" illegal[ity]) (internal quotation marks omitted).[5]

26   _____

27       [5] *See In re Musical Instruments,* 798 F.3d at 1195 (allegations that vertical players were "pressured" or "coerc[ed]" into adopting certain policies insufficient

28   to establish collusion because "decisions to heed similar demands made by a common, important customer do not suggest conspiracy or collusion"); *See also*

Again ignoring the Court's guidance about the defects in the SAC, Plaintiff adds not a single fact to demonstrate that Defendants exerted any type of unlawful coercion on anyone at all.  In fact, the only new factual allegations that Plaintiff adds to the TAC relating to this purported vertical conspiracy is a quote from an alleged 2014 email, taken out of context, in which Tom Rothman, Chairman of Sony Pictures stated "They are demanding and getting fees now on these from the financiers (they call it a 'packaging fee') and are keeping as many emerging high end filmmaker projects off the market until they have full control," which obviously refers to motion picture production, not scripted television.  TAC ¶ 18.[6]

But even if the statement had been free to be made in a relevant context, nothing in the quote describes improper coercion by ICM Partners.  Moreover, at best, the quote is equally consistent with "mere exposition, persuasion, argument, or pressure" as it is with unlawful coercion.

Finally, although not a new allegation, Plaintiff apparently believes it can still support its boycott claim with its description of the anecdote related by Gavin

---

*Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761; 104 S. Ct. 1464; 79 L. Ed. 2d 775 (1984) ("[A] distributor is free to acquiesce in the manufacturer's demand in order to avoid termination."); *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1158-59 (9th Cir. 1988) ("exposition, persuasion, argument, or pressure" insufficient to establish coercion (citation omitted)); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2d Cir. 1980) (same); *cf. G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 269; 195 Cal. Rptr. 211 (1983) (allegations of "economic leverage" to "coerc[e]" more favorable terms from vertical distributors insufficient to establish unlawful conspiracy under California's Cartwright Act).

[6] Plaintiff references but does not provide a copy Tom Rothman's email (the "Rothman email") or identify its source.  ICM Partners was able to obtain a copy of the Rothman email from the Wikileaks website devoted to posting emails hacked from Sony Pictures Entertainment ("SPE"), and a copy is attached as Exhibit B to ICM Partners' Request for Judicial Notice ("RJN") filed concurrently herewith. The Rothman email is an exchange between Tom Rothman, then in charge of SPE's TriStar Productions division, to Amy Pascal, then Co-Chairman of SPE, prompted by a deadline.com article entitled "Focus Makes $20 Million P&A Deal for River Road, Participant and Lionsgate Intl-Funded Juan Antonio Bayona-Helmed 'A Monster Calls,'" a copy of which is provided as Exhibit C to the RJN.  When the complete email is read in context with the deadline.com article, it is clear that Rothman is providing his opinion about SPE's decision not to invest in the referenced motion picture and his commentary that SPE and other studios should "double down on development spending" on motion pictures to better compete with talent agencies engaging in motion picture packaging.

-15-

1  Polone to the Hollywood Reporter, ignoring that Polone's experience did not
2  involve a purported refusal to co-package with a smaller agency at all, nor did he
3  claim there was an alleged threat made by any talent agency, let alone by UTA or
4  ICM.  TAC ¶ 77.  Obviously, Polone's speculation that agencies "will kill a deal" if
5  they are not paid a package commission is entitled to no less credit by this Court
6  than Plaintiff's own factually unsupported accusations.

7  Thus, Plaintiff's claim that the Agencies "use[d] veiled threats . . . against
8  studios, networks and producers not to deal with non-[Agencies], (TAC ¶¶ 68, 75-
9  76), even if it were true, is insufficient as a matter of law to plead a conspiracy in
10 restraint of trade.  The Section 1 claim must therefore be dismissed.[7]

11 **B.     Plaintiff Fails To Allege That It Suffered Any Antitrust Injury.**

12 "It can't be said often enough that the antitrust laws protect competition, not
13 competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990).
14 Thus, to sustain a private right of action for an alleged federal antitrust violation, a
15 private plaintiff must plead that it "[was] harmed by the defendant's anti-
16 competitive contract, combination, or conspiracy, and that this harm flowed from
17 an 'anti-competitive aspect of the practice under scrutiny.'" *Brantley*, 675 F.3d at
18 1197 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334; 110 S.
19 Ct. 1884; 109 L. Ed. 2d 333 (1990) ("*ARCO*").  But "while 'conduct that eliminates
20 rivals reduces competition,' 'reduction of competition does not invoke the Sherman

21

22 ⁷ Likewise, Plaintiff's persistent use of antitrust buzzwords, such as "tying"
23 and "predatory pricing," without any factual or logical support, fails to state any
    claim under Section 1.  *E.g.* TAC ¶¶ 42, 54, 75, 78.  Antitrust buzz words or "magic
24 words" standing alone are legal conclusions and, without more, are insufficient to
    state a claim under Section 1.  *Int'l Norcent Tech.*, 2007 WL 4976364, at *10.
25 Plaintiff fails to allege any agreement or facts to suggest that Defendants allocated
    any market or "tied" any products together.  *See Brantley*, 675 F.3d at 1199
26 (defining tying arrangements).  Nor has Plaintiff alleged any facts to establish
    "predatory pricing," which requires that Defendants priced below their costs and
27 then later had a dangerous probability of recouping their losses by charging
    supracompetitive prices after rivals were eliminated or substantially weakened
28 during the predation period.  *See, e.g., Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d
    1421, 1433-34 (9th Cir. 1995).

Act until it harms consumer welfare.'" *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) (quoting *Rebel Oil*, 51 F.3d at 1433).  In other words, to state a claim, a private plaintiff must allege facts that plausibly demonstrate harm not to competitors but to consumers, meaning an increase in price or reduction in output.  *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011); *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1128 (N.D. Cal. 2010); *see also Rebel Oil*, 51 F.3d at 1433.  In this regard, "a decrease in profits from a reduction in a competitor's prices, so long as the prices are not predatory, is not an antitrust injury." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001); *cf. ARCO*, 495 U.S. at 340.

Plaintiff cannot demonstrate antitrust injury because the TAC does not allege facts to show that Plaintiff suffered harm *as a result of* any alleged anticompetitive conduct.  Plaintiff does not allege that it was excluded from receiving a package or co-package, let alone that such exclusion was the result of any alleged boycott supposedly organized by ICM Partners.  Instead, Plaintiff's sole alleged injury is the loss of Clients #1 and #2.[8]  Yet, nowhere does Plaintiff allege that Clients #1 and #2 left *because* Defendants or their alleged co-conspirators refused to split a particular package with Plaintiff, or *because* buyers of talent refused to employ Clients #1 or #2 due to some fear of, threat from, or loss of opportunity at the hands of Defendants—to the contrary, Plaintiff alleges that these clients left because Defendants offered them lower commissions.  *See, e.g.,* TAC ¶¶ 51-56, 97.  Consequently, Plaintiff's complaint stems from *more* vigorous competition, not

---

[8] Although Plaintiff also refers to loss of choice and diversity in support of its claim, these do not constitute actionable antitrust injuries either.  As the Ninth Circuit has explained, even if an "agreement has the effect of reducing consumers' choices or increasing prices," that "does not sufficiently allege an injury to competition" because each is "fully consistent with a free, competitive market." *Brantley*, 675 F.3d at 1202.  In the absence of injury to competition, such concerns are simply not actionable.  *See id.*

less.  *See, e.g., ARCO*, 495 U.S. at 339.  Plaintiff's injury, thus, is merely an injury to a competitor (Plaintiff), not to competition and is not actionable antitrust injury.[9]

Because Plaintiff has had multiple opportunities and has failed to plead facts to show how ICM Partners participated in the formation and operation of any antitrust conspiracy, or facts that could show that Plaintiff has suffered antitrust injury, the Section 1 claim should be dismissed with prejudice.

## II.   THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNFAIR COMPETITION IN VIOLATION OF SECTION 17200

California's Unfair Competition Law (UCL) defines "unfair competition" to include, in relevant part, an "unlawful" business act or practice or an "unfair" business act or practice.  *Bus. & Prof. Code § 17200 et seq.*  The UCL thus prohibits acts that violate some other law or are "unfair" as California case law has defined that term.  *Cel–Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180; 83 Cal. Rptr. 2d 548; 973 P.2d 527 (1999).  Here, Plaintiff's UCL claim fails under any theory and must be dismissed.

### A.   Plaintiff Fails To Allege Facts Sufficient To Plead A UCL "Unfair" Claim

When a plaintiff asserts a claim under the UCL's "unfair" prong against a competitor, the California Supreme Court has held that the term "unfair" means conduct which "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns*, 20 Cal. 4th at 187.

---

[9] *Cf. Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 616 (6th Cir. 2001) (where Plaintiff alleged that manufacturer granted exclusive contract to Plaintiff's competitor and terminated distribution contract with Plaintiff, holding that Plaintiff failed to plead antitrust injury "because the injury to [Plaintiff] flows from the termination; the antitrust violation was not a necessary predicate of the injury").

As this Court recognized in dismissing the SAC, although it is not necessary in all circumstances for an allegedly "unfair" practice under the UCL also to violate a federal or state antitrust law, the conduct claimed of under the UCL must contain factual allegations to show an unreasonable restraint on trade and harm to consumers. Dkt. 43 at 15-16; *see also City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375; 113 Cal. Rptr. 2d 175 (2001). And "the determination that [a defendant's] conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers." *Office of the Comm'r of Baseball,* 776 F.3d at 691-92; *Chavez*, 93 Cal. App. 4th at 375; *accord RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1286; 35 Cal. Rptr. 3d 469 (2005) (summary judgment on Cartwright Act claim precluded UCL claim under the "unfair" prong). Indeed, "[t]o permit a separate inquiry into essentially the same question under the unfair competition law [as under the antitrust laws] would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Chavez*, 93 Cal. App. 4th at 375 (affirming trial court's dismissal of UCL claims for failure to state a claim).

As discussed above, Plaintiff's antitrust claim fails in its entirety and must be dismissed. Beyond Plaintiff's failure to plead the necessary elements for conspiracy,[10] Plaintiff's Section 1 claim fails more fundamentally because it fails to allege any anticompetitive conduct or harm to competition or consumers. To the contrary, the only conduct Plaintiff alleges on ICM Partners' part—that a lone

---

[10] Although claims under California's UCL do not necessarily require proof of conspiracy, where a plaintiff bases a UCL claim entirely upon a purported conspiracy, then the UCL claim rises and falls with the alleged conspiracy. *See Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866-67; 107 Cal. Rptr. 2d 841; 24 P.3d 493 (2001). Here, Plaintiff's UCL claim incorporates its preceding allegations, does not allege any additional conduct, and therefore depends on its allegation of the existence of a purported conspiracy. TAC ¶¶ 82-88. Thus, because Plaintiff has failed to adequately plead a conspiracy, its UCL claim likewise must fail.

client left Plaintiff and paid lower commissions at ICM Partners (TAC ¶¶ 95, 97)—is procompetitive, not anticompetitive.  Thus, Plaintiff cannot be permitted to reach via the UCL procompetitive conduct that is not unlawful under the antitrust laws.

**B.     Plaintiff Fails To Allege Facts Sufficient To Plead A UCL "Unlawful" Claim**

The "unlawful" prong of the UCL "borrows" violations from other laws, and causes of action under the "unlawful" prong must be predicated upon an independent violation of law.  *Cel-Tech Commc'ns*, 20 Cal. 4th at 180.  Thus, to plead a claim under this prong, the plaintiff must allege facts sufficient to demonstrate a violation of an underlying law.  *People v. McKale*, 25 Cal. 3d 626, 635; 159 Cal. Rptr. 811, 602 P.2d 731 (1979).

Here, Plaintiff rests its UCL claim on a predicate violation of the Sherman Act, and suggests that the same conduct also violates California's Cartwright Act.  TAC ¶¶ 82-88.  As discussed herein, Plaintiff's underlying Sherman Act claim fails and thus cannot support a UCL claim.  Nor has Plaintiff adequately pleaded a predicate Cartwright Act violation sufficient to save its UCL claim.

As with the Sherman Act, to plead a violation of section 16720 of the Cartwright Act, Plaintiff must allege facts sufficient to show concerted action in the form of a contract, combination, or conspiracy.  *Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 495; 132 Cal. Rptr. 3d 660 (2011); *Biljac Assocs. v. First Interstate Bank of Or., N.A.*, 218 Cal. App. 3d 1410, 1423; 267 Cal. Rptr. 819 (1990) *overruled on other grounds by Demps v. S.F. Housing Auth.,* 149 Cal. App. 4th 564; 57 Cal. Rptr. 3d 204 (2007); *cf. Aguilar*, 25 Cal. 4th at 851-52 (importing Sherman Act conspiracy standard into Cartwright Act claim for purposes of summary judgment).  Indeed, "[s]ince the Cartwright Act and the federal Sherman Act share similar language and objectives, California courts often look to federal precedents under the Sherman Act for guidance."  *Chavez*, 93 Cal. App. 4th at 369.

1    Moreover, like the Sherman Act, the pleading standard for conspiracy under

2    the Cartwright Act also requires a "high degree of particularity."  *Compare*

3    *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 196; 91 Cal. Rptr.

4    2d 534 (1999) *with Kendall*, 518 F.3d at 1047.  A mere recitation of the elements is

5    not enough—Plaintiff must make factual allegations of specific conduct and overt

6    acts.  *Id.*; *see also Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 119; 81 Cal. Rptr.

7    592; 460 P.2d 464 (1969) ("The lack of factual allegations of specific conduct

8    directed toward furtherance of a conspiracy to eliminate or reduce competition . . .

9    renders the complaint insufficient."); *Chicago Title Ins. Co. v. Great W. Fin. Corp.*,

10   69 Cal. 2d 305, 316-17; 70 Cal. Rptr. 849; 444 P.2d 481 (1968) (superseded by

11   statute on other grounds) ("[C]ontracts, combinations or conspiracies in restraint

12   of . . . trade or commerce cannot be alleged generally in the words of the statute but

13   the facts must be set forth which indicate the existence of such contracts,

14   combinations or conspiracies.").  For the reasons described above, since Plaintiff

15   has failed to plead factual allegations sufficient to support a conspiracy amongst the

16   Agencies, Plaintiff's allegations can no more support a violation of the Cartwright

17   Act than they can a violation of Section 1 of the Sherman Act.

18   Because all of Plaintiff's underlying claims fail and Plaintiff failed to allege

19   any anticompetitive conduct, the UCL claim must be dismissed with prejudice.

20   **III.   THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM**
     **FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC**
21   **ADVANTAGE**

22   Interference often signals vigorous competition.  To protect healthy

23   competition, California has adopted the doctrine of competitor's privilege: "Perhaps

24   the most significant privilege or justification for interference with a prospective

25   business advantage is free competition."  *Della Penna v. Toyota Motor Sales,*

26   *U.S.A., Inc.*, 11 Cal. 4th 376, 389; 45 Cal. Rptr. 2d 436 (1995).  Thus, to plead a

27   claim for interference with prospective economic advantage, Plaintiff must "allege

28   an act that is wrongful independent of the interference itself."  *CRST Van*

*Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1109.

As the Court previously recognized, Plaintiff relies on the alleged Sherman Act violations to satisfy the independently wrongful act element of its interference with prospective economic advantage claim. Dkt. 43 at 10; *see also* TAC ¶ 104. Plaintiff's allegations in the TAC do nothing to save its Sherman Act claim, for the reasons discussed above; thus, the interference with prospective economic advantage claim must likewise be dismissed with prejudice.

## IV.   THE THIRD AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT

As the Court recognized, Plaintiff's interference with contract claim fails unless Plaintiff can allege facts to show that its oral agency agreements with Clients #1 and #2 were for specified terms, rather than at-will. *See* Dkt 43 at 16-18; *see also Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152; 17 Cal. Rptr. 289; 95 P.3d 513 (2004). In the TAC, Plaintiff continues to acknowledge that these agency agreements were oral, but alleges that they were not terminable at-will because the Clients were prohibited from terminating under the "90 Day Clause" contained in Rider D to the Agreement between the Association of Talent Agents and Directors Guild of America, Inc. of January 1, 1977 (as restated January 1, 2004) (the "ATA/DGA Agreement").[11]  Plaintiff's reliance upon Rider D is misplaced.

In its prior ruling, the Court never reached the applicability of Rider D and its 90 Day Clause to oral agency agreements, but rather granted the motions to dismiss because Plaintiff failed to allege the second requisite condition set forth in the

---

[11] The entire ATA/DGA Agreement, including Rider D, is attached as Exhibit A to ICM Partners' RJN. Although Plaintiff attaches Rider D as Exhibit C to the TAC, Plaintiff neglected to include the entire agreement to which Rider D is attached. Exhibit A to the RJN represents the entire agreement.

clause, specifically, that the Director must be "entitled to an amount equal to his last compensation at a pro rata equivalent to 3 weeks of service." Thus, the Court concluded that "even assuming the ATA/DGA Agreement could elevate the status of Plaintiff's contracts from at-will to term agreements, Plaintiff fails to sufficiently plead that Rider D's termination restriction would apply to Client #1's and Client #2's notices of termination." Dkt 43 at 18 (emphasis added).

The Court should grant the motion to dismiss the interference claim, this time with prejudice, because Plaintiff's TAC merely adds a conclusory statement that Client #2 obtained employment meeting the stated employment threshold, without providing any factual allegations about the alleged employment. Plaintiff continues to rely upon Client #2's employment for one episode of "Lottery" but fails to allege facts that show how this employment satisfied the "3 weeks of service" threshold.

Even had Plaintiff pled sufficient facts to satisfy both conditions addressed by the Court in its ruling, the TAC would fail to state a claim because Rider D's 90 Day Clause does not prohibit a client from terminating an oral agency agreement. Under Plaintiff's misguided interpretation, the clause would prohibit a client under an oral agency agreement from ever terminating his or her agency relationship so long as the agency provided a bona fide offer for employment in any field in which the client was represented by the agency for the equivalent of 3-week's pay. This is obviously not the purpose of or intent behind the 90 Day Clause .

Taking a step back, the purpose of the ATA/DGA Agreement is to promulgate a Code of Fair Practice which establishes minimum practices in the relationship between agents and DGA members, eliminates undesirable practices, and introduces a uniform procedure in the agency relationship. RJN Ex. A at 1. To that end, the agreement provides that Rider "D" "shall be attached to, and made a part of existing or future agency contracts between DGA members and agents . . . with respect to services to be rendered by said DGA members as Directors." *Id.*

It is clear from the plain language of Rider D's 90 Day Clause that its purpose is to provide the DGA member with the ability to terminate an unfruitful agreement with a specified term, by delivering written notice. *See id.* at 14-15 (dictating that, in the event of a fruitless relationship, "either Director or Agent may terminate the employment of Agent"). Although the ATA/DGA Agreement does not prohibit oral agency agreements, many of its protections for Directors were written in contemplation of written agency agreements having fixed terms. The ATA/DGA Agreement expressly limits the term of an initial agency agreement to two years and a renewal to three years while making clear that a Director is not required "to sign" for the maximum terms permitted. *Id.* at 1, ¶4. The ATA/DGA Agreement also includes provisions giving the Client the right to terminate the agency agreement in the event his designated representative leaves the agency (*id.* at 2-3, ¶9) or in specific agency merger situations. *Id.* at 3, ¶10. These provisions were designed to give the DGA member under a written agency agreement for a fixed term "an out" in certain situations where the relationship was unproductive or materially changed. They were never designed to prohibit a DGA member from terminating an oral agency agreement, which by its nature is at will.

Plaintiff's reliance on subparagraph (C) of the 90 Day Clause is also misplaced. Subparagraph (C) merely contains one of the "terms and provisions" for the application of the 90 Day Clause. *Id.* at 14. While the ATA/DGA Agreement is expressly limited to the representation of DGA members as Directors, subparagraph (C) provides that employment or a bona fide offer for employment in another field, such as an Executive Producer, may in certain circumstances be counted for the purpose of determining whether the Director-member can invoke the 90 Day Clause. *Id.* Therefore, if Plaintiff had a written, two-year exclusive agency contract with Client #2 for his directing services (governed by the ATA/DGA Agreement and therefore incorporating the terms contained in Rider "D"), and obtained a bona fide offer as an Executive Producer satisfying the requirements of

subparagraph (C) within the last 90 days, Client #2 would be unable to invoke the 90 Day Clause to terminate the written contract.  Here, because Plaintiff did not have a written contract with a specified term, Client #2 did not need to invoke the 90 Day Clause to terminate his relationship with Plaintiff, and whether or not specific employment qualifies under subparagraph (C) is irrelevant.

If anything, Rider D further establishes the propriety of package commissions.  Paragraph 5 of Rider D expressly recognizes packages and provides that the package agency may not charge its DGA client commissions on the same project, thereby preventing double commissions. *Id.* at 15-16.

Plaintiff's allegation that the oral agency agreement had a specified term does not change the outcome.  Beginning with the SAC, Plaintiff has alleged that its oral agency agreement with Client #2 contained an initial term of two years, followed by a two-year and multiple one-year renewal terms.  TAC ¶ 95.  This would defy common sense, but in any event, would mean the alleged agreement is unenforceable under the statute of frauds since it could not possibly be performed within a year. *Rosenthal v. Fonda*, 862 F.2d 1398, 1400-01 (9th Cir. 1988).

Thus, because Plaintiff failed to plead that the alleged contract was for a specified term rather than terminable at will, and because Plaintiff failed to plead any independently wrongful act to defeat the competitor's privilege, Plaintiff's interference with contract claim must be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, ICM Partners respectfully requests that the Court dismiss the entire TAC with prejudice.

DATED:  February 12, 2016

**PERKINS COIE LLP**

By: */s/ Michael Garfinkel*
    Michael B. Garfinkel

Attorneys for Defendants
INTERNATIONAL CREATIVE
MANAGEMENT PARTNERS, LLC